**SUPPRESSED**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

**FILED**

JUL·1 2 2017

U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

UNITED STATES OF AMERICA,              )
                                       )
        Plaintiff,                     )
                                       )
v.                                     )    No. S2-4:16-cr-00466-JAR-SPM
                                       )
MICHAEL McNEILL                        )
        a/k/a Mr. White                )
        a/k/a Todd Lockwood,           )
DONALD SCHNOCK,                        )
JOSHUA FLYNN                           )
        a/k/a Mr. Pink                 )
        a/k/a Jeff Thomas,             )
TIMOTHY MURPHY                         )
        a/k/a Mr. Black                )
        a/k/a Colby Muhlberg           )
        a/k/a Arthur Whitton,          )
ASHLEY POWELL                          )
        a/k/a Ashley Bazin             )
        a/k/a Ashley Payne             )
        a/k/a Brittany Wilson,         )
THOMAS SILHA                           )
        a/k/a Keith Henderson          )
        a/k/a Dave Marsh,              )
SHAWN CASEY                            )
        a/k/a Shawn Anderson           )
        a/k/a Daniel Arenson,          )
SCOTT SHOCKLEE                         )
        a/k/a Fredo,                   )
JENNIFER HANSEN                        )
        a/k/a Hailee Randall,          )
JASON GALLAGHER,                       )
ANDRE DEVOE,                           )
JOHN BALLEWEG                          )
        a/k/a Trent Lombardi,          )
DEAN MILLER,                           )
        a/k/a Jeffrey Wilkes           )
MICHAEL SILVER                         )
        a/k/a Michael Wright,          )
BRUCE DOLL,                            )
ANTHONY SWIANTEK,                      )
PHILIP HALE,                           )

CYBILL OSTERMAN,                     )
BRIAN PHILLIPS, and                  )
RUSSELL HIBBERT,                     )
                                     )
          Defendants.                )

## SECOND SUPERSEDING INDICTMENT

### COUNT 1
### Conspiracy to Commit Mail Fraud, Wire Fraud and Bank Fraud
### 18 U.S.C. § 1349 (18 U.S.C. §§ 1341, 1343 and 1344)

The Grand Jury charges:

1.      Beginning on or about sometime prior to April 2012, with the exact date unknown

to the Grand Jury, and continuing until on or about July 2015, with the exact date unknown to the

Grand Jury, in the Eastern District of Missouri and elsewhere,

MICHAEL McNEILL a/k/a Mr. White a/k/a Todd Lockwood,
DONALD SCHNOCK,
JOSHUA FLYNN a/k/a Mr. Pink a/k/a Jeff Thomas,
TIMOTHY MURPHY a/k/a Mr. Black a/k/a Colby Muhlberg a/k/a Arthur Whitton,
ASHLEY POWELL a/k/a Ashley Bazin a/k/a Ashley Payne a/k/a Brittany Wilson,
THOMAS SILHA a/k/a Keith Henderson a/k/a Dave Marsh,
SHAWN CASEY a/k/a Shawn Anderson a/k/a Daniel Arenson,
SCOTT SHOCKLEE a/k/a Fredo,
JENNIFER HANSEN a/k/a Hailee Randall,
JASON GALLAGHER,
ANDRE DEVOE,
JOHN BALLEWEG a/k/a Trent Lombardi,
DEAN MILLER a/k/a Jeffrey Wilkes
MICHAEL SILVER a/k/a Michael Wright,
BRUCE DOLL,
ANTHONY SWIANTEK,
PHILIP HALE,
CYBILL OSTERMAN,
BRIAN PHILLIPS, and
RUSSELL HIBBERT,

the defendants herein, and other persons known and unknown to the Grand Jury, did knowingly

and willfully combine, conspire, confederate and agree together and with each other to commit

various offenses defined in Title 18, United States Code, Part 1, Chapter 63, that is mail fraud, in

2

violation of Title 18, United States Code, Section 1341; wire fraud, in violation of Title 18, United States Code, Section 1343; and bank fraud, in violation of Title 18, United States Code, Section 1344.

2.     The allegations of Paragraphs 1 through 108 of Count 2 of this Indictment are hereby realleged and incorporated herein by reference as if fully set forth herein.

In violation of Title 18, United States Code, Section 1349 (Title 18, United States Code, Sections 1341, 1343 and 1344).

## COUNT 2
### Wire Fraud, Telemarketing, Aiding and Abetting
### 18 U.S.C. §§ 1343, 2326 and 2

The Grand Jury further charges:

## A.     INTRODUCTION AND OVERVIEW OF THE TELEMARKETING ENTERPRISE

At all times material to this Indictment:

1.     "Telemarketing" refers to a plan, program, promotion, or campaign that is conducted to induce the purchase of goods or services by the use of one or more interstate telephone calls initiated by a person who is conducting or participating in the plan, program, promotion, or campaign.

2.     The "Telemarketing Enterprise" and the defendants herein, as members of the Telemarketing Enterprise, sold "business opportunities" as part of a plan, program, promotion, and campaign related to the business of merchant processing. The Telemarketing Enterprise consisted of and utilized:

a.     multiple frontend call rooms based primarily in and around Phoenix, Arizona; frontend rooms, also known as boiler rooms, were outbound call centers where a seller

3

or employee of a seller, uses a telephone to make interstate cold calls and seeks sales of any goods or services to a consumer for an initial payment;

      b.     one and more backend rooms based in and around Phoenix, Arizona; a backend room consisted of a call center for both inbound and outbound interstate calls related to customer service, reloading, and campaign management; a backend location also typically served as the operational base for the management and administration of the Telemarketing Enterprise;

      c.     a network of individuals, agents, affiliates and nominees (and the entities and financial accounts created, and caused to be created, as part of the network) that served the Telemarketing Enterprise by supplying the frontend and backend rooms with "merchant accounts"; merchant accounts enabled the Telemarketing Enterprise to:

           i.     capture, authorize and process credit card account transactions;

           ii.     settle credit card transactions pursuant to merchant account agreements; and,

           iii.     ultimately, receive deposits from settled credit card transactions;

      d.     a series of entities, typically limited liability companies, created by, and through, nominees for the purpose of obtaining merchant accounts necessary for the Telemarketing Enterprise; the Telemarketing Enterprise's nominees and nominee companies, in turn, applied for, opened and held merchant accounts at financial institutions insured by the Federal Deposit Insurance Corporation, including, but not limited to, Wells Fargo Bank, NA, BMO Harris Bank, Synovus Bank and National Bank of California; merchant account agreements with financial institutions governed the settlement of funds generated by credit card transactions and the terms by which the accounts would operate and remain open;

4

      e.     a self-described "fulfillment" operation based initially in Utah and then in Nevada; as used by the Telemarketing Enterprise, "fulfillment" activities revolved around contesting chargebacks initiated by credit card customers of the Telemarketing Enterprise; fulfillment activities also involved managing ancillary services and products sold by the Telemarketing Enterprise, such as LLC creation and tax services;

      f.     entities created primarily for the purpose of obtaining business bank accounts for the Telemarketing Enterprise which, in turn, enabled the Telemarketing Enterprise to accept and deposit backend payments from individuals via wire transfers and mailed checks;

      g.     entities created primarily for the purpose of obtaining bank accounts used in the promotion, management and administration of the Telemarketing Enterprise; and

      h.     entities created primarily for the purpose of obtaining bank accounts used by individual members of the Telemarketing Enterprise to receive payments from the Telemarketing Enterprise.

## I.    THE SCHEME AND CONSPIRACY

3.    Beginning on or about sometime prior to April 2012, with the exact date unknown to the Grand Jury, and continuing until on or about July 2015, with the exact date unknown to the Grand Jury, in the Eastern District of Missouri and elsewhere,

MICHAEL McNEILL a/k/a Mr. White a/k/a Todd Lockwood,
DONALD SCHNOCK,
JOSHUA FLYNN a/k/a Mr. Pink a/k/a Jeff Thomas,
TIMOTHY MURPHY a/k/a Mr. Black a/k/a Colby Muhlberg a/k/a Arthur Whitton,
ASHLEY POWELL a/k/a Ashley Bazin a/k/a Ashley Payne a/k/a Brittany Wilson,
THOMAS SILHA a/k/a Keith Henderson a/k/a Dave Marsh,
SHAWN CASEY a/k/a Shawn Anderson a/k/a Daniel Arenson,
SCOTT SHOCKLEE a/k/a Fredo,
JENNIFER HANSEN a/k/a Hailee Randall,
JASON GALLAGHER,
ANDRE DEVOE,
JOHN BALLEWEG a/k/a Trent Lombardi,

DEAN MILLER a/k/a Jeffrey Wilkes
MICHAEL SILVER a/k/a Michael Wright,
BRUCE DOLL,
ANTHONY SWIANTEK,
PHILIP HALE,
CYBILL OSTERMAN,
BRIAN PHILLIPS, and
RUSSELL HIBBERT,

the defendants herein, and other persons known and unknown to the Grand Jury, devised and

intended to devise a scheme and artifice to defraud, and to obtain money and property by means

of materially false and fraudulent pretenses, representations and promises from purchasers of

"business opportunities" promoted, offered and sold as part of the Telemarketing Enterprise, and

in connection with telemarketing that victimized ten or more persons over the age of 55 and

targeted persons over the age of 55, and knowingly executed and attempted to execute a scheme

and artifice to defraud financial institutions regarding high risk merchant accounts for the

Telemarketing Enterprise, and to obtain any of the money, funds, credits, assets, securities and

property owned by, and under the custody and control of such financial institutions, by means of

materially false and fraudulent pretenses, representations, and promises.

## II.    MANNER AND MEANS OF THE SCHEME AND CONSPIRACY

4.      The purpose of the joint scheme and artifice to defraud of the defendants herein

and the conspiracy was to make unsolicited interstate telephone calls to sell goods and services

for false and fictitious "business opportunities." The represented business opportunities related

to merchant processing services. The primary function of merchant processing services is to

establish and provide merchants and businesses, such as a restaurant or store, with a processing

system to accept, validate and process credit card transactions. Yet, none of the telemarketing

entities selling business opportunities in merchant processing were actually in the business of

merchant processing. Thus, no real business opportunity existed and the telemarketing plan,

program, promotion, and campaign was, at every point of sale, a sham. Over the course of the

scheme and conspiracy, the frontend and backend rooms of the Telemarketing Enterprise

generated in excess of $20,000,000 in telemarketing sales. The Telemarketing Enterprise

targeted persons over the age of 55 and the scheme and artifice to defraud did, in fact, victimize

ten or more persons over the age of 55. This scheme and artifice to defraud and to obtain money

and property by means of materially false and fraudulent pretenses, representations, and

promises and the conspiracy was carried out by the defendants herein in the following manner:

**B.**    **ENTITIES INVOLVED IN THE SCHEME**

5.    The Telemarketing Enterprise operated under multiple business names and

utilized multiple business entities over the course of the scheme including, but not limited to, the

following: ABS Management Group; ACME Business Services, LLC; Alpha Lead Holdings,

LLC; APEX Business Development, LLC; Biz Management Pros; Biz System Now, LLC;

Canyon State Merchant Services, LLC DBA Complete Market Share; Capital Marketing Pros,

LLC; Cash Box SEO, LLC; CC Payroll Services, LLC; CM Marketing Biz, LLC; Corporate

Business Builders; Corporate Business Structure, LLC; Corporate Edge Alliance, LLC; Cyber

System Now; Digital Blog World, LLC; Direct Marketing Source, LLC; DM Business Solutions;

Dynamic Virtual Office, LLC; ENF, LLC DBA Network Market Solutions; Epic Financial

Resources; Financial Lead Brokers, LLC; Fremont Marketing Services; Fulfillment Specialists;

Global National Company, LLC;  H&R Investments DBA Biz Management Pros; H&R

Investments DBA Digital Blog World; Internet Biz System; Internet Market Master, LLC;

Market Options, LLC;  MCV Lead Holdings, LLC; M-Power Online, LLC; Premiere Portfolio

Select, LLC; Prestige Training Solutions, LLC; Quick Online Biz, LLC; RLR Enterprises, LLC;

Secured Drop, LLC; Smart Business Pros, LLC; S[ ] S[ ] Consulting, LLC, Universal Marketing

7

& Training, LLC; VMC Business Development, LLC; VMC Income, LLC; VMC Marketing

Pros, LLC; WJ Security Consulting, LLC; and WJ Staffing, LLC.

      6.     The Telemarketing Enterprise utilized multiple merchant accounts over the course

of the scheme and conspiracy.  Entities of the Telemarketing Enterprise with merchant accounts

included the following:

| Merchant account(s) in use on and after | Merchant Account name | Represented Merchant Location | Primary use by Telemarketing Enterprise |
|---|---|---|---|
| April, 2012 | ENF, LLC DBA Network Market Solutions | Phoenix, AZ | backend sales |
| April, 2012 | Universal Marketing & Training, LLC | Glendale, AZ | frontend sales |
| September, 2012 | Canyon State Merchant Services LLC, DBA Complete Market Share | Phoenix, AZ | backend sales |
| October, 2012 | Epic Financial Resources | Bluffdale, UT | frontend and/or backend sales |
| January, 2013 | Fremont Marketing Services | Phoenix, AZ | backend sales |
| April, 2013 | DM Business Solutions | Phoenix, AZ | frontend and/or backend sales |
| May, 2013 | Direct Marketing Source, LLC | Salt Lake City, Utah | frontend and/or backend sales |
| June, 2013 | H&R Investments DBA Biz Management Pros | Parker, CO | frontend and/or backend sales |
| June, 2013 | H&R Investments DBA Digital Blog World | Parker, CO | frontend and/or backend sales |
| August, 2013 | Quick Online Biz, LLC | Henderson, NV | Frontend and/or backend sales |
| January, 2014 | Biz System Now, LLC | Marshalltown, IA | frontend and/or backend sales |
| March, 2014 | Cyber System Now | Derby, KS | Frontend and/or backend sales |
| June, 2014 | Internet Biz System | Las Vegas, NV | frontend and/or backend sales |
| July, 2014 | Internet Market Master, LLC www.InternetMarketMaster.net | Pembroke Pines, FL | frontend and/or backend sales |

| July, 2014 | Smart Business Pros, LLC www.SmartBusinessPros.net | Warson Woods, MO (St. Louis, MO) | frontend and/or backend sales |
| September, 2014 | Cash Box SEO, LLC | Torrance, CA | backend sales |
| February, 2015 | Global National Company, LLC www.GlobalNational.net | San Jose, CA | frontend and/or backend sales |
| March, 2015 | Capital Marketing Pros, LLC www.CapitalMarketingPros.net | West Hollywood, CA | frontend and/or backend sales |

7.    The Telemarketing Enterprise utilized multiple business bank accounts over the course of the scheme and conspiracy.  Bank accounts utilized by the Telemarketing Enterprise include the following:

| Beginning Date in Use (on or before) | Name on Account | Account | State Opened in | Credit Card Deposits | Wire and/or Check Deposits |
|---|---|---|---|---|---|
| April, 2012 | ENF, LLC | Midfirst Bank Acct. #xxx3426 | AZ | X | X |
| April, 2012 | ENF, LLC | Midfirst Bank Acct. #xxx3434 | AZ | X | X |
| April, 2012 | Universal Marketing & Training, LLC- "Drop Account" | Bank of America Acct. #xxx6573 | AZ | X | |
| April, 2012 | Universal Marketing & Training, LLC- "Operations Account" | Bank of America Acct. #xxx6560 | AZ | | |
| April, 2012 | Universal Marketing & Training, LLC- "Savings Account" | Bank of America Acct. #xxx4208 | AZ | | |
| May, 2012 | ENF, LLC- Drop Account | Bank of America Acct. #xxx6939 | AZ | X | |
| May, 2012 | ENF, LLC- Operations | Bank of America Acct. #xxx6955 | AZ | | X |

| Beginning Date in Use (on or before) | Name on Account | Account | State Opened in | Credit Card Deposits | Wire and/or Check Deposits |
|---|---|---|---|---|---|
| May, 2012 | ENF, LLC-Savings | Bank of America Acct. #xxx6968 | AZ | | X |
| September, 2012 | Canyon State Merchant Services, LLC | Bank of America Acct. #xxx1595 | AZ | X | |
| September, 2012 | Canyon State Merchant Services, LLC | Bank of America Acct. #xxx7782 | AZ | | X |
| September, 2012 | Canyon State Merchant Services, LLC | Bank of America Acct. #xxx8728 | AZ | | |
| October, 2012 | Epic Financial Resources | JPMorgan Chase Acct. #xxx0960 | UT | X | |
| November, 2012 | Epic Financial Resources | JPMorgan Chase Acct. #xxx0900 | UT | | |
| December, 2012 | Fremont Marketing Services, LLC | Bank of America Acct. #xxx0834 | AZ | X | X |
| December, 2012 | Fremont Marketing Services, LLC | Bank of America Acct. #xxx0847 | AZ | | |
| December, 2012 | Fremont Marketing Services, LLC | Bank of America Acct. #xxx0850 | AZ | | |
| February, 2013 | Epic Financial Resources | JPMorgan Chase Acct. #xxx3961 | UT | X | |
| February, 2013 | Amerify LTD, DBA Digital Blog World | JPMorgan Chase Acct. #xxx0817 | NV | X | |
| February, 2013 | S[ ] S [ ] Consulting | Bank of America Acct. #xxx6390 | AZ | | |
| March, 2013 | DM Business Solutions | JPMorgan Chase Acct. #xxx7849 | AZ | | |
| March, 2013 | DM Business Solutions | JPMorgan Chase Acct. #xxx5306 | AZ | X | X |
| April, 2013 | WJ Security Consulting, LLC | Wells Fargo Bank Acct. #xxx9598 | AZ | | X |
| April, 2013 | Direct Marketing Source, LLC | Wells Fargo Bank Acct. #xxx0870 | VT | X | X |

| Beginning Date in Use (on or before) | Name on Account | Account | State Opened in | Credit Card Deposits | Wire and/or Check Deposits |
|---|---|---|---|---|---|
| May, 2013 | DM Business Solutions | Midfirst Bank Acct. #xxx5085 | AZ | | X |
| August, 2013 | WJ Staffing, LLC | Wells Fargo Bank Acct. #xxx4308 | AZ | | |
| August, 2013 | WJ Staffing, LLC | Wells Fargo Bank Acct. #xxx8968 | AZ | | |
| September, 2013 | RLR Enterprises, LLC | Bank of America Acct. #xxx9920 | AZ | | X |
| October, 2013 | Fulfillment Specialists, LLC | JPMorgan Chase Acct. #xxx3586 | NV | | |
| October, 2013 | RLR Enterprises, LLC | Wells Fargo Bank Acct. #xxx8624 | AZ | | X |
| October, 2013 | RLR Enterprises, LLC | Wells Fargo Bank Acct. #xxx8533 | AZ | | X |
| November, 2013 | Biz System Now, LLC | Wells Fargo Bank Acct. #xxx8343 | IA | X | |
| November, 2013 | H&R Investments, LLC (Biz Management Pros & 4Business Power) | Wells Fargo Bank Acct. #xxx7846 | CO | X | |
| November, 2013 | H&R Investments, LLC (Biz Management Pros) | Wells Fargo Bank Acct. #xxx7853 | CO | X | |
| December, 2013 | Corporate Business Structure, LLC | Wells Fargo Bank Acct. #xxx9805 | AZ | X | |
| December, 2013 | Quick Online Biz, LLC | Wells Fargo Bank Acct. #xxx2337 | AZ | X | |
| December, 2013 | Corporate Business Structure, LLC | Wells Fargo Bank Acct. #xxx4341 | AZ | | |
| December, 2013 | Quick Online Biz, LLC | Wells Fargo Bank Acct. #xxx9649 | AZ | | |

| Beginning Date in Use (on or before) | Name on Account | Account | State Opened in | Credit Card Deposits | Wire and/or Check Deposits |
|---|---|---|---|---|---|
| January, 2014 | Cyber Systems Now, LLC | Wells Fargo Bank Acct. #xxx1646 | KS | X | |
| January, 2014 | Biz System Now, LLC | Wells Fargo Bank Acct. #xxx2469 | IA | | |
| January, 2014 | PCWJ Staffing, LLC | Wells Fargo Bank Acct. #xxx7565 | DE | | |
| February, 2014 | ABS Management Group | Bank of America Acct. #xxx2776 | MO | X | |
| March, 2014 | Financial Lead Brokers, LLC | Bank of America Acct. #xxx0942 | NM | | X |
| March, 2014 | Financial Lead Brokers, LLC | Wells Fargo Bank Acct. #xxx1520 | NM | | X |
| April, 2014 | Quick Online Biz, LLC | Wells Fargo Bank Acct. #xxx8628 | NV | X | |
| April, 2014 | Quick Online Biz, LLC | Wells Fargo Bank Acct. #xxx2931 | NV | X | |
| April, 2014 | Biz System Now, LLC | Wells Fargo Bank Acct. #xxx9045 | IA | | |
| May, 2014 | ABS Management Group | Bank of America Acct. #xxx3381 | MO | | |
| May, 2014 | ABS Management Group | Bank of America Acct. #xxx3394 | MO | | |
| May, 2014 | CC Payroll Services, LLC | Wells Fargo Bank Acct. #xxx3554 | AZ | | |
| May, 2014 | Secured Drop, LLC | Wells Fargo Bank Acct. #xxx4958 | CA | | X |
| June, 2014 | Corporate Business Structure, LLC | Wells Fargo Bank Acct. #xxx7317 | AZ | X | |
| June, 2014 | Internetbizsystem.com | Wells Fargo Bank Acct. #xxx7663 | CA | X | X |
| June, 2014 | Internet Market Masters, LLC | Wells Fargo Bank Acct. #xxx2084 | FL | X | X |
| July, 2014 | Biz System Now, LLC | Wells Fargo Bank Acct. #xxx0702 | IA | X | |
| July, 2014 | Cyber Systems Now, LLC | Wells Fargo Bank Acct. #xxx7043 | KS | X | |

| Beginning Date in Use (on or before) | Name on Account | Account | State Opened in | Credit Card Deposits | Wire and/or Check Deposits |
|---|---|---|---|---|---|
| July, 2014 | Cyber Systems Now, LLC | Bank of America Acct. #xxx6569 | KS | X | |
| July, 2014 | Smart Business Pros, LLC | US Bank Acct. #xxx5401 | MO | X | |
| July, 2014 | Cyber Systems Now, LLC | Bank of America Acct. #xxx3054 | KS | | |
| July, 2014 | Internet Market Masters, LLC | Wells Fargo Bank Acct. #xxx9764 | FL | | |
| July, 2014 | Smart Business Pros, LLC | US Bank Acct. #xxx4842 | MO | | |
| July, 2014 | Internet Market Masters, LLC | Wells Fargo Bank Acct. #xxx9772 | FL | | |
| July, 2014 | ACME Business Services, LLC. | Wells Fargo Bank Acct. #xxx6644 | AZ | | X |
| July, 2014 | Smart Business Pros, LLC | US Bank Acct. #xxx4859 | MO | | X |
| August, 2014 | Cash Box SEO, LLC | Wells Fargo Bank Acct. #xxx5141 | CA | X | |
| August, 2014 | Cash Box SEO, LLC | Wells Fargo Bank Acct. #xxx5166 | CA | | X |
| August, 2014 | Cash Box SEO, LLC | Wells Fargo Bank Acct. #xxx5158 | CA | | |
| September, 2014 | APEX Business Development, LLC | Bank of America Acct. #xxx7690 | MO | | |
| September, 2014 | APEX Business Development, LLC | Bank of America Acct. #xxx7700 | MO | | |
| October, 2014 | Capital Marketing Pros, LLC | Wells Fargo Bank Acct. #xxx8454 | CA | X | |
| October, 2014 | VMC Business Development, LLC | Bank of America Acct. #xxx4270 | NV | X | |
| October, 2014 | Internet Market Masters, LLC | Bank of America Acct. #xxx2760 | FL | X | X |
| October, 2014 | H&R Investments, LLC (Biz | Wells Fargo Bank Acct. #xxx8729 | CO | X | |

| Beginning Date in Use (on or before) | Name on Account | Account | State Opened in | Credit Card Deposits | Wire and/or Check Deposits |
|---|---|---|---|---|---|
| | Management Pros) | | | | |
| October, 2014 | Capital Marketing Pros, LLC | Wells Fargo Bank Acct. #xxx0768 | CA | | |
| October, 2014 | VMC Business Development, LLC | Bank of America Acct. #xxx4267 | NV | | |
| October, 2014 | Capital Marketing Pros, LLC | Wells Fargo Bank Acct. #xxx0743 | CA | | |
| November, 2014 | Corporate Business Structure, LLC | Wells Fargo Bank Acct. #xxx7005 | AZ | | |
| December, 2014 | Global National Company, LLC | Bank of America Acct. #xxx4261 | CA | X | |
| December, 2014 | MCV Lead Holdings, LLC | Wells Fargo Bank Acct. #xxx7003 | AZ | | |
| December, 2014 | MCV Lead Holdings, LLC | Bank of America Acct. #xxx0793 | AZ | | |
| December, 2014 | Global National Company, LLC | Bank of America Acct. #xxx4274 | CA | | |
| December, 2014 | MCV Lead Holdings, LLC | Wells Fargo Bank Acct. #xxx7011 | AZ | | X |
| December, 2014 | MCV Lead Holdings, LLC | Bank of America Acct. #xxx0780 | AZ | | X |
| January, 2015 | Alpha Lead Holdings, LLC | Wells Fargo Bank Acct. #xxx6673 | AZ | | X |
| February, 2015 | Alpha Lead Holdings, LLC | Bank of America Acct. #xxx7178 | AZ | | X |
| March, 2015 | Cash Box SEO, LLC | Wells Fargo Bank Acct. #xxx3938 | CA | | |

## C.    DEFENDANTS AND THEIR ROLES IN THE SCHEME

8.    Beginning sometime prior to January 2013, with the exact date unknown to the Grand Jury, and continuing until on or about July 2015, defendant Michael McNeill, with one or more partners, owned, led, directed, controlled and managed the Telemarketing Enterprise

14

including, but not limited to, the Telemarketing Enterprise's "frontend" and "backend" rooms. Beginning sometime prior to April 2012, with the exact date unknown to the Grand Jury, and continuing until sometime after November 2012, defendant McNeill was a "Reloader" for one or more backend room of the Telemarketing Enterprise. As a Reloader, defendant McNeill was responsible for upselling and reloading by selling individuals "leads" for their business opportunity. Defendant McNeill also trained one or more Reloaders for the Telemarketing Enterprise. Bank accounts opened and used by defendant McNeill for the Telemarketing Enterprise included one or more bank accounts opened under the names LMFAO, LLC and Wilkinson Construction, LLC. Bank accounts controlled by defendant McNeill for the Telemarketing Enterprise through an associate included one or more bank accounts opened under the names Canyon State Merchant Services, LLC; Fremont Marketing Services; DM Business Solutions; and S[ ] S[ ] Consulting, LLC. Names used by defendant McNeill for the Telemarketing Enterprise included "Mr. White" and "Todd Lockwood."

9.     Beginning sometime prior to April 2012, with the exact date unknown to the Grand Jury, and continuing until sometime after July 2013, with the exact date unknown to the Grand Jury, defendant Donald Schnock, with one or more partners, including defendant Michael McNeill, owned, led, directed, controlled and managed the Telemarketing Enterprise including, but not limited to, the Telemarketing Enterprise's "frontend" and "backend" rooms. Bank accounts opened and used by defendant Schnock for the Telemarketing Enterprise included one or more bank accounts opened under the name 4 Group Holdings, LLC.

10.     Beginning sometime in 2013 and continuing until on or about July 2015, defendant Joshua Flynn, with one or more partners, including defendant Michael McNeill, owned, led, directed, controlled and managed the Telemarketing Enterprise including, but not

15

limited to, the Telemarketing Enterprise's "frontend" and "backend" rooms.  Defendant Flynn

was, as of September 24, 2013, subject to a judicial order issued in the State of Arizona

prohibiting his involvement in telemarketing activities, specifically, a stipulated consent

judgment entered in Maricopa County Superior Court, Civil Case number CV2013-012700.

Names used for the Telemarketing Enterprise by defendant Flynn included "Mr. Pink" and "Jeff

Thomas."

      11.     Beginning sometime in 2013 and continuing until on or about July 2015,

defendant Timothy Murphy managed and directed the Telemarketing Enterprise including, but

not limited to, the Telemarketing Enterprise's "frontend" and "backend" rooms.  Defendant

Murphy also had day-to-day responsibilities overseeing and directing the financial transactions

of the Telemarketing Enterprise including, but not limited to, establishing and managing

financial accounts, including bank and merchant accounts, utilized by the Telemarketing

Enterprise.  Names used by defendant Murphy for the Telemarketing Enterprise included "Mr.

Black," "Colby Muhlberg" and "Arthur Whitton."

      12.     Beginning sometime in 2012, with the exact date unknown to the Grand Jury, and

continuing until on or about July 2015, defendant Ashley Powell managed and administered day-

to-day operations of the backend rooms of the Telemarketing Enterprise.  Defendant Powell's

responsibilities included managing Reloader appointments, "docking" Reloader calls, finalizing

frontend and backend transactions, and communicating with customers of the Telemarketing

Enterprise.  Names used by defendant Powell for the Telemarketing Enterprise included

"Brittany Wilson" and "Mary."  Bank accounts used by defendant Powell for the Telemarketing

Enterprise included one or more bank accounts opened under the name NLV Construction.

13.     Beginning sometime in 2013 and continuing until July 2015, defendant Thomas Silha was a "Campaign Manager" for the backend rooms of the Telemarketing Enterprise.  As a Campaign Manager for the backend rooms, defendant Silha provided those individuals who purchased leads from the Telemarketing Enterprise post-sale updates on their business opportunity, including information on the status of their leads and future commissions. Names used by defendant Silha for the Telemarketing Enterprise included "Keith Henderson" and "Dave Marsh."

14.     Beginning sometime prior to January 2014, and continuing until on or about July 2015, defendant Shawn Casey was a Reloader for the backend rooms of the Telemarketing Enterprise.  As a Reloader, defendant Casey was responsible for upselling and reloading by selling individuals "leads" for their business opportunity.   Names used by defendant Casey for the Telemarketing Enterprise included "Shawn Anderson" and "Daniel Arenson."

15.     Beginning sometime in 2014, with the exact date unknown to the Grand Jury, and continuing until on or about July 2015, defendant Scott Shocklee managed, directly and indirectly, Telemarketing Enterprise's frontend room operations and personnel.  Defendant Shocklee also supervised individual frontend room managers.  Defendant Shocklee was also responsible for accompanying individuals and overseeing the execution and delivery of certain high-dollar financial transactions for the backend room managers and owners.  Defendant Shocklee was, as of April 11, 2014, subject to an "Assurance of Discontinuance" issued in the State of Arizona prohibiting his involvement in telemarketing activities, specifically, an agreement entered in Maricopa County Superior Court, Civil Case number CV2014-006859. Names used by defendant Shocklee for the Telemarketing Enterprise included "Fredo."

17

16.     Beginning sometime in 2013 and continuing until July 2015, defendant Jennifer Hansen was a backend room administrator responsible for day-to-day operations of the Telemarketing Enterprise including, but not limited to, accounting and assisting with coordinating frontend, backend and "fulfillment" operations related to chargebacks.  Names used by defendant Hansen for the Telemarketing Enterprise included "Hailee Randall."  Defendant Hansen was a signatory on one or more accounts in the name of RLR Enterprises, LLC.

17.     Beginning sometime prior to April 2012, with the exact date unknown to the Grand Jury, and continuing until on or after January 2013, defendant Jason Gallagher managed one or more backend rooms of the Telemarketing Enterprise including one or more backend rooms where defendant McNeill was a "Reloader."  Bank accounts used by defendant Gallagher for the Telemarketing Enterprise included one or more bank accounts opened under the name CJJC Inc.

18.     Beginning sometime in 2013, with the exact date unknown to the Grand Jury, and continuing until on or about July 2015, defendant Andre Devoe was a senior frontend room manager for the Telemarketing Enterprise with responsibilities over Rollers, Closers, and transferring deals from his frontend room to the backend room.  Defendant Devoe's responsibilities included the day-to-day operations of his frontend call room.  These responsibilities included managing the call room, keeping employees on task and on script, and hiring and firing employees.  Defendant Devoe's ultimate responsibility was to ensure his frontend room generated viable deals, also known as "paper" for reload by the backend.  Defendant Devoe's responsibilities included supervising one or more frontend managers.  Prior to 2013, defendant Devoe was a Roller and a Closer for the Telemarketing Enterprise.  Bank

18

accounts used by defendant Devoe for the Telemarketing Enterprise included one or more bank accounts opened under the name AD Consulting Services.

19.    Beginning on or about 2013 and continuing until on or about July 2015, defendant John Balleweg was a frontend room manager for the Telemarketing Enterprise with responsibilities over Rollers, Closers, and transferring deals from his frontend room to the backend room.  Defendant Balleweg was responsible for his frontend call room's day-to-day operations, which included, but was not limited to, managing the call room, keeping employees on task and on script, and hiring and firing employees. Defendant Balleweg's ultimate responsibility was to ensure his frontend room generated viable deals for reload by the backend. Defendant Balleweg was responsible for supervising one or more frontend managers.  Names used by defendant Balleweg for the Telemarketing Enterprise included "Trent Lombardi."

20.    Beginning on or about 2013 and continuing until on or about July 2015, defendant Dean Miller was a frontend room manager for the telemarketing operation with responsibilities over Rollers, Closers, and transferring deals from his frontend room to the backend room. Defendant Miller was responsible for his frontend call room's day-to-day operations, which included, but was not limited to, managing the call room, keeping employees on task and on script, and hiring and firing employees.  Defendant Miller's ultimate responsibility was to ensure his frontend room generated viable deals for reload by the backend. Names used by defendant Miller for the Telemarketing Enterprise included "Jeffrey Wilkes."

21.    Beginning in 2014 and continuing until on or about July 2015, defendant Michael Silver was a frontend room manager for the telemarketing operation with responsibilities over Rollers, Closers, and transferring deals from his frontend room to the backend room.  Defendant Silver was responsible for his frontend call room's day-to-day operations, which included, but

19

was not limited to, managing the call room, keeping employees on task and on script, and hiring and firing employees. Defendant Silver's ultimate responsibility was to ensure his frontend room generated viable deals for reload by the backend. Prior to 2014, Silver was a Roller and a Closer for the Telemarketing Enterprise. Names used by defendant Silver for the Telemarketing Enterprise included "Michael Wright."

22.     Beginning sometime in 2013, with the exact date unknown to the Grand Jury, and continuing until on or about July 2015, defendant Bruce Doll, with one or more partners, owned, led, directed, controlled and managed the Telemarketing Enterprise including, but not limited to, the Telemarketing Enterprise's "fulfillment" operation. The primary responsibility of the fulfillment operation was to contest and win chargebacks for the Telemarketing Enterprise. Defendant Doll's company, "Fulfillment Specialists," was the entity that contested chargebacks and did so under Doll's direction and supervision. Defendant Doll's responsibilities for the Telemarketing Enterprise extended to activities necessary for obtaining merchant accounts such as recruiting nominees and communicating with agents involved in merchant processing.

23.     Beginning sometime in 2013, with the exact date unknown to the Grand Jury, and continuing until on or about July 2015, defendant Anthony Swiantek obtained merchant accounts for the Telemarketing Enterprise and recruited and directed nominees who also obtained or attempted to obtain merchant accounts for the Telemarketing Enterprise. In addition, defendant Swiantek, with one or more partners, owned a frontend room of the Telemarketing Enterprise that, while operational for a limited period of time, did generate frontend deals for the Telemarketing Enterprise. Defendant Devoe, and others, managed this particular frontend room.

24.     Beginning sometime in 2014, with the exact date unknown to the Grand Jury, and continuing until on or about July 2015, defendant Philip Hale, a resident of the Eastern District

of Missouri, was the named owner and fictitious manager of Smart Business Pros, LLC, an entity

created for the Telemarketing Enterprise.  Defendant Hale opened the associated business and

merchant accounts of Smart Business Pros, LLC.  Defendant Hale also executed one or more

merchant account applications in the name of Smart Business Pros, LLC.  Defendant Hale also

recruited and attempted to recruit other merchant account nominees for the Telemarketing

Enterprise.

   25. Beginning sometime prior to 2014, with the exact date unknown to the Grand

Jury, and continuing until on or about July 2015, defendant Cybill Osterman was the named

owner of CC Payroll Services, LLC and the associated bank accounts of CC Payroll Services,

LLC.  Defendant Osterman conducted financial transactions for the Telemarketing Enterprise

and did so at the direction of defendant Murphy and others.

   26. Beginning sometime in 2014, with the exact date unknown to the Grand Jury, and

continuing until on or about July 2015, defendant Brian Phillips was the named owner of ACME

Business Services, LLC and the associated bank accounts of ACME Business Services, LLC.

Defendant Phillips conducted financial transactions for the Telemarketing Enterprise and did so

at the direction of defendant Murphy and others.

   27. Beginning sometime in 2013, with the exact date unknown to the Grand Jury, and

continuing until on or about July 2015, defendant Russell Hibbert, Vice President of MiCamp

Solutions, obtained, and sought to obtain, merchant accounts for the telemarketing enterprise by

and through multiple agent and sub-agent relationships within the high risk merchant processing

industry.  Defendant Hibbert's responsibilities included communicating with agents and sub-

agents for financial institutions regarding underwriting and risk associated with a series of

merchant accounts applied for and/or used by the Telemarketing Enterprise.  In addition,

beginning sometime on or about January 2015, defendant Hibbert established and directed a partnership between the Telemarketing Enterprise and Sprout Financial, an affiliated company of MiCamp Solutions.  As directed by defendant Hibbert and others, Sprout Financial provided "financing and credit consulting services" to individuals referred to Sprout Financial by the Telemarketing Enterprise.

**D.      OPERATION OF THE TELEMARKETING ENTERPRISE**

28.      It was part of the joint scheme and artifice to defraud and the conspiracy that the defendants herein represented that they were offering business opportunities that would generate additional income for individuals when, in fact, they knew that business opportunities sold by the frontend and backend rooms of the Telemarketing Enterprise were false and fictitious and there was no real opportunity for the individual to make additional income in the manner represented.

29.      It was further part of the scheme to defraud and the conspiracy that the defendants herein falsely represented they were with, connected to, contracting with or otherwise affiliated with MasterCard, Visa and FDIC insured banks when, in fact, they were not.

30.      It was further part of the scheme to defraud and the conspiracy that the defendants represented to individuals that by becoming "referral agents" and/or by purchasing "leads" they could generate income from the business opportunity when, in fact, a "referral agent" was a meaningless designation.  There was no legitimate entity connected to the Telemarketing Enterprise to refer business to.  Moreover, the "leads" sold were fictitious and not as represented. Thus, there was no mechanism or opportunity within the Telemarketing Enterprise by which a lead purchased from the Telemarketing Enterprise could possibly generate a commission or be turned into income as represented.

31.     It was further part of the scheme to defraud and the conspiracy that the Telemarketing Enterprise was designed to conceal the nature of their operation and the identities of individuals involved in the enterprise, including the involvement of the defendants herein. The Telemarketing Enterprise was able to conceal the nature of the Telemarketing Enterprise and those individuals in control of the enterprise by:

a.      creating a series of entities with no public or disclosed connection to an overarching Telemarketing Enterprise or apparent relationship to past and future entities of the Telemarketing Enterprise;

b.      using said entities to open bank and merchant accounts for the Telemarketing Enterprise in a manner designed not to reveal the nature of the business, the risks associated with the accounts, and the individuals directing, controlling and benefiting from the transactions engaged in by those entities;

c.      using false individual identities in telephone communications with individuals;

d.      using aliases within the telemarketing enterprise and with third parties;

e.      using fictitious and misleading business addresses in communications and on sales documents, such as invoices, and other documents provided to individuals and third parties including, but not limited to, banks;

f.      using telephone numbers, including "customer service" numbers, which would only be in service or otherwise answered for a limited period of time; and

g.      using a self-described fulfillment operation to contest merchant account chargebacks initiated by customers in a manner designed to further conceal and mislead individuals, banks and other third parties regarding the nature, operation and extent of the

Telemarketing Enterprise as well as the products and services sold by the Telemarketing Enterprise.

**The Frontend Pitch**

32.     It was further part of the scheme and conspiracy that the defendants, as part of the Telemarketing Enterprise, employed multiple frontend call rooms.  A frontend call room consisted of "Rollers," "Closers," and a "Manager."

33.     Typically, the scheme and the execution of the scheme would begin with an initial telemarketing cold-call to an individual from a frontend call room location; the initial call would be made by a "Roller."  Rollers were responsible for making the initial interstate telephone solicitation and would work from a script provided by the frontend Manager.  Rollers would make numerous interstate phone calls on a daily basis from phone numbers generated from a leads list or auto dialer.

34.     The frontend Rollers of the Telemarketing Enterprise typically utilized a common script.  Beginning sometime on or before 2015, the title of the common script was: "BAD ASS OPENING SCRIPT!!!"  At the beginning of the call, the Roller, typically using a name other than their own, would identify the company they represented.  While the company name would change frequently over the course of the scheme, the script used by the frontend rooms would essentially remain the same.

35.     Thus, as part of the Telemarketing Enterprise, a frontend room interstate telephone call from a Roller would typically begin as follows:

HELLO _____, MY NAME IS _____, AND I'M
CALLING FROM, _____WITH VISA & MASTERCARD.

THE REASON FOR THE CALL IS THAT WE RECENTLY HAD AN AGENT
REFERRAL POSITION BECOME AVAILABLE IN YOUR AREA AND

24

> YOUR NAME CAME ACROSS MY DESK AS A PERSON INTERESTED IN
> GENERATING ADDITIONAL INCOME.

36.     After confirming the individual was interested in generating additional income,

the Roller would attempt to gain information from the individual regarding their finances.

Typically, the Roller would make such inquiries as:

> WHAT DO YOU CURRENTLY DO FOR A LIVING?  RETIRED?  HOW
> LONG?  AND WHAT DID YOU DO PRIOR TO RETIREMENT?
>
> NOW, OUT OF THE 4 MAJOR CREDIT CARDS, WHICH ONE GIVES YOU
> THE BEST REWARDS, PERSONALLY I LOVE MY DISCOVER
>
> OKAY, IF I WERE TO WRITE YOU A CHECK TODAY TO ELIMINATE
> ALL OF YOUR CREDIT CARD DEBT, HOW MUCH WOULD THAT CHECK
> BE FOR?  HOW MANY OF YOUR CARDS IS THAT DEBT ON?
>
> THE REASON YOU'VE BEEN SELECTED IS . . . OUR RECORDS
> INDICATE YOU NORMALLY USE LESS THAN HALF OF YOUR
> AVAILABLE CREDIT.  IS THAT STILL THE CASE?
>
> IF YES – THEN YOU HAVE AT LEAST $_____ AVAILABLE NOW,
> CORRECT?

37.     The Roller would generally describe the business opportunity being sold as an

opportunity in merchant processing.

38.     After playing a short audio presentation regarding the business opportunity, the

initial frontend call would transition to efforts to close the frontend deal.  After the audio

presentation, the "Roller" would turn the call over to a "Closer."

39.     The frontend Closer would also use a common script.  Beginning sometime on or

before 2015, the title of the Closer's script was: "BAD ASS CLOSING SCRIPT!!!"

40.     The Closer was responsible for persuading the individual to become a Referral

Agent and purchase goods and services for the merchant processing business opportunity.

25

41.     The Closer, typically using a name other than their own, would typically represent to the individual that he or she was a recruiting director with, or for, Visa and/or MasterCard or a recruiting director with, or for, an affiliate of Visa and/or MasterCard. The Closer would then go on to explain the business opportunity to the individual by representing that:

a.     A Referral Agent is someone that refers business names and their contact information to the Closer's company. The Closer's company would then contact those businesses and offer them a lower processing rate on their credit card transactions;

b.     A Referral Agent would then get paid commissions on every referral that the Closer's company signed up. Referral agent commissions were related to credit card terminals, cash advance loans, and/or processing fees;

c.     As part of the Business opportunity, the Referral Agent would be assigned a "Business Development Manager." The Business Development Manager would, in a future call, explain the entire business with an emphasis on the first 60 days of the business and generating commissions; and

d.     The Business Development Manager was an experienced individual and trained by Visa/MasterCard/Discover/American Express and that listening to the Business Development Manager was the "easiest way to make a ton of cash."

42.     As part of the frontend call, and consistent with the Closer script, the Telemarketing Enterprise required and caused an individual to pay a set-up fee in order to become a Referral Agent and pursue the business opportunity.

43.     Typically, the Closer would represent some variation on the following to solicit the set-up fee and close the frontend deal:

SO HERE'S HOW IT WORKS, THE SET UP FEE IS NORMALLY $1,499,
BUT I AM GOING TO SHOW YOU HOW TO SAVE A BUNCH OF MONEY

26

AND I'M GOING TO SHOW YOU HOW YOU CAN GET SET UP WITH
ZERO OUT OF POCKET COST. VISA/MASTERCARD WILL BACK YOU
TO GET THE BUSINESS STARTED. WE'LL SIMPLY LEVERAGE THE
COST OF THE BUSINESS USING ONE OF YOUR CREDIT CARDS. VISA
AND MASTERCARD HAVE A DEAL TODAY ONLY FOR $695.00 WHERE
THEY PAY OVER $800 OF YOUR $1499.

## The Transition from the Frontend Pitch to the Backend Reload

44.      As part of the Telemarketing Enterprise, it was further part of the joint scheme

and artifice to defraud that closed frontend deals were transitioned and transferred to the backend

rooms for upselling and reloading. Upon completion of a frontend pitch and a closed sale,

backend room administrators would:

>      a.      prepare and deliver invoices;

>      b.      engage in customer service calls;

>      c.      initiate and process credit card information and charges;

>      d.      facilitate the execution of certain documents via couriers, emails, faxes

and EchoSign. EchoSign is a web-based program that enables its customers to prepare contracts

and documents that can be signed electronically via email;

>      e.      create and assign an individual Referral Agent number; create and

maintain an on-line dashboard specific to the individual Referral Agent; provide passcode and

login information to the Referral Agent for their dashboard;

>      f.      ensure that frontend room Managers turn over the deals from their

individual rooms to the backend room for the purpose of upselling and reloading;

>      g.      conduct follow-up calls and schedule appointments for the purpose of

upselling and reloading; and

>      h.      collect and process payroll information for the frontend rooms of the

Telemarketing Enterprise.

**Upselling and Reloading Based on the Sale of Leads**

45.     It was further part of the scheme and conspiracy that the Telemarketing Enterprise would employ backend room personnel for the purpose of upselling and reloading.  Typically, upon receipt of a frontend deal, an administrator for the backend room would make an appointment for the individual Referral Agent to speak with their Business Development Manager (sometimes referred to as a "coach").  The Business Development Manager would be a "Reloader" for the Telemarketing Enterprise.

46.     The objective of a "Reloader" was to re-contact individuals who had previously purchased goods and/or services as a result of the frontend pitch.  The Referral Agent, who had already committed funds to this business opportunity, would be told by their Business Development Manager (the Reloader) that they were unlikely to make additional income pursuing the business on their own and would want, and need, to purchase "leads" to make money at their new business.

47.     Thus, the purpose of the backend call with the Reloader was to reload or upsell the individual by persuading the individual to purchase "leads" through one or more entities of the Telemarketing Enterprise.

48.     Prior to the call, the Business Development Manager's assistant, an administrator for the Telemarketing Enterprise, would ask the individual background questions to determine the individual's financial position with the objective of determining a target amount for the sale.

49.     The Reloader would typically confirm and build on that financial background information before beginning the reload pitch.  The Reloader would seek to determine and confirm information such as:  whether the individual was retired or not; the financial portfolio of the individual including the extent of funds held in saving accounts, funds held in investment

28

and/or retirement accounts, and available credit on credit card accounts; the individual's average monthly income; and the individual's average monthly expenses.

50.     As part of the scheme and artifice to defraud and conspiracy, the backend Reloader would typically and falsely represent:

a.     that he presently had a large number of referral agents currently working under his direction and that those referral agents were presently making monthly commissions under his directions and guidance.  Typically, the Reloader would falsely represent that the range of commission was between $2,000 and 30,000 a month;

b.     that, as the Referral Agent's Business Manager, he had a way for the individual's new business opportunity to succeed and it would not take any of the individual's time, effort, energy, and/or knowledge, but it would require a financial investment.  The Reloader would then identify a specific investment amount and state that it would be used to purchase "leads."  The investment amount initially identified by the Reloader was not tied to any real business cost or projection.  Instead, the identified investment amount was based purely upon the funds the Reloader and the Telemarketing Enterprise determined the individual had access to or could potentially have access to;

c.     that the individual's return on their investment would be quick and enable the individual to pay themselves back in a short time based upon the commissions they would receive in the first 60 days; and

d.     that the return on investment would include residual income for the next 60 months.

51.     Throughout the reload call, the Reloader would falsely state and emphasize that the opportunity and investment was connected with Visa and MasterCard, including such

29

statements as: "this is all MasterCard and Visa"; because it was with "Visa and MasterCard" it was not risky; and/or there is a scholarship/grant being offered by Visa and MasterCard by which MasterCard and/or Visa would pay half the cost of the leads or match the amount the individual paid to purchase leads; and/or MasterCard and/or Visa would "back" the individual in the business.

52.     The Reloader would explain in detail that the investment involved purchasing "leads." Specifically, the Reloader would explain that the individual, as a Referral Agent, would purchase a list of "leads" of small business owners who were interested in lowering their percentage rate on their merchant processing system(s) and who were also interested in a loan and/or cash advance for their small business. The Reloader would then explain the ways the purchased leads would make the individual money. Typically, the Reloader:

a.     would falsely represent that "we" (the entities of the Telemarketing Enterprise and/or MasterCard or Visa) make loans to small businesses ranging from $50,000 to $2.5 million with most loans between $50,000 and $300,000;

b.     would falsely represent that the Referral Agent who purchased the leads would receive 2% commission on each funded loan generated from their purchased lead, and that the average loan amount was approximately $100,000;

c.     would falsely represent that Visa and/or MasterCard would be issuing the loans and that the Business Development Manager and his company (an entity of the Telemarketing Enterprise) represented Visa and MasterCard;

d.     would falsely represent that on loans issued, the agent would receive their commission check within 72 hours;

e.      would falsely represent that the one way that "we" ensure the small business pays back the loan is that they have to sign a contract that they will do all their processing through "us" for the next 60 months; and

f.      would falsely represent that the Referral Agent, in addition to commissions associated with loans, would receive 2% on all credit card transactions on a monthly basis. Thus, the agent would be receiving residual income for the next 60 months.

53.    Regarding the origination and nature of the leads, the Reloader would falsely represent some variation of the following:

a.      when a major bank's loan department receives a business loan application from a small business and turns down the small business seeking a loan, major banks are now required to sell that information to a third party in order to broaden the opportunities for small businesses to obtain funding;

b.      that we have an exclusive relationship with certain major banks who are now forced to create a file when they deny a small business a loan;

c.      that we have the opportunity to purchase that major bank's loan file in the form of a lead; in turn, we can pursue that lead and have the ability to make a loan to that same small business;

d.      that when a Referral Agent purchases a lead file, that lead file goes out to our call center floor;

e.      that our call center is staffed by a hundred people trained by the loan department at MasterCard and/or Visa;

31

f.     that a trained and experienced individual from our call center simply re-contacts the small business owner who recently applied for, but was denied, a small business bank loan;

g.     that the call center closes or converts lead files (in other words, closes loans) at a rate of 3% or more.  Thus, a purchase of 1000 leads would typically generate 30 loans from which the Referral Agent would receive a commission;

h.     that the Referral Agent has no involvement or responsibilities beyond purchasing the leads and that the Business Development Manger's company and call center will pursue the leads and close the loans;

i.     that the Referral Agent will be able to track the progress of their lead files through their agent dashboard via their referral agent number; and

j.     that the Referral Agent would be receiving a commission for each closed loan.

**The Purchase of Leads**

54.     As part of the scheme and artifice to defraud and the conspiracy, individuals who purchased leads sold by Reloaders for the Telemarketing Enterprise would pay for their leads in multiple ways.

a.     Some individuals purchased leads with their credit cards.  The credit card transactions for the purchase of leads included transactions with and processed under the name of entities with merchant accounts, such as Quick Online Biz, LLC, Biz Management Pros, and Smart Business Pros, LLC.

32

b.      Some individuals purchased leads by mailing a check or sending a wire payable to such entities as WJ Security Consulting, LLC, RLR Enterprises, LLC, Secured Drop, LLC, MCV Lead Holdings and Alpha Lead Holdings, LLC.

c.      Some individuals, in order to purchase leads, would first apply for multiple credit cards and, upon receiving the new credit cards, purchase leads with cash advances from those credit cards.

**After the Reload**

55.      It was further part of the scheme and conspiracy, that backend room administrators and managers for the Telemarketing Enterprise would:

a.      provide wire and mailing information and track wires and mailings to ensure payments were received;

b.      mail one or more discs containing leads and/or upload the leads to the Referral Agent's dashboard; the leads themselves were typically nothing more than a random list of business names, addresses and phone numbers; and

c.      assign the referral agent a "Campaign Manager" and represent that the "Campaign Manager" would be responsible for updating the individual on the status of their leads files and commissions. The individual was also told that their agent dashboard would be updated to reflect the status of their leads and commissions.

56.      The backend room would also present and sell additional products and services as part of the Telemarketing Enterprise such as LLC creation, tax services, web design, and so forth. While the upselling related to these ancillary products and services was typically done by Phoenix based members of the Telemarketing Enterprise, upon selling an ancillary product such

33

as LLC creation, tax services or web designs, the telemarketing operation would pass the

customer along to the fulfillment operations based in Utah and Nevada for any future dealings.

57. These ancillary services were of no value to the individual as it related to their

prospects for making money as a Referral Agent or by purchasing leads. Instead, they

constituted an additional upselling component and revenue stream of the Telemarketing

Enterprise.

58. As part of the conspiracy and scheme to defraud, the Telemarketing Enterprise

utilized third parties to obtain, and attempt to obtain, "corporate credit." For those individuals

with satisfactory personal credit scores but lacking the funds to purchase leads, defendant

McNeill and others initiated a "corporate credit" component to the reload sales pitch. When

needed to effect the sale, corporate credit became part of the pitch made by the reloaders,

including defendant Casey. Defendants Hansen and Powell, working with defendants Hibbert

and Doll, directed the process of turning corporate credit into actual payments to the

telemarketing enterprise. Email addresses used by defendant Powell in communications

regarding corporate credit included "visacorporatecredit@gmail." Corporate credit was nothing

more than a process by which a third party would, for a fee, assist an individual in applying for

multiple credit cards at the same time and then guide them through the process of liquidating that

credit once "funded." Liquidation was the process by which the individual would take cash

advances as soon as credit funds were available in order to "invest" in the business opportunity.

59. From mid-2013 and until July 2015, members of the Telemarketing Enterprise

including defendants Doll, Swiantek and Murphy, repeatedly engaged defendant Hibbert, acting

by and through MiCamp Solutions, as an agent in order to obtain merchant accounts. The

34

majority of the referrals made by the Telemarketing Enterprise for corporate credit went to Sprout Financial, an affiliated company of MiCamp Solutions.

60.   Between January 2015 and July 2015, as part of the corporate credit reload process, MiCamp Solution's affiliated company, Sprout Financial, received client referrals when individuals with satisfactory credit scores were convinced to seek funding for the business opportunity represented by the Telemarketing Enterprise.  Between January 2015 and July 2015, defendant Hibbert managed and directed both Sprout Financial and the high-risk merchant account business for MiCamp Solutions.

61.   Beginning in January 2015, Hibbert and Doll established a partnership and agreement whereby the Telemarketing Enterprise worked directly with Sprout Financial for the purpose of maximizing a referred individual's "borrowing power" and then assisting that individual in applying for and obtaining multiple lines of unsecured credit through new individual credit card accounts.  Defendant Hibbert, working with defendants Doll, Powell, Hansen and others, establishes a process by which individuals could and, in fact, did borrow money in order to purchase leads from the Telemarketing Enterprise as represented by the reloader.

62.   As set up and directed by defendant Hibbert, and as part of the Telemarketing Enterprise, Sprout Financial employees handled pre-qualification, customer calls, funding conditions if needed, the funding process, the liquidation process, and billing.   As agreed by defendants Hibbert and Doll, Sprout Financial and Acme Business Services split the "consulting fee" paid by the individual to Sprout Financial.

63.   By virtue of his sustained role in obtaining merchant accounts for the Telemarketing Enterprise, Defendant Hibbert knew the history, business model and practices of

35

the Telemarketing Enterprise.   Defendant Hibbert was actively misrepresenting the ownership, control and nature of the merchants of the Telemarketing Enterprise in order to obtain merchant accounts.  Moreover, when he sought referrals for Sprout Financial from the Telemarketing Enterprise, Hibbert had direct knowledge that multiple merchant accounts had already closed and that the accounts had closed based upon claims of fraud and misleading sales practices. Yet, Hibbert not only sought and accepted referrals from the Telemarketing Enterprise for Sprout Financial, he concealed the information known to him. Though Sprout Financial charged referred individuals a client and consulting fee for its services and consultation, Hibbert concealed, and caused to be concealed, the known business history and practices of the Telemarketing Enterprise.  Hibbert misrepresented, and caused to be misrepresented, that the service and consultation Sprout Financial provided to a referred individual was for the benefit of the individual and their new business opportunity when, in fact, it was exclusively to the benefit of the Telemarketing Enterprise.  Ultimately, Hibbert knew that facilitating the opening and "liquidation" of credit card accounts in order to transfer funds to the Telemarketing Enterprise would result in a sizable, unsecured personal debt obligation for the individual.  Defendant Hibbert also knew that the companies of the Telemarketing Enterprise referring the clients to Sprout Financial had a limited lifespan and, thus, there was no real business opportunity associated with investing in, or becoming an agent for, these companies.

### E.   CORE AND COMMON MISREPRESENTATIONS MADE AS PART OF THE TELEMARKETING ENTERPRISE

64.     The core and common misrepresentations made by the Telemarketing Enterprise, and the defendants herein, and as part of the conspiracy and the joint scheme and artifice to defraud included, but were not limited to, the following:

a.      that there was an actual business opportunity in merchant processing available to individuals as offered through the Telemarketing Enterprise when, in fact:

i.      there was no way to make money by becoming a Referral Agent for the entities used in the scheme and

ii.     that, over the course of the Telemarketing Enterprise, no one had made money by becoming a Referral Agent;

b.      that the goods and services of the Telemarketing Enterprise constituted a business opportunity when, in fact, no service or product offered by the Telemarketing Enterprise could generate income or commissions as represented;

c.      that the business opportunity had the backing, the support, an affiliation, or an association with MasterCard, Visa or any banking institution as represented when, in fact, no such connection existed;

d.      that any entity of the Telemarketing Enterprise had any business relationship, contractual relationship, backing, support, affiliation, or association with MasterCard, Visa or any banking institution as represented when, in fact, no such connection existed;

e.      that any leads sold by, and through, any entity of the Telemarketing Enterprise were:

i.      of value to the business opportunity;

ii.     acquired from major banks; or

iii.    generated as a result of a small business seeking a loan or cash advances, as represented when, in fact, the leads were, in all material respects, fictitious;

37

f.      that any entity of the Telemarketing Enterprise had at any time any Referral Agents making any commissions from leads sold by and through entities of the Telemarketing Enterprise when, in fact, no commissions were paid by or through the Telemarketing Enterprise to any Referral Agents;

g.      that any entity of the Telemarketing Enterprise had any direct or indirect means to cause a small business loan to be offered, solicited, processed, underwritten or closed, as represented, when in fact, the Telemarketing Enterprise and its entities had no such means or capabilities;

h.      that any entity of the Telemarketing Enterprise caused, attempted to cause, would attempt to cause, or had the capacity to cause any small business identified as a lead to:

i.      install a credit card processing terminal;

ii.     enter into a merchant service processing contract of any duration; or

iii.    receive a loan or cash advance, as represented when, in fact, the business operations of the entities were fictitious and the entities themselves were created solely to serve the scheme and artifice to defraud and the conspiracy;

i.      that the updates reflected on the agent dashboard and/or communicated over the phone by the Campaign Manager were accurate and that loans were being reviewed, in process, pre-qualified, in underwriting, or closed, as represented when, in fact, nothing happened with the leads after the leads were purchased and loaded onto the dashboard and/or mailed to the Referral Agent because there was no dedicated call center as represented;

38

j.      that there was little or no financial risk involved in the business opportunity, with the purchase of leads, or with individual's use of their personal savings, retirement accounts and/or credit cards when, in fact, there was;

k.      that the individual would quickly recoup their investment and/or be able to pay off their credit cards within 60-90 days with their commissions, when, in fact, they would not, at any time recoup their investment or receive a commission through the Telemarketing Enterprise;

l.      that the entities referenced and used in frontend and backend calls were legitimate and ongoing businesses when, in fact, they were not.  Specifically, the entities were:

i.      newly created shell companies used in succession by the Telemarketing Enterprise;

ii.      represented by individuals of the Telemarketing Enterprise who were utilizing false names and false business addresses and providing phone numbers, including designated customer service numbers, that would only be viable for a short period of time; and

iii.      would inevitably become unreachable and disappear from public view, often within a matter of weeks after an individual had purchased leads and received his last update from the Campaign Manager;

m.      that the entities in the Telemarketing Enterprise were in the business of merchant processing and that individuals could generate income as a Referral Agent to one or more of their companies when, in fact, the companies of the Telemarketing Enterprise had no merchant service products or services; and

39

n.      it was further part of the scheme and conspiracy that the defendants would communicate utilizing both their phones, including "burner phones" and other devices;

i.      over the course of the Telemarketing Enterprise defendant Murphy communicated with one or more: defendants, coconspirators, and other persons known and unknown to the Grand Jury, regarding the Telemarketing Enterprise. Those communications include the following:

| Date | To/From | Message |
|------|---------|---------|
| 7/3/2013 | From: "Josh" To: Murphy | Maybe Mulberg, it's jewy |
| 7/3/2013 | From Murphy To: "Josh" | That is true. Jewy is good. [ ] |
| 10/16/2013 | From: coconspirator To: Murphy | Yeah so far, just sitting with Ashley. I met Mike. Is Jakes $30k wire going to come through you think? |
| 10/16/2013 | From: Murphy To: coconspirator | I do, we also have some deals that need to be doced out, are you able to come back here for a bit? |
| 10/25/2013 | To: Murphy From: coconspirator | Wat up mang? |
| 11/20/2013 | To: Murphy From: coconspirator | If someone needs a job and is willing to roll tape do I just send them in? How does that work? |
| 11/20/2013 | From: Murphy To: coconspirator | Sure, just send gem over to the office. Who is it? |
| 11/20/2013 | From: Murphy To: coconspirator | You should talk to my friend Colby. |
| 5/22/2014 | From: "Cybill" To: Murphy | Hey. [ ] I'll be leaving around 2 or 3. Can I come by your office after that? |
| 5/22/2014 | From: "Cybill" To: Murphy | TIM |
| 5/22/2014 | From: Murphy To: "Cybill" | Yes! Sorry, busy morning. |
| 5/22/2014 | From: Murphy To: Unknown | Hey Matt, Tim Murphy here. What's the address at your office? |
| 5/22/2014 | From: Cybill To: Murphy | You should print this out and post it in your rooms |
| 5/22/2014 | From: Murphy To: "Cybill" | I love that |
| 3/2/2015 | From: Arthur Whitton To: | I need you all to change the phone number on the front end docs. It should appear in two places on the doc, please change the old number to 800-504-0381. |

| Date | To/From | Message |
|------|---------|---------|
|  | Frontend Managers | This is the new front end customer service number you should all be using going forward. |
| 3/3/2015 | From: Arthur Whitton To: Frontend Managers | Mandatory manager meeting at the back end tomorrow morning at 10:00. Make sure you have someone to cover your rooms. |
| 3/6/2015 | From: Arthur Whitton To: Frontend Managers | Every deal written today and tomorrow, roller gets $20 cash and closer will get 450 cash as long as the deal is over $500. Fredo will bring the cash on Monday. Get these motherf[ ]rs excited. |
| 3/17/2015 | From: Murphy To: Unknown | We usually discourage anyone from coming to the office, to be honest. The no friends or family rule has been pretty strictly enforced by my employers :/ |
| 4/27/2015 | From: Arthur Whitton To: Frontend Managers | No one is allowed to have C[ ] M[ ] working at their office. He is on time-out from [ ]'s room until he cleans up, and that is the only place he has a job if and when he does. |
| 4/30/2015 | From: Cybill To: Murphy | What do you pay your front end? |
| 4/30/2015 | From: Murphy To: Cybill | 125 a week and 120 a deal for rollers, closers no base and 130-330 per deal depending on the amount |
| 4/30/2015 | From: Cybill To: Murphy | Do they do pretty well? |
| 4/30/2015 | From: Murphy To: Cybill | Some of them do, and some of them suck |

ii.    over the course of the Telemarketing Enterprise defendant Silver

communicated with one or more: defendants, coconspirators, and other persons

known and unknown to the Grand Jury, regarding the Telemarketing Enterprise.

Those communications include the following:

| Date | From/To | Message |
|------|---------|---------|
| 4/2/2015 | From: Silver To: "Dre" | We all already know it's me , let Arthur /Fredo know, and I'm sure they will send me over there .. |
| 5/4/2015 | From: Silver To: Coconspirator | Okay so since I gave fredo those paper leads from Friday and saturday, I can't send them, but I do know fow to fax scan and copy, so I will always make sure I have toner from now on and won't let this issue happen again |

| Date | From/To | Message |
|------|---------|---------|
| 5/4/2015 | From: Silver<br>To: Coconspirator | Hey I gave the physical deal sheets to fredo, he's gonna bring them to you |
| 6/3/2015 | From: Shockley<br>To: Silver | Sorry for being an [ ] |
| 6/3/2015 | From: Silver:<br>To: Shockley | It is what it is man, I know what position your in, and I know I'm just adding<br>to the complaints that you really have no control over, but you asked us to<br>hit you up when we have an issue, so that's what I did[ ], I'm also a pretty<br>receptive person, I don't need to be threatened for me to do a better job., but it's cool, and I appreciate you apologizing |
| 6/3/2015 | From: Shockley<br>To:  Silver | I kno |
| 6/9/2015 | To: Shockley<br>From: Silver | My phones are cutting In and out alot[ ].I rolled for about 30 minutes just to make sure[ ] |
| 6/9/2015 | To: Shockley<br>From: Silver | Hey man if you come across any rollers that need jobs can you pls send<br>them my way I cleaned house today and I have like 8 rollers |
| 6/9/2015 | From: Shockley<br>To: Silver | Ok |
| 6/10/2015 | From: Silver:<br>To: Arthur | Hey goodmorning, don't mean to bother you like thus but I'm have static<br>issues with my phones[ ], I've addressed the issue to dre and shockley, but we're going on two weeks now, we're losing some deals for sure |
| 6/10/2015 | From: "Arthur"<br>To: Silver | I'm not in town, so ask Fredo again. From what I remember it sounds like<br>you have a Cox issue with how much bandwidth your building is getting, and<br>I'm a |

iii.   over the course of the Telemarketing Enterprise defendant

Balleweg communicated with one or more: defendants, coconspirators, and other

persons known and unknown to the Grand Jury, regarding the Telemarketing

Enterprise. Those communications include the following:

| Date | From/To(s) | Message |
|------|------------|---------|
| 3/6/2015 | From: Arthur Whitton | Every deal written today and tomorrow, roller gets $20 cash and closer will |

| Date | From/To(s) | Message |
|------|-----------|---------|
| | To: Balleweg | get $50 cash as long as the deal is over $500. Fredo will bring the cash on Monday. Get these motherf[ ]s excited. |
| 3/12/2015 | From: Jeff Thomas To: Balleweg | Is each of you training a new closer this week? Also, how many new rollers have you hired this week? Sales numbers are still way too low. |
| 3/12/2015 | | Your current 6 room total of 36 deals for the week is terrible and unacceptably low. Anyone care to offer excuses? |
| 3/18/2015 | From: Jeff Thomas To: Balleweg | Current deal count for the week? Respond ASAP |
| 4/14/2015 | From: Jeff Thomas To: Balleweg | Quick like bunnies, how many deals green this week for your room and how many new employees? |
| 4/14/2015 | From: Balleweg To: Jeff Thomas | I guess they got a 25 thousand off my paper. I'm just trying to find out if it is all eaten up which I'm sure it is. I don't know what else to do man. I'm producing paper, pitching the coach, my room is just about filled. And yet I'm not making any money because 0 paper is reloading. If I'm missing something please tell me man. So I can pay my bills. |
| 4/14/2015 | From: Jeff Thomas To: Balleweg | Yep, I will look into it. Don't panic |
| 4/16/2015 | From: Balleweg To: Jeff Thomas | Hey man. I know there's some problems with the merchants on the back. But have you heard of anything that's happening with my paper that would help us get paid. Any info would be great thanks |
| 4/16/2015 | From: Jeff Thomas To: Balleweg | Yeah, the [ ] is pulling reports for us on which rollers and closers produce on the back and which don't |
| 4/16/2015 | From: Jeff Thomas To: Balleweg | I think the biggest problem is still the way r[ ] b[ ] is selling the front. |
| 4/16/2015 | From: Balleweg To: Jeff Thomas | I sat and listened to his whole pitch from open to close and had him add more of the coach. That was the only thing I could hear wrong. He has had the same pitch that we put together since Mesa. And I know his paper hasn't always been 100 |

| Date | From/To(s) | Message |
|---|---|---|
| | | percent but it was reloading a few times a week at least. I know he puts back a lot of paper but so does my other closers and none of them are hitting and I have sat and listened to them all. I now have them<br>digging deeper about money and investments and putting notes on the<br>deals. I also set the coach up when I veryify every deal. And have them<br>pitch strictly the coach while we are setting up the doc. |
| 4/16/2015 | From: Balleweg<br>To: coconspirator | Just talked to Josh for a while about everything and he gave some really good points and he said our room is right where his was when he was flat broke and first started and it was at Christmas. The. Come January and February it took off and he started making 100 of thousands of dollars. He also said that the room is just at the point where now we are pumping out 20 deals a week we are in that sit back and just wait area and it will happen. It just sucks being in that area right now. |
| 4/21/2015 | From: Balleweg<br>To: Jeff Thomas | Hailee said she hasn't done them yet from last week. But from what it looks<br>like we should be close to being out of the red |
| 4/21/2015 | From: Jeff Thomas<br>To: Balleweg | Sweet deal, I will get an accurate number from her later in the week |
| 4/22/2015 | From: Balleweg<br>To: coconspirator | Cool. Well I talk to Hailee and told her josh said it was cool if I took what ever profit was left. And she said they wouldn't know exactly till the end of the week. So try and keep an eye out for what's going on. |

iv.    over the course of the Telemarketing Enterprise defendant Miller

communicated with one or more: defendants, coconspirators, and other persons

known and unknown to the Grand Jury, regarding the Telemarketing Enterprise.

Those communications include the following:

| Date | From/To(s) | Message |
|---|---|---|
| 5/23/2015 | From: Miller<br>To: Jeff Thomas | Hey[ ]i just want you to know that I am very greatful for everything you have done for me. You've saved my ass more times than I can count and whatever |

| Date | From/To(s) | Message |
|------|-----------|---------|
| | | reasoning you've had for doing so I thank you. You (and Arthur) are still the only people I trust in this business of two-faced, cut throat, back-stabbing … |
| 6/11/2015 | From: Miller<br>To: Jeff Thomas | So I wanted to give you an update: I hired 11 new rollers this week so I'm completely full for the first time. I'm duplicating how you ran the front ie; polite but firm, praise the best, ridicule the rest and starting next week the infamous public firing will begin. I WILL make this room produce I promise. |
| 6/12/2015 | From: Jeff Thomas<br>To: Miller | ….I told Arthur to approve extra money |

v.      over the course of the Telemarketing Enterprise defendant McNeill

communicated (and preserved one or more communications) with one or more:

defendants, coconspirators, and other persons known and unknown to the Grand

Jury, regarding the Telemarketing Enterprise. Those communications include the

following:

| Date | From/To(s) | Message |
|------|-----------|---------|
| 9/25/2012 | From: McNeill<br>Ashley Bazin | All green |
| 11/5/2012 | From: Bank of America<br>To: McNeill | Bank of America Alert: Debit Card/ATM Deduction from Account<br>Exclusively for Canyon State Merchant Services |
| 12/17/2012 | From: McNeill<br>To: Gallagher | Can you just have that app emailed to mike@mcneillmail.com<br>…headed to the west side and can take to [ ] … |
| 12/21/12 | From: Gallagher<br>To: McNeill | Cjjc…xxx6439 |
| 12/22/12 | From: Gallagher<br>To: McNeill | We're u able to make that deposit? |
| 1/7/2013 | From: McNeill<br>To: coconspirator | Are we live? |
| 1/18/2013 | From: McNeill<br>To: coconspirator | What time will we have a log in? |
| 1/18/2013 | From: McNeill<br>To: coconspirator | Hey baby, talked to the boys late last night and they all (including Jason) felt it was a reasonable request at a 40% processing and fulfillment.  So JG will call you to set up this morning… |

| Date | From/To(s) | Message |
|------|-----------|---------|
| 1/28/2013 | To: McNeill<br>From: [ ] | Dear Valued Merchant,<br>Your Payment Gateway account is within 10% of your maximum allowed monthly transaction limit…<br><br>Payment Gateway Account: Fremont Marketing Services<br>Processor ID: Fremont3620 |
| 2/11/2013 | From: coconspirator<br>To: McNeill | Bank Letter<br>(company name) has opened a checking account with routing#[ ]. and account#[ ]  This account can accept ACH credit and debit transactions.<br><br>Mike, it needs to be on bank letterhead and signed by prepare.<br><br>Thanks |
| 2/22/2013 | From: McNeill<br>To: coconspirator | Re: Fremont Marketing<br>Monday – Saturday … volume must be at 50% in order to get drop.<br>Cap deal at 10k, Ok to write some at 20k but must be split between… |
| 3/8/2013 | To: McNeill<br>From: [ ] | FW: Fremont Marketing<br><br>Good Morning Mike,<br><br>We need a few additional items from you per the request of the underwriter…<br><br>How is the product/service marketed to support the projected volume? (i.e. radio, print, outbound calls, etc)<br><br>Sales Scripts |

vi.     Defendant Powell communicated with one and more individuals as "Brittany" regarding backend sales including communications with L.J.

vii.    Defendant Silha communicated with one and more individuals as campaign manager "Keith Henderson" regarding backend sales including communications with L.M.

        viii.     Defendant Silha communicated with one and more individuals as campaign manager "Dave Marsh" regarding backend sales including communications with L.J.

        ix.     Defendant Casey communicated with one and more individuals as Reloader "Shawn Anderson" including communications with L.B.

        x.     Defendant Casey communicated with one and more individuals as Reloader "Daniel Arenson" including communications with L.D.

## F.    THE ROLE OF MERCHANT ACCOUNTS AND MEMBER (ACQUIRER) BANKS IN THE CONSPIRACY AND SCHEME

### Overview

65.    A merchant account is a bank account opened by a merchant through a bank or other financial institution that is a member of a major credit card network.

66.    Common participants in merchant processing are the merchant, member banks (also known as acquiring banks), and third-party organizations.

67.    A bank that contracts with merchants for the settlement of card transactions is a member bank. A member bank contracts, directly or indirectly, with merchants to process card transactions. For example, BMO Harris Bank's "DISCLOSURE PAGE" to the merchant includes the following statements:

*MEMBER BANK (ACQUIRER) INFORMATION*
    *Acquirer name:  BMO Harris Bank N.A.*
    *Acquirer Address Schaumburg, Illinois*
*IMPORTANT MEMBER BANK (ACQUIRER) RESPONSIBILITIES*
    *1.    A Visa / MasterCard Member is the only entity approved to extend acceptance of Visa / MasterCard products directly to a Merchant.*
    *2.    A Visa / MasterCard Member must be a principal (signer) to the Merchant Agreement.*
    *3.    A Visa / MasterCard Member is responsible for educating Merchants on pertinent Visa / MasterCard Operating Regulations with which Merchants must comply.*

> 4.    The Visa / MasterCard Member is responsible for and must
>        provide settlement funds to the merchant.
> 5.    The Visa / MasterCard Member is responsible for all funds held in
>        reserve that are derived from settlement.

**IMPORTANT MERCHANT RESPONSIBILITIES**

> 1.    Ensure compliance with cardholder data security and storage
>        requirements.
> 2.    Maintain fraud and chargeback below thresholds.
> 3.    Review and understand the terms of the Merchant Agreement.
> 4.    Comply with Visa Operating Regulations.

68.    A third-party organization is any outside company with which the member bank

contracts to provide merchant services, such as an Independent Selling Organization ("ISO") or

Member Service Provider ("MSP"). ISOs and MSPs have registered agents and sub-agents who

submit merchant account applications to the ISOs and MSPs with the understanding that the

applications, supporting documentation, and other representations made in support of an

application are reviewed by underwriting departments for the ISO, MSPs, and the banks.

69.    An ISO/MSP solicits merchants and performs services for member banks such as

processing merchant applications and chargebacks, detecting fraud, servicing merchant

customers, providing accounting services, selling or leasing electronic terminals to merchants,

processing transactions, authorizing purchases, and capturing data.

70.    Member banks may be subject to exposure and losses through fraud, chargeback

losses, and bank card association fines. If the merchant or third-party organization does not have

the financial capacity to absorb the loss, the bank must absorb it.

71.    A high-risk merchant account poses increased risk to banks through fraud, high

chargeback rates, or poor credit history. Merchant account categories that may be deemed high

risk include businesses where the products incur a high likelihood of consumer fraud.

72.    A "chargeback" is generated when a cardholder disputes a transaction or when the

merchant does not follow proper procedures. The card issuer and member bank research the facts

to determine which party is responsible for the transaction. Chargebacks become a credit exposure to the member bank if the merchant is unable or unwilling to pay legitimate chargebacks. In that case, the member bank is obligated to honor the chargeback and pay the card-issuing bank which could result in a loss to the member bank.

73.     A member bank is potentially liable for losses caused by merchant fraud, including merchants engaged in deceptive or misleading practices. Thus, member banks typically have a formal merchant underwriting and approval policy to control risk. The underwriting policy typically designates the types of merchants with which the member bank is willing to conduct business as well as the criteria for selecting merchants such as time in business, location, and sales volumes. In addition, the member banks typically dictate what information each merchant application should contain, such as type of business, location, and Social Security number/tax identification number for the business entity and principal owners.

74.     Merchant underwriting provides an opportunity to reject a merchant that the member bank determines has an unacceptable history of chargeback volumes, has a weak financial condition, is not operating a valid business, or is otherwise not acceptable for the member bank's program.

75.     It was a further part of the scheme to defraud and the conspiracy that the defendants and Telemarketing Enterprise:

a.      falsely represented the nature of their merchant accounts to individuals, third parties and FDIC insured banks. Specifically, merchant account applications, as well as supporting documents submitted for underwriting purposes as part of the application process, contained false and misleading information and, thereby, caused banks to:

49

       i.      fail to identify and assess the risks associated with the merchant accounts used by the Telemarketing Enterprise;

      ii.     process and settle Telemarketing Enterprise transactions pursuant to a merchant account agreement for a business other than the specific business submitted for underwriting review;

     iii.     transfer or "drop" funds, via electronic deposit, from a merchant account to a designated business bank account of the Telemarketing Enterprise;

     iv.     transfer settlement funds which were (or would be) subject to legitimate chargeback claims; and

     v.     collect, hold and disperse reserve funds derived from sales of the Telemarketing Enterprise.

    b.     submitted merchant account applications to member banks, via ISOs/MSPs and/or agents for ISOs/MSPs, necessarily contained:  false and misleading information regarding the ownership, location and control of the business; the nature of the business the merchant was involved in; the nature of the charges that would be processed through the account; and the connections, affiliations and common control of the merchant accounts by the defendants and the Telemarketing Enterprise;

    c.     knowingly devised and intended to devise a scheme and artifice to defraud FDIC insured financial institutions and to obtain funds under the custody and control of FDIC insured financial institutions, by means of material false and fraudulent representations;

      d.      provided false personal, business, and financial information and statements that misrepresented and concealed the purpose and use of the merchant account and the underlying risks in an effort to secure certain merchant accounts from financial institutions;

      e.      provided false personal, business, and financial information and statements that misrepresented and concealed the purpose and use of the merchant account, and the underlying risks, and provided false and fraudulent representations in response to initiated chargebacks in an effort to maintain and keep open certain merchant accounts from financial institutions;

      f.      used merchant accounts for purposes other than those authorized under the terms of the merchant account agreement;

      g.      made one or more of the following types of material false and fraudulent statements and representations to the banks including, but not limited to, the following:

            i.      substantially overstating the financial position of the individual and/or the merchant applying for the merchant account;

            ii.      misrepresenting and concealing the merchant's profile including, but not limited to, the location of the business, the product and services being marketed, and the methods used to market the products and services;

            iii.      misrepresenting and concealing the ownership, control and processing history; and

            iv.      providing false and fraudulent information in support of the application including, but not limited to, false and altered bank statements,

false and manufactured financial statement, and false scripts substituted

for the actual scripts used by the telemarketing rooms.

h.      Concealed from ISOs, MSPs, and member banks that new entities for

which they sought merchant accounts were affiliated with, and under the control of, the

Telemarketing Enterprise and were intended to replace merchant accounts of the Telemarketing

Enterprise that had been previously closed for reasons related to risk, such as excessive

chargebacks including chargebacks arising from claims of fraud and misleading sales practices.

76.     As part of the scheme to defraud and the conspiracy, defendants McNeill,

Schnock, Gallagher, and others, submitted and caused to be submitted fraudulent merchant

applications in the name of Network Market Solutions, Complete Market Share, Fremont

Marketing Services and others. As used herein, a "fraudulent merchant application" refers to the

executed merchant application form itself as well as the documents and communications

submitted in support.

77.     As part of the scheme to defraud and the conspiracy, defendant Swiantek, and

others, submitted and caused to be submitted fraudulent merchant applications in the name of

Quick Online Biz, Biz System Now, Cyber System Now, Internet Market Master, and others. As

used herein, a "fraudulent merchant application" refers to the executed merchant application

form itself as well as the documents and communications submitted in support.

78.     As part of the scheme to defraud and the conspiracy, defendant Hale, and others,

submitted and caused to be submitted fraudulent merchant applications in the name of Smart

Business Pros and APEX Business Development. As used herein, a "fraudulent merchant

application" refers to the executed merchant application form itself as well as the documents and

communications submitted in support.

79.     As part of the scheme to defraud and the conspiracy, defendants Doll, Murphy, and others, submitted and caused to be submitted fraudulent merchant applications in the name of Quick Online Biz, Biz System Now, Cyber System Now, Internet Market Master, Smart Business Pros, APEX Business Development, LLC, Capital Marketing Pros and others. As used herein, a "fraudulent merchant application" refers to the executed merchant application form itself as well as the documents and communications submitted in support.

80.     As part of the scheme to defraud and the conspiracy, defendant Hibbert and others submitted and caused to be submitted fraudulent merchant applications including, but not limited to, merchant applications associated with: Quick Online Biz; Corporate Business Structure; H&R Investment; Digital Blog World; 4businesspower; Dynamic Virtual Office, LLC; Luxe Lashes, LLC; Biz Management Pros; Biz System Now, LLC; Platinum Biz System; Cyber System Now; Carpe Diem Partners; Cash Box SEO; Internet Biz System; APEX Business Development, LLC; Internet Market Masters; Smart Business Pros; Capital Marketing Pros; Corporate Business Builders; and Global National Company. As used herein, a "fraudulent merchant application" refers to the executed merchant application form itself as well as the documents and communications submitted in support. Documents altered by Defendant Hibbert, and/or caused to be altered by Defendant Hibbert, in support of a fraudulent merchant application include the following:

a.     On or about January 13, 2014, defendant Hibbert and others caused an altered copy of a voided check to be submitted as part of a Biz Management Pros merchant account application. Specifically, the address on the actual check was removed and replaced with a different address. As to the alteration of the original voided check, defendant Hibbert

directed another MiCamp Solutions employee as follows: "See if you can update the name/address on this check.. needs to pass underwriting eyes, even if they zoom in…";

      b.      On or about January 23, 2014, defendant Hibbert caused an altered Chase bank statement to be submitted as part of a Quick Online Biz merchant account application. Specifically, the names of individuals identified in the description for certain withdrawals and deposits, including the name of defendant Swiantek and the name of defendant Doll, were removed from the actual Quick Online Biz bank statement and replaced with initials.   As to the alteration of the original bank statement, defendant Hibbert directed a coconspirator to "please update your wire transfer process to just show initials or use nicknames moving forward.  Long term we don't want underwriters seeing the exact names of other high risk people in the space, showing you are sending money." … "It looks like these are scans, can you actually download PDF statements from online and send to me? If so I can edit these names on my side to something else";

      c.      On or about January 27, 2014, defendant Hibbert and others caused an altered PowerPay payment processing statement to be submitted as part of a Quick Online Biz merchant account application.  Specifically, three chargebacks listed on the actual Quick Online Biz November 2013 PowerPay payment processing statement were removed and the number and total amount of chargebacks was changed.   As to the alteration of the original PowerPay payment processing statement, defendant Hibbert directed a MiCamp Solutions employee to convert the statement to a "word doc for me please."  Previously, on January 16, 2014, defendant Hibbert noted to a coconspirator that the "Quick Online Biz PowerPay MID was one of the worst performing merchants accounts I have ever had in this space with 24% chargeback in only 90 days of processing."

81.     On or about May 2013, as part of the scheme to defraud and the conspiracy, defendants McNeill and Schnock met with an agent for an ISO/MSP regarding merchant accounts for the Telemarketing Enterprise and detailed the frontend and backend pitch of the Telemarketing Enterprise.

82.     After May of 2013, fraudulent merchant applications submitted and provided, directly or indirectly, to FDIC insured banks as part of the scheme, and that caused a merchant account to be opened, include the following:

| Merchant | Application Date | ISO/ MSP | Bank | MID# |
|---|---|---|---|---|
| Quick Online Biz | 7/9/2013 | PowerPay | Deutsche Bank | xxx6315 |
| Quick Online Biz | 10/29/2013 | Base Commerce | Synovus Bank | xxx2175 |
| Biz System Now | 11/10/2013 | PowerPay | Deutsche Bank | xxx9048 |
| Biz System Now | 11/10/2013 | TS Acquisition | Merrick Bank | xxx0744 |
| Quick Online Biz | 11/11/2013 | Electronic Merchant Systems | Merrick Bank | xxx2748 |
| Biz System Now | 12/5/2013 | Base Commerce | Synovus Bank | xxx2233 |
| Biz System Now | 12/11/2013 | Meritus | Wells Fargo | xxx0507 |
| Cyber System Now | 1/10/2014 | PowerPay | Deutsche Bank | xxx0127 |
| Quick Online Biz | 1/21/2014 | Meritus | Wells Fargo | xxx0655 |
| Cyber System Now | 3/13/2014 | Meritus | Wells Fargo | xxx9095 |
| Biz System Now | 6/25/2014 | First Pay Solutions | Wells Fargo | xxx9340 |
| Internet Market Master | 7/3/2014 | First Pay Solutions | Wells Fargo | xxx9712 |
| Smart Business Pros | 7/8/2014 | First Pay Solutions | Wells Fargo | xxx0165 |
| APEX Business Development | 9/12/2014 | PowerPay | Deutsche Bank | xxx2404 |
| Smart Business Pros | 10/24/2014 | Secure BC | Synovus Bank | xxx1853 |

| Merchant | Application Date | ISO/ MSP | Bank | MID# |
|----------|------------------|----------|------|------|
| Smart Business Pros | 12/2/2014 | Electronic Merchant Systems | BMO Harris | xxx6882 |
| Capital Marketing Pros | 12/3/2014 | National Merchant Association | BMO Harris | xxx4881 |
| Smart Business Pros | 12/11/2014 | Merchant e-solutions | Synovus Bank | xxx8107 |
| Smart Business Pros | 12/16/2014 | Complete Merchant Solutions | National Bank of California | xxx5455 |
| Global National Company | 1/5/2015 | National Merchant Association | Wells Fargo | xxx2055 |
| Internet Market Master | 3/10/2015 | Vantiv | Fifth Third Bank | xxx1155 |
| Global National Company | 4/23/2015 | Cardflex | BMO Harris | xxx6757 |

83.     As part of the conspiracy and the scheme to defraud, the Telemarketing

Enterprise, often under the direction of defendants Doll and Hibbert, contested chargeback

claims made against the merchant accounts of the Telemarketing Enterprise.  Contested

chargebacks necessarily involved further misrepresentations to banks and others and often

involved submitting additional information designed to conceal and mislead.

**G.     ADDITIONAL ACTS IN FURTHERANCE OF THE SCHEME AND CONSPIRACY RELATED TO ENF AND NETWORK MARKET SOLUTIONS INCLUDE THE FOLLOWING:**

84.     As part of the scheme to defraud and the conspiracy:

a.     Defendant Schnock, McNeill and Gallagher, and others, owned and

operated one or more backend rooms as part of the Telemarketing Enterprise and engaged in

fraudulent telemarketing sales in the name of Network Market Solutions;

b.     Defendant McNeill was a Reloader for fraudulent telemarketing sales

done in the name of Network Market Solutions;

c.      Defendant Gallagher was a backend room manager for fraudulent telemarketing sales done in the name of Network Market Solutions;

d.      Defendant Schnock received compensation for fraudulent telemarketing sales done in the name of Network Market Solutions through a series of payments from ENF to 4 Group Holdings;

e.      Defendant McNeill received compensation for fraudulent telemarketing sales done in the name of Network Market Solutions through a series of payments from ENF to Wilkinson Construction; and

f.      Defendant Gallagher received compensation for fraudulent telemarketing sales done in the name of Network Market Solutions through a series of payments from ENF to CJJC Inc.

85.      As part of the scheme to defraud and the conspiracy, credit card transactions related to telemarketing sales done in the name of Network Market Solutions include the following:

| Date | Type | Amount | Individual | Residence | Merchant or Bank Account | Sale Type |
|------|------|--------|------------|-----------|--------------------------|-----------|
| 4/27/2012 | Credit card | $490 | B.M. | O'Fallon, Missouri | Universal Marketing & Training, LLC | Frontend sale |
| 5/4/2012 | Credit card | $14,840 | B.M. | O'Fallon, Missouri | Network Market Solutions | Backend reload |
| 5/19/2012 | Credit card | $490 | L.M. | Britt, Iowa | Universal Marketing & Training, LLC | Frontend sale |
| 5/26/2012 | Credit card | $30,000 | L.M. | Britt, Iowa | Network Market Solutions | Backend reload |

| Date | Type | Amount | Individual | Residence | Merchant or Bank Account | Sale Type |
|---|---|---|---|---|---|---|
| 7/23/2012 | Credit card | $490 | T.L. | Ellettsville, Indiana | Universal Marketing & Training, LLC | Frontend sale |
| 7/30/2012 | Credit Card | $20,000 | T.L. | Ellettsville, Indiana | Network Market Solutions | Backend reload |
| 8/1/2012 | Credit Card | $490 | K.M. | Orrick, Missouri | Universal Marketing & Training, LLC | Frontend sale |
| 8/8/2012 | Credit Card | $30,000 | K.M. | Orrick, Missouri | Network Market Solutions | Backend reload |
| 8/16/2012 | Credit card | $490 | S.L. | University City, Missouri | Universal Marketing & Training, LLC | Frontend sale |
| 8/21/2012 | Credit Card | $40,000 | S.L. | University City, Missouri | Network Market Solutions | Backend reload |

## H.   ADDITIONAL ACTS IN FURTHERANCE OF THE SCHEME AND CONSPIRACY RELATED TO COMPLETE MARKET SHARE AND CANYON STATE MERCHANT SERVICES INCLUDE THE FOLLOWING:

86.     As part of the scheme to defraud and the conspiracy:

a.     Defendant Schnock, McNeill and Gallagher, and others, owned and operated one or more backend rooms as part of the Telemarketing Enterprise and engaged in telemarketing sales in the name of Complete Market Share;

b.     Defendant McNeill was a Reloader for fraudulent telemarketing sales done in the name of Complete Market Share;

c.     Defendant Gallagher was a backend room manager for telemarketing sales done in the name of Complete Market Share;

d.      Defendant Schnock received compensation for fraudulent telemarketing sales done in the name of Complete Market Share through one or more payments from Canyon State Merchant Services to 4 Group Holdings;

e.      Defendant McNeill received compensation for fraudulent telemarketing sales done in the name of Complete Market Share through one or more payments from Canyon State Merchant Services to Wilkinson Construction; and

f.      Defendant Gallagher received compensation for fraudulent telemarketing sales done in the name of Complete Market Share through one or more payments from Canyon State Merchant Services to CJJC Inc.

87.     As part of the scheme to defraud and the conspiracy, credit card transactions related to telemarketing sales done in the name of Complete Market Share include the following:

| Date | Type | Amount | Individual | Residence | Merchant or Bank Account | Sale Type |
|------|------|--------|------------|-----------|--------------------------|-----------|
| 8/15/2012 | Credit card | $495 | S.R. | Florissant, Missouri | Universal Marketing & Training, LLC | Frontend sale |
| 9/21/2012 & 10/6/2012 | Credit card | $12,000 | S.R. | Florissant, Missouri | Complete Market Share | Backend reload |
| 8/28/2012 | Credit card | $490 | M.U. | St. Louis, Missouri | Universal Marketing & Training, LLC | Frontend sale |
| 9/14/2012 & 10/31/2012 | Credit card | $16,000 | M.U. | St. Louis, Missouri | Complete Market Share | Backend reload |
| 9/6/2012 | Credit card | $490 | S.G. | St. Louis, Missouri | Universal Marketing & Training, LLC | Frontend sale |
| 9/14/2012 | Credit Card | $20,000 | S.G. | St. Louis, Missouri | Complete Market Share | Backend reload |

| Date | Type | Amount | Individual | Residence | Merchant or Bank Account | Sale Type |
|---|---|---|---|---|---|---|
| 9/12/2012 | Credit Card | $490 | G.C. | Vine Grove, Kentucky | Universal Marketing & Training, LLC | Frontend sale |
| 9/19/2012 | Credit Card | $75,000 | G.C. | Vine Grove, Kentucky | Complete Market Share | Backend reload |
| 10/27/2012 | Credit Card | $495 | T.S. | Kansas City, Missouri | Universal Marketing & Training, LLC | Frontend sale |
| 11/7/2012 | Credit Card | $40,000 | T.S. | Kansas City, Missouri | Complete Market Share | Backend reload |
| 10/25/2012 | Credit card | $495 | J.S. | Chambersberg, Pennsylvania | Universal Marketing & Training, LLC | Frontload sale |
| 11/1/2012 | Credit card | $55,000 | J.S. | Chambersberg, Pennsylvania | Complete Market Share | Backend reload |
| 10/31/2012 | Credit card | $495 | E.B. | Warrenton, Missouri | Universal Marketing & Training, LLC | Frontend sale |
| 11/7/2012 | Credit Card | $25,000 | E.B. | Warrenton, Missouri | Complete Market Share | Backend reload |

I.  **ADDITIONAL ACTS IN FURTHERANCE OF THE SCHEME AND CONSPIRACY RELATED TO WJ STAFFING; B&G DIGITAL WORLD, LLC; MHS CONSULTING AND RELATED MERCHANT ACCOUNTS**

88.     B&G Digital World, LLC consist of individuals who had obtained merchant accounts for the Telemarketing Enterprise under such names as Biz Management Pros.

89.     MHS Consulting, LLC consists of individuals, including defendant Swiantek, who obtained merchant accounts for the Telemarketing Enterprise under such names as Quick Online Biz.

90.    In furtherance of the joint scheme and artifice to defraud and the conspiracy:

a.    on or about December 2013, members of B&G Digital World, LLC and members of MHS Consulting, LLC, including defendant Swiantek, formed a frontend call room for the Telemarketing Enterprise with an initial investment of $108,000 payable to WJ Staffing, an entity of the Telemarketing Enterprise operated and controlled by defendants Murphy, Flynn and McNeill;

b.    one or more members of B&G Digital World, LLC met, on one or more occasions, with Doll, Murphy, Flynn and/or McNeill regarding certain merchant accounts and/or this particular frontend call room of the Telemarketing Enterprise; and

c.    one or more members of MHS Consulting, LLC met, on one or more occasions, with Doll, Murphy, Flynn and/or McNeill regarding certain merchant accounts and/or this particular frontend call room of the Telemarketing Enterprise.

91.    Communications, including emails and texts, in furtherance of the joint scheme and artifice to defraud and the conspiracy that involved members of B&G Digital World, LLC and members of MHS Consulting, LLC include the following:

| Date | From/To | Subject | Message |
|---|---|---|---|
| 12/2013 | To: McNeill From: coconspirator | | Mike, I spoke to Bruce and he help[ed] me understand the importance to make sure the money is there on time … I'll do an over the counter check so it's there right away.  Let's just keep it moving… |
| 12/12/2012 | From: Doll To: Swiantek | Biz System Now | Fwd: |
| 12/12/2013 | From: Swiantek To: coconspirator | Biz System Now | You will need to call this lady.  Ill email you all your info.  It's on your |

| Date | From/To | Subject | Message |
|---|---|---|---|
| | | | applications.  Biz address is Marshalltown. |
| 12/17/2013 | From: Swiantek<br>To: coconspirators | | …The Parties have formed a call center business in the state of Arizona with an initial investment of $108,000 to WJ Staffing… The credit card processing will come from the parties companies and from outside sources… Estimated Breakdown of Profits/Obligations are as follows: … |
| 12/26/2013 | From: wjstaffing@yahoo.com<br>To:  Swiantek | | Please review the attached report for the BizSystemNow project. Please be advised that funds will need to be available for the purchase of the office furniture and equipment as soon as our office is accepted, and for first and last month's rent no later than December 31. |
| 12/26/2013 | From: Swiantek<br>To: wjstaffing@yahoo.com | | Hey WJ,<br><br>The funds are in the account right now… |
| 12/27/2013 | From: wjstaffing@yahoo.com<br>To: Swiantek | Re: Progress Report | Tony,<br>Just got word this morning that John is willing to sell all the furniture and equipment for $8,800, and I told him we would take it. He is also going to throw in the internet equipment (routers, T1s, and the PBX which runs the phones for the building) as well as the |

| Date | From/To | Subject | Message |
|------|---------|---------|---------|
| | | | phone headsets, so this is a really great price… As far as the rent, the check needs to be made payable to [ ]. The first and last month's rent totals $6,322.20, and the monthly rent going forward will be $3,161.10. I will send you the wire information so we can lock it down. Thanks, Colby |
| 12/27/2013 | From: Swiantek To: coconspirator | Fwd: Re: Progress | …Need you to wire asap. Instructions below. |
| 12/27/12 | To: Swiantek | Fwd: Re: Progress | Will wire out tomorrow. 8800$ out of bizsystem acct correct |
| 1/10/2014 | From: wjstaffing@yahoo.com To: Swiantek | Status Report for First Week | Attached is the status report for the first week, along with an invoice for leads that were purchased and an authorization form to change the dialer account… |
| 1/10/2014 | From: Swiantek To: coconspirator | Fw: Status Report for First Week | Need you to fill out this form and get it to Colby ASAP. Call Colby if you have any questions about the form. |
| 1/20/2014 | To: Swiantek From: coconspirator | Re: More Funding | Colby called me this morning to let me know the following needed to be paid for ASAP…We need to make another deposit today. Below is what we were charged for. $4,800 for leads to [ ], $619.18 for dialer time to [ ], $927.37 for internet to Cox…. Please deposit 3250 into bizsystemnow ASAP, … |
| 1/29/2014 | From: Doll To: Swiantek | last week | Gentlemen, I see you have everything worked out with WJ, |

| Date | From/To | Subject | Message |
|---|---|---|---|
| | | | hopefully we can start concentrating on getting this room to over 100k consistently. Pipeline and momentum are extremely important just as with any business.  Consistency and high paychecks on the front end will bear great results on the back end… |
| 1/29/2014 | From: Swiantek To: coconspirator | Fwd: last week | I sent payment to Bruce from Corp Biz Structure… |
| On or about 3/31/2014 | From: McNeill To: Anthony Swiantek (and coconspirators) | | Sorry for being demanding, but I need to see each of you in Vegas this coming Wednesday at 2pm. |
| 4/4/2014 | To: Swiantek From: coconspirator | Vegas Expenses | …Tony you owe $110.50… Any word from McNeil if he's gonna keep processing with us?  Can we look into what our cash would look like if we were to get out of the biz? It's nice to have the cash flow, but I don't think any of us like this business. I don't do sh[ ], and its annoying dealing with these scumbags…Mcneil talked about a sweet spot as far as getting out at the right time, how do we know when that is?[ ] |
| 4/22/2014 | To: Bruce Doll From: coconspirator | Bizsystemnow issue | Just a heads up.  [ ] from Canada called me today saying she bought 30k worth of leads and nobody's answering her calls or helping her out.  She is a single mom of 4 and her family is convincing her it's a scam.  The bank gave her my number to call, can they do that?  This is the same lady who sent the police |

| Date | From/To | Subject | Message |
|------|---------|---------|---------|
| | | | officer to my parents house… |
| 4/27/2014 | From: Swiantek To: coconspirators | Gross last week | Hey Boys, Big numbers for Biz System Last Week. They shut down Vantage but we still ran 60k on it… |
| 6/18/2014 | From: Doll To: Swiantek | FW: Processing | Send bsn here |
| 6/18/2014 | From: Swiantek To: coconspirator | FW: Processing | Click this link and do this app asap.  I am working on F[ ]'s app.  Bruce has all the other stuff. |
| 6/24/2014 | From: Doll To: Swiantek | Correction | This is the app we need, CBS, BSN, and [ ] For CBS and BSN put 350k/month or 4.2 mil… average ticket $3500 max ticket $9k. For J[ ]put $250k/mo or 3mil average ticket $3500 max ticket $9k I think J[ ] IBS is done should have gateway tomorrow |
| 7/16/2014 | From: randallhailee@gmail.com To: Swiantek | Drops | Wire to… |

## J.   ADDITIONAL ACTS IN FURTHERANCE OF THE SCHEME AND CONSPIRACY RELATED TO SMART BUSINESS PROS, LLC AND ALPHA LEAD HOLDINGS, LLC

92.     In furtherance of the joint scheme and artifice to defraud and the conspiracy, the

Telemarketing Enterprise and the defendants herein:

a.      on or before June 4, 2014, defendants Doll, Murphy and others recruited

and caused an individual residing in the Eastern District of Missouri to form a Delaware limited

liability company in the name of Smart Business Pros, LLC, with a stated business address in

Warson Woods, Missouri, for use in the Telemarketing Enterprise;

    b.  between on or about June 4, 2014 and July 21, 2014, directed said

individual to established bank accounts in the Eastern District of Missouri at a branch of US

Bank; and

    c.  beginning on or before July 3, 2014, caused and attempted to cause one

and more merchant accounts to be opened in the name of Smart Business Pros, LLC for use by

the Telemarketing Enterprise for both frontend and backend credit card transactions.  US Bank

account, account no. xxx5401, established in the Eastern District of Missouri, in the name of

Smart Business Pros, LLC was the bank account designated to receive settlement deposits from

Smart Business Pros, LLC's merchant accounts.

  93.  Beginning on or about June 4, 2014, members of the Telemarketing Enterprise,

located both in Phoenix, Arizona and Las Vegas, Nevada, exchanged email communications

with said individual in the Eastern District of Missouri regarding Smart Business Pros, LLC.

Specifically, those email communications concerned:

    a.  establishing the entity Smart Business Pros, LLC, opening bank accounts

in the name of Smart Business Pros, LLC, and applying for merchant accounts with FDIC

insured banks;

    b.  providing the Telemarketing Enterprise access and control over the Smart

Business Pros, LLC bank accounts, including account login and password information, ordering

checks for the Smart Business Pros, LLC bank accounts, and having said checks delivered to the

Telemarketing Enterprise in Arizona;

c.      providing the Telemarketing Enterprise with a signature stamp for use with said checks; and

d.      directions regarding chargebacks notification.

94.      In addition, beginning in September 2014, members of the Telemarketing Enterprise, including defendants Hale, Doll, Murphy, and Hibbert exchanged emails and text messages in reference to APEX Business Development, LLC, another entity created in the Eastern District of Missouri by the Telemarketing Enterprise for the purpose of obtaining one or more merchant accounts.

95.      The emails exchanged, including emails sent to the Eastern District of Missouri and received in the Eastern District of Missouri, include one or more of the following:

| Date | Email address of From | Email address or To(s) | Subject | Message |
|---|---|---|---|---|
| 5/30/2014 | Phil H (philh1999@hotmail.com) | colbymuhlberg@gmail.com | 2 attachments PNC1.pdf, PNC2.pdf | attached Philip Hale |
| 6/4/2014 | colbymuhlberg@gmail.com | bruce-doll@hotmail.com | Smart Business Pro | Attached are the formation docs for Phil's company, both the Articles and the Operating Agreement will be needed to open bank accounts. The website is live at www.smartbusinesspros.com and I am still working on his bank statements. |
| 6/4/2014 | bruce doll (bruce-doll@hotmail.com) | Phil Hale (philh1999@hotmail.com) | 2 attachments Smart Business Pros, LLC... | Bruce Doll |
| 6/9/2014 | bruce doll (bruce-doll@hotmail.com) | Phil Hale (philh1999@hotmail.com) | 2 attachments Smart Business Pros, LLC ... | Here are the articles and operating agreement for Phil |

| Date | Email address of From | Email address or To(s) | Subject | Message |
|---|---|---|---|---|
| | | | | Hale.  Website is listed below. . . Phil, this is all you should need to open bank accounts.  You will need to provide new business bank act info, copy of id, etc. . . . whatever you don't have let me know and ill help you with it. Thank you Bruce Doll |
| 6/9/2014 | [ ]@gmail.com | philh1999@hotmail.com | Introductions | Phil, My name is [ ] I work with Bruce Doll . . . Please see attached Applications for High Risk Accounts. Please fill these out to the best of your abilities.  I've also created a list of the supporting documents required by underwriters at the bank in order to obtain an approval. On occasion more items are needed, but we address those as the bank asks . . . |
| 6/24/2014 | bruce doll ( bruce-doll@hotmail.com) | Phil Hale (philh1999@hotmail.com) | | Hey bud, do you have everything done?  Waiting on you |
| 6/24/2014 | Phil H (philh1999@hotmail.com) | bruce-doll@hotmail.com (bruce-doll@hotmail.com) | | Hopefully this weekend. Philip Hale |

| Date | Email address of From | Email address or To(s) | Subject | Message |
|---|---|---|---|---|
| 7/1/2014 | Phil H (philh1999@hot mail.com) | bruce-doll@hotmail.com | 4 attachments [ ] | Bruce, I've filled out what I know how to. There's a lot of info I dont know what to put. They are attached. Let me know how to fill the rest out. |
| 7/1/2014 | bruce doll (bruce-doll@hotmail.c om) | Phil Hale (philh1999@hotmai l.com) | | Ok, we will finish... |
| 7/2/2014 | Phil H (philh1999@hot mail.com) | colbymuhlberg@g mail.com | 1 attachment CP575Notice_1 404326282154. | Philip Hale 314-623-3199 |
| 7/3/2014 | Phil H (philh1999@hot mail.com) | bruce-doll@hotmail.com | 5 attachments | Bruce, Attached: 1. Copy of ID 2. Copy of Check 3. LLC Docs 4. EIN Doc I never received bank statements. Colby must have them. Philip Hale |
| 7/3/2014 | Phil H (philh1999@hot mail.com) | colbymuhlberg@g mail.com | 6 attachments App... | Philip Hale |
| 7/6/2014 | Phil H (philh1999@hot mail.com) | bruce-doll@hotmail.com | 2 attachments [ ] | Attached Philip Hale |
| 7/7/2014 | Colby Muhlberg (colbymuhlberg @gmail.com | Phil H (philh1999@hotmai l.com) | 2 attachments 9 pages filled out.pdf, smart business pros-blank.pdf | Hi Phil, I have attached both the document I received and on that I filled out. You need to sign everywhere there is an x and return to Bruce . . . Call me if you have any |

| Date | Email address of From | Email address or To(s) | Subject | Message |
|---|---|---|---|---|
| | | | | questions while you are filling it out. Thanks Colby |
| 7/8/2014 | Phil HG (philh1999@hotmail.com) | bruce-doll@hotmail.com | 1 attachment SBP_FPS.PDF | Bruce, Attached Philip Hale |
| 7/9/2014 | Phil H (philh1999@hotmail.com) | colbymuhlberg@gmail.com | 1 attachment Hale_PNC_June.pdf | Colby, Per Bruce my June Bank Statement attached Philip Hale |
| 7/15/2014 | Colby Muhlberg (colbymuhleberg@gmail.com) | Phil H (philh1999@hotmail.com) | Merchant Account in reference to Smart Business Pros, LLC | Phil, I just got the login for your merchant account, so we are ready to start processing. Can you tell me where we are with the bank accounts, checks, signature stamps, etc.? I don't think I ever got the bank account logins from you. Let me know at your earliest convenience please. Thanks, Colby |
| 7/15/2014 | Phil H (philh1999@hotmail.com) | Colby Muhlberg (colbymuhlberg@gmail.com) | login, password and security question information for the Smart Business Pros, LLC bank accounts at US bank | US Bank Login: [ ] Password: [ ] Questions: Dream Job: [ ] Vacation Home: [ ] Model First Car: [ ] Philip Hale |
| 7/17/2014 | Phil H (philh1999@hotmail.com) | colbymuhlberg@gmail.com | | FYI, I called the person at the bank who set my original checking accts and she asked me to |

| Date | Email address of From | Email address or To(s) | Subject | Message |
|---|---|---|---|---|
| | | | | come in Monday at 11:00 because she is not in tomorrow. Philip Hale |
| 7/22/2014 | Colby Muhlberg (colbymuhlberg @gmail.com) | Phil H (philh1999@hotmail.com) | | Hey Phil, The merchant drops look like they are coming in on schedule, and the bank accounts are set up just right…please order 500 checks for the payroll account, the one ending in 4859…Rather than ordering them to your location and then mailing them to us, you could have them sent to our payroll department: CC Payroll Services 3116 S Mill Ave Tempe, AZ 85282 Also, we will need the debit card from the same payroll account and a signature stamp that we can use with the checks mailed to same address at your earliest convenience. You can get a signature stamp made at any Office Max, Staples, etc. Let me know if you have any questions, and feel free to give me a cal if you do. |

| Date | Email address of From | Email address or To(s) | Subject | Message |
|---|---|---|---|---|
| | | | | Thanks, Colby |
| 7/24/2014 | Colby Muhlberg (colbymuhlberg @gmail.com) | Phil H (philh1999@hotmail.com) | instructions for sending a wire | Hey Phil, thanks for taking care of this. Please send a wire in the amount of $16500.00 from the payroll account (ending in 4859) to the following account: CC Payroll Services, LLC . . . Feel free to call me is you have any questions, thanks again. Colby |
| 7/24/2014 | Phil H (philh1999@hotmail.com) | Colby Muhlberg (colbymuhlberg@gmail.com) | | Going into bank 9:30 tmr morning to send the wire Philip Hale |
| 7/24/2014 | Colby Muhlberg (colbymuhlberg @gmail.com) | Phil H (philh1999@hotmail.com) | | Thank you, sir. |
| 7/31/2014 | support@usabancard.com | bruce-doll@hotmail.com | CB Alerts Applications for Smart Business Pros | Attached is your gateway application. It is 12 pages.  I have broken down what needs to be done on each page as well as highlighted each item for you.  In case you have any questions, please do not hesitate to contact us. |
| 7/31/2014 | bruce doll <bruce-doll@hotmail.com> | colbymuhlberg@gmail.com | FW: CB Alerts Application for Smart Business Pros | get this filled out and back from PHIL help him with it if he has problems, thank you |

| Date | Email address of From | Email address or To(s) | Subject | Message |
|---|---|---|---|---|
| 7/31/2014 | Colby Muhlberg (colbymuhlberg @gmail.com) | Phil H (philh1999@hotmail.com) | 1 attachment blank cb alerts Smart Business Pros.pdf (350.0 KB) | |
| 7/31/2014 | Colby Muhlberg (colbymuhlberg @gmail.com) | Phil H (philh1999@hotmail.com) | | And fill in the art on the first page where it asks for the contacts in case of chargebacks. Colby Muhlberg 602-432-9541 colbymuhlberg@gmail.com Mountain Time |
| 8/1/2014 | Colby Muhlberg (colbymuhlberg @gmail.com) | Phil H (philh1999@hotmail.com) | instructions for sending a wire | Please send a wire in the amount of $35,000.00 from the payroll account (ending in 4859) to the following account: CC Payroll Services, LLC . . . Feel free to call me is you have any questions, thanks again. Colby |
| 8/1/2014 | Phil H (philh1999@hotmail.com) | Colby Muhlberg (colbymuhlberg@gmail.com) | | Ok.  Abt 12:30. |
| 8/1/2014 | Colby Muhlberg (colbymuhlberg @gmail.com) | Phil H (philh1999@hotmail.com) | | Thank you Phil. |
| 10/8/2014 | Phil H (philh1999@hotmail.com) | Colby Muhlberg (colbymuhlberg@gmail.com) | Your Deluxe For Business Order Has Shipped | |
| 10/10/2014 | philh1999@hotmail.com | bruce-doll@hotmail.com (bruce-doll@hotmail.com) ; | | Attached is the letter I received in the mail about the chargeback for |

| Date | Email address of From | Email address or To(s) | Subject | Message |
|------|----------------------|------------------------|---------|---------|
| | | randallhailee@gamil.com (randallhailee@gamil.com; cb.fulfillmentspecialists@gamil.com (cb.fulfillmentspecialists@gmail.com) | | Smart Business Pros. Phillip Hale |
| 10/14/2014 | bruce-doll@hotmail.com | rhibbert@micamp.com | new accounts | Russel, Can you give me a call when you have a second?  I have the following accounts that I need a home for Cyber systems 250k/mo less then 1% cb Smart business pro's 250k/mo less then 1/2% cb Internet Market Masters 250k/mo less then 1.5% cb Corporate Business Structure 250k/mo less then 3.5% cb Need about 200-300k for these This one is iffy Biz Systems Now 250k/mo 7.5% cb Brand new Apex (pending with you now) CM Marketing (coming to you soon) VMC Business (coming to you soon) Capital Marketing Pro's (coming to you soon) |

| Date | Email address of From | Email address or To(s) | Subject | Message |
|---|---|---|---|---|
| | | | | Need 200-300k/mo for these . . . PS. Powerpay has released 30k reserve for Quick Online and is considering Bus Management Pro's in 30 days ... Hopefully this gives you more comfort in our abilities to deliver as we originally discussed. Thanks, Bruce Doll |
| 10/14/2014 | Russell Hibbert (rhibbert@micamp.com) | Mister Black (misterblackconsulting@gmail.com) | Re: FW: New apps | Thank You, documents have been provided to my underwriter and in review.  That dept. will let us know if we need anything else likely tomorrow. Hopefully this should be the last of it. Thank You, |
| 10/17/2014 | chargebacks (cb.fulfillmentspecialists@gmail.com) | philh1999@hotmail.com cc:  bruce doll (bruce-doll@hotmail.com) | | I wanted to send out an email addressing the chargeback notification letters. It is important for these letters to be responded on before or on the due date that is specified on each notification letter that comes in. If they are not responded to by the due date, a denial will be issued. |

| Date | Email address of From | Email address or To(s) | Subject | Message |
|---|---|---|---|---|
| | | | | To avoid this, I will need for the chargeback notification letters, pre-arb letter and retrieval letter to either be directly faxed or mailed to me. Below will the fax number and address . . . Henderson NV 89016 You will have to contact the chargeback department to make this change and let them know that you have a third party that will be dealing with the chargebacks . . . |
| 10/21/2014 | Mister Black (misterblackconsulting@gmail.com) | rhibbert@micamp.com | Apps for Smart Business Pros LLC | Per Bruce here are the apps and supporting documents for Smart Business Pros LLC. This company has been processing for a few months and the statements are attached also. |
| 10/29/2014 | Bruce (bruce-doll@hotmail.com) | Russell Hibbert (rhibbert@micamp.com) | Re: meeting recap | Thank you, really need smart business pros and Internet market masters or apex open asap . . . |
| 11/17/2014 | "bruce doll" <bruce-doll@hotmail.com> | "Phil Hale" philh1999@hotmail.com, misterblackconsulting@gmail.com | FW: Underwriting last requests. | |

| Date | Email address of From | Email address or To(s) | Subject | Message |
|---|---|---|---|---|
| 11/18/2014 | Phil H (philh1999@hotmail.com) | Colby Muhlberg (colbymuhlberg@gmail.com) | 1 attachment Smart Business Pros Packet - Updated | |
| 11/19/2014 | bruce doll (bruce-doll@hotmail.com) | rhibbert@micamp.com; misterblackconslutin g@gmail.com | contact | Russ, I'm cc Colby Black so that he and [ ] can link up and work on the pending app's and new app's that are about to be sent over. Colby work with [ ] direct moving forward.  Send them the update I asked you to prepare for the call. Thank you, Bruce Doll |
| 11/19/2014 | Russell Hibbert (rhibbert@micamp.com) | [ ] | Re: contact | [ ], Please meet Colby (cc'd) who works with Bruce Doll.  He will be the contact for new APPS, needed stips etc. . . . |
| 11/20/2014 | Colby Muhlberg (colbymuhlberg@gmail.com) | Phil H (philh1999@hotmail.com) | 1 attachment Smart Business Pros Packet - Updated | Please sign and scan back to me ASAP |
| 11/20/2014 | Phil H (philh1999@hotmail.com) | Colby Muhlberg (colbymuhlberg@gmail.com) | 1 attachment SBP_Merchant _AP.PDF | Philip Hale |
| 11/24/2014 | colbymuhlberg @gmail.com | philh1999@hotmail .com | Re: Apps for signature | Got a new app deck for you to sign, make sure you get all the highlighted spots.  Thanks |
| 11/24/2014 | Phil H (philh1999@hotmail.com) | Colby Muhlberg (colbymuhlberg@gmail.com) | 1 attachment SBP-BMO0AP.PDF (12.5 MB) | |

| Date | Email address of From | Email address or To(s) | Subject | Message |
|------|----------------------|------------------------|---------|---------|
| 11/24/2014 | Colby Muhlberg (colbymuhlberg @gmail.com) | Phil H philh1999@hotmail .com) | | The underwriter has conceded to take your 2011 tax return and a letter from your accountant (on company letterhead) that states he is working on your 2013 tax return . . . |
| 11/25/2014 | Colby Muhlberg (colbymuhlberg @gmail.com) | Phil H (philh1999@hotmai l.com) | | Can I tell them when they can expect to have those?  The underwriter is telling me that once we get those two things turned in they will open the account. |
| 11/25/2014 | Colby Muhlberg (colbymuhlberg @gmail.com) | Phil H (philh1999@hotmai l.com) | | Perfect, thank you. Hope everything is alright for you over there in St. Louis. |
| 11/24/2014 | Phil H (philh1999@hot mail.com) | colbymuhlberg@g mail.com | 2 attachments | Philip Hale |
| 12/1/2014 | Phil H (philh1999@hot mail.com) | colbymuhlberg@g mail.com | 1 attachment Hale_Tax_Lette r.PDF | Colby, Letter attached Philip Hale 314-623-3199 |
| 12/2/2014 | Phil H (philh1999@hot mail.com) | Colby Muhlberg (colbymuhlberg@g mail.com) | 1 attachment SBP_Page20.P DF (20.1 KB) | |
| 12/2/2014 | colbymuhlberg @gmail.com | philh1999@hotmail .com | Re: Acct Letter | Can you sign the two spaces on the right and return to me please? |
| 12/11/2014 | [ ] @micamp.com | Russell Hibbert (rhibbert@micamp. com); bruce-doll@hotmail.com; Mister Black (misterblackconsult ing@gmail.com) | Call- Changing the Price Points | Russ, Please contact Bruce @ 11:00 MST. |

| Date | Email address of From | Email address or To(s) | Subject | Message |
|---|---|---|---|---|
| 12/17/2014 | Phil H (philh1999@hotmail.com) | colbymuhlberg@gmail.com | 1 attachment SBP_Corporation_Invoice.PDF | Received this in the mail today.  I guess I overlooked the first one. Philip Hale |
| 12/17/2014 | Colby Muhlberg (Colbymuhlberg@gmail.com) | Phil H (philh1999@hotmail.com) | | I'll get it taken care of. |
| 1/5/2015 | Phil H (philh1999@hotmail.com) | colbymuhlberg@gmail.com | 1 attachment Merchant-Esolutions-Letter.PDF | Received in the mail today.  Letter is attached. Philip Hale |
| 1/15/2015 | Phil H (philh1999@hotmail.com) | colbymuhlberg@gmail.com | 1 attachment EMS-Letter.PDF | Received this in the mail today. Philip Hale |

**K.**   **ADDITIONAL ACTS IN FURTHERANCE OF THE SCHEME AND CONSPIRACY RELATED TO IP ADDRESS   70.166.113.25; 70.184.119.10; 184.176.131.4 INCLUDE THE FOLLOWING:**

96.   In furtherance of the scheme and conspiracy, the Telemarketing Enterprise sold

L.S. the business opportunity set forth in this Indictment.  As to these fraudulent sales:

a.   L.S. paid with his credit card for his frontend purchase;

b.   L.S. paid with his credit card for his backend purchase; and

c.   the IP addresses associated with L.S.'s credit card transactions include the

following:

| Date | Type | IP Address | Amount | Individual | Residence | Merchant |
|---|---|---|---|---|---|---|
| 3/3/2015 | Credit Card Authorization | 70.184.119.10 | $   895.00 | L.S. | Hannibal, MO | Smart Business Pros |
| 3/6/2015 | Credit Card Capture | 184.176.131.4 | $   895.00 | L.S. | Hannibal, MO | Smart Business Pros |

| Date | Type | IP Address | Amount | Individual | Residence | Merchant |
|------|------|-----------|--------|-----------|-----------|----------|
| 3/9/2015 | Credit Card Authorization | 70.166.113.25 | $ 5,000.00 | L.S. | Hannibal, MO | Smart Business Pros |
| 3/10/2015 | Credit Card Authorization | 70.166.113.25 | $ 5,000.00 | L.S. | Hannibal, MO | Smart Business Pros |
| 3/17/2015 | Credit Card Capture | 70.166.113.25 | $ 5,000.00 | L.S. | Hannibal, MO | Smart Business Pros |
| 3/17/2015 | Credit Card Capture | 70.166.113.25 | $ 5,000.00 | L.S. | Hannibal, MO | Smart Business Pros |
| 4/17/2015 | Credit Card Authorization | 70.166.113.25 | $ 5,000.00 | L.S. | Hannibal, MO | Cash Box SEO |
| 4/20/2015 | Credit Card Capture | 70.166.113.25 | $ 5,000.00 | L.S. | Hannibal, MO | Cash Box SEO |

97.     In furtherance of the scheme and conspiracy, credit card transactions with the

same IP address associated with L.S.'s credit card transactions include the following:

| Date | Type | IP Address | Amount | Individual | Residence | Merchant |
|------|------|-----------|--------|-----------|-----------|----------|
| 5/12/2015 | Credit Card Capture | 70.166.113.25 | $   895.00 | B.S. | Palm Desert, CA | Capital Marketing Pros |
| 3/16/2015 | Credit Card Capture | 70.166.113.25 | $   895.00 | F.S. | Springfield, IL | Smart Business Pros |
| 3/13/2015 | Credit Card Authorization | 70.166.113.25 | $ 1,000.00 | F.S. | Springfield, IL | Smart Business Pros |
| 3/18/2015 | Credit Card Capture | 70.166.113.25 | $ 1,000.00 | F.S. | Springfield, IL | Smart Business Pros |
| 3/13/2015 | Credit Card Authorization | 70.166.113.25 | $ 4,000.00 | F.S. | Springfield, IL | Cash Box SEO |
| 3/23/2015 | Credit Card Capture | 70.166.113.25 | $ 4,000.00 | F.S. | Springfield, IL | Cash Box SEO |
| 3/13/2015 | Credit Card Authorization | 70.166.113.25 | $ 5,000.00 | F.S. | Springfield, IL | Smart Business Pros |
| 3/18/2015 | Credit Card Capture | 70.166.113.25 | $ 5,000.00 | F.S. | Springfield, IL | Smart Business Pros |
| 3/5/2015 | Credit Card Authorization | 70.184.119.10 | $   895.00 | F.S. | Springfield, IL | Smart Business Pros |
| 2/27/2015 | Credit Card Capture | 184.176.131.4 | $   895.00 | H.G. | Pensacola, FL | Smart Business Pros |

| Date | Type | IP Address | Amount | Individual | Residence | Merchant |
|------|------|-----------|--------|-----------|-----------|----------|
| 3/16/2015 | Credit Card Capture | 70.166.113.25 | $   495.00 | J.C. | Rochester, NY | Smart Business Pros |
| 3/18/2015 | Credit Card Capture | 70.166.113.25 | $   895.00 | L.C. | North Glenn, CO | Smart Business Pros |
| 2/4/2015 | Credit Card Capture | 184.176.131.4 | $   895.00 | L.D. | Golden, CO | Smart Business Pros |
| 4/7/2015 | Credit Card Authorization | 70.166.113.25 | $ 7,000.00 | R.B. | Nashville, TN | Cash Box SEO |
| 4/7/2015 | Credit Card Authorization | 70.166.113.25 | $   500.00 | R.B. | Nashville, TN | Cash Box SEO |
| 4/7/2015 | Credit Card Authorization | 70.166.113.25 | $ 4,000.00 | R.B. | Nashville, TN | Internet Market Master |
| 4/7/2015 | Credit Card Authorization | 70.166.113.25 | $ 1,000.00 | R.B. | Nashville, TN | Internet Market Master |
| 4/7/2015 | Credit Card Authorization | 70.166.113.25 | $ 2,500.00 | R.B. | Nashville, TN | Internet Market Master |
| 4/13/2015 | Credit Card Capture | 70.166.113.25 | $ 7,000.00 | R.B. | Nashville, TN | Cash Box SEO |
| 4/13/2015 | Credit Card Capture | 70.166.113.25 | $   500.00 | R.B. | Nashville, TN | Cash Box SEO |
| 4/13/2015 | Credit Card Capture | 70.166.113.25 | $ 4,000.00 | R.B. | Nashville, TN | Internet Market Master |
| 4/13/2015 | Credit Card Capture | 70.166.113.25 | $ 1,000.00 | R.B. | Nashville, TN | Internet Market Master |
| 4/13/2015 | Credit Card Capture | 70.166.113.25 | $ 2,500.00 | R.B. | Nashville, TN | Internet Market Master |
| 3/23/2015 | Credit Card Capture | 70.166.113.25 | $   695.00 | R.B. | Nashville, TN | Smart Business Pros |
| 4/24/2015 | Credit Card Capture | 70.166.113.25 | $   695.00 | S.C. | Seminole, FL | Capital Marketing Pros |
| 2/3/2015 | Credit Card Capture | 184.176.131.4 | $   695.00 | S.H. | Montagne, MI | Smart Business Pros |

98.     In furtherance of the scheme and conspiracy, as to the individuals noted above,

additional backend reload payments were made by check or wire, include the following:

| Date | Type | Amount | Individual | Residence | Bank Account |
|------|------|--------|-----------|-----------|--------------|
| 5/19/2015 | Check | $  75,000.00 | B.S. | Palm Desert, CA | Alpha Lead Holdings |
| 3/24/2015 | Check | $  70,000.00 | F.S. | Springfield, IL | Alpha Lead Holdings |
| 3/30/2015 | Check | $  36,000.00 | H.G. | Pensacola, FL | Alpha Lead Holdings |
| 4/3/2015 | Check | $101,000.00 | J.C. | Rochester, NY | Alpha Lead Holdings |

| Date | Type | Amount | Individual | Residence | Bank Account |
|------|------|--------|-----------|-----------|--------------|
| 3/23/2015 | Check | $101,000.00 | L.C. | North Glenn, CO | Alpha Lead Holdings |
| 3/3/2015 | Wire | $ 50,000.00 | L.D. | Golden, CO | Alpha Lead Holdings |
| 4/15/2015 | Check | $110,000.00 | R.B. | Nashville, TN | Alpha Lead Holdings |
| 5/29/2015 | Check | $ 33,295.00 | S.C. | Seminole, FL | Alpha Lead Holdings |
| 2/11/2015 | Check | $ 50,000.00 | S.H. | Montagne, MI | Alpha Lead Holdings |

**L.  ADDITIONAL ACTS IN FURTHERANCE OF THE SCHEME AND CONSPIRACY RELATED TO SMART BUSINESS PROS, LLC AND ALPHA LEAD HOLDINGS, LLC INCLUDE THE FOLLOWING:**

99.     Between on or about January and February 2015, an individual member of the Telemarketing Enterprise established bank accounts at Bank of America and Wells Fargo in the name of Alpha Lead Holdings, LLC.

100.    In furtherance of the scheme and conspiracy, additional transactions involving individuals who made payments to Smart Business Pros and/or Alpha Lead Holdings include the following:

| Date | Type | Amount | Individual | Residence | Merchant or Bank Account | Sale Type |
|------|------|--------|-----------|-----------|--------------------------|-----------|
| 7/3/14 | Credit card | $895 | P.S. | Aurora, Colorado | Internet Biz System | Frontend sale |
| 7/18/14 | Credit card | $7,500 | P.S. | Aurora, Colorado | Smart Business Pros, LLC | Backend reload |
| 1/29/15 | Credit card | $695 | S.H. | Montagne, Michigan | Smart Business Pros, LLC | Frontend sale |
| 2/10/15 | Check | $50,000 | S.H. | Montagne, Michigan | Alpha Lead Holdings, LLC | Backend reload |
| 1/26/15 | Credit card | $895 | L.H. | Vienna, Virginia | Smart Business Pros, LLC | Frontend sale |
| 2/2/15 | Wire | $40,000 | L.H. | Vienna, Virginia | Alpha Lead Holdings, LLC | Backend reload |

| Date | Type | Amount | Individual | Residence | Merchant or Bank Account | Sale Type |
|------|------|--------|------------|-----------|--------------------------|-----------|
| 1/27/15 | Credit card | $895 | L.D. | Golden, Colorado | Smart Business Pros, LLC | Frontend sale |
| 3/3/15 | Wire | $50,000 | L.D. | Golden, Colorado | Alpha Lead Holdings, LLC | Backend reload |
| 1/10/15 | Credit card | $895 | S.T. | Center Point, Iowa | Smart Business Pros, LLC | Frontend sale |
| 3/19/15 | Check | $35,000 | S.T. | Center Pont, Iowa | Alpha Lead Holdings, LLC | Backend reload |
| 3/5/15 | Credit card | $895 | F.S. | Springfield, Illinois | Smart Business Pros, LLC | Frontend sale |
| 3/24/15 | Check | $70,000 | F.S. | Springfield, Illinois | Alpha Leading Holdings, LLC | Backend reload |
| 3/11/15 | Credit card | $895 | L.C. | Northglenn, Colorado | Smart Business Pros, LLC | Frontend sale |
| 3/20/15 | Check | $101,000 | L.C. | Northglenn, Colorado | Alpha Lead Holdings, LLC | Backend reload |
| 2/17/15 | Credit card | $895 | M.F. | Monona, Wisconsin | Smart Business Pros, LLC | Frontend sale |
| 3/12/15 | Check | $65,000 | M.F. | Monona, Wisconsin | Alpha Lead Holdings, LLC | Backend reload |
| 1/16/15 | Credit card | $895 | S.L. | Milwaukee, Wisconsin | Smart Business Pros, LLC | Frontend sale |
| 1/22/15 | Wire | $20,000 | S.L. | Milwaukee, Wisconsin | Alpha Lead Holdings, LLC | Backend reload |
| 3/10/15 | Credit card | $495 | J.C. | Rochester, New York | Smart Business Pros, LLC | Frontend sale |

| Date | Type | Amount | Individual | Residence | Merchant or Bank Account | Sale Type |
|------|------|--------|-----------|-----------|--------------------------|-----------|
| 4/1/15 | Check | $101,000 | J.C. | Rochester, New York | Alpha Lead Holdings, LLC | Backend reload |
| 2/23/15 | Credit card | $895 | H.G. | Pensacola, Florida | Smart Business Pros, LLC | Frontend sale |
| Between 3/1/15 and 4/14/15 | Checks | $41,000 | H.G. | Pensacola, Florida | Alpha Lead Holdings, LLC | Backend reload |
| 1/26/15 | Credit card | $895 | K.M. | Sylvan Lake, Alberta, Canada | Smart Business Pros, LLC | Frontend sale |
| 2/2015 | Wires | $39,980 | K.M. | Sylvan Lake, Alberta, Canada | Alpha Lead Holdings LLC | Backend reload |
| 2/13/15 | Credit card | $895 | P.M. | Providence, Rhode Island | Smart Business Pros, LLC | Frontend sale |
| 2/23/15 | Wire | $10,000 | P.M. | Providence, Rhode Island | Alpha Lead Holdings, LLC | Backend reload |
| 10/23/14 | Credit card | $895 | K.F. | Luling, Louisiana | Internet Market Master, LLC | Frontend sale |
| 11/6/14 | Wire | $10,000 | K.F. | Luling, Louisiana | Smart Business Pros, LLC | Backend reload |
| 3/19/15 | Credit card | $695 | R.S. | Nashville, Tennessee | Smart Business Pros, LLC | Frontend sale |
| 4/14/15 | Check | $110,000 | R.S. | Nashville, Tennessee | Alpha Lead Holdings, LLC | Backend reload |
| 10/25/14 | Credit card | $895 | J.G. | South Bend, Indiana | Internet Market Master, LLC | Frontend sale |
| 11/12/14 | Check | $20,000 | J.G. | South Bend, Indiana | Smart Business Pros, LLC | Backend reload |

**M.   ADDITIONAL ACTS IN FURTHERANCE OF THE SCHEME AND CONSPIRACY SPECIFIC TO SPROUT FINANCIAL AND ALPHA LEAD HOLDINGS, LLC**

101.   As part of the conspiracy and scheme and artifice to defraud, and in order to execute the scheme and artifice to defraud, and to attempt to execute the scheme and artifice to defraud, individuals obtained funds by and through the services of Sprout Financial for the purchase of leads from Alpha Lead Holdings.

102.   Emails initially exchanged regarding referrals to Sprout Financial include the following:

| Date | Email address of From | Email address or To(s) | Subject | Message |
|---|---|---|---|---|
| 1/19/2015 | Russell Hibbert rhibbert@micamp. com | bruce-doll@hotmail.com | Re:  friday meeting | Hi Bruce, For funding applications for Sproutfin (Sprout Financial).  Please submit all potential clients to applications@sproutfin. com, that are 680 credit score or above. Processing team will then do pre-qual / conditions letter.  I then will assign an RM []to call the customers, sell the deal, work through conditions if needed and manage the funding process, liquidation & Billing with client.  If you just want to send client information [ ] can pull credit report internally when he calls customer.  [ ] will call from Sprout Financial on behalf of the name of the company the |

| Date | Email address of From | Email address or To(s) | Subject | Message |
|---|---|---|---|---|
| | | | | customer is working with on your side. |
| 2/2/2015 | Russell Hibbert rhibbert@micamp.com | bruce-doll@hotmail.com | Sprout deals | Bruce, where are all my deals for Sprout, we are ready to handle some funding to these clients and get you guys paid! |
| 2/2/2015 | Bruce Doll bruce-doll@hotmail.com | rhibbert@micamp.com | Sprout deals | We've been sending them, there are at least 10 submitted so far. |

103.    Individual clients of Sprout Financial who purchased leads as part of a reload

involving "corporate credit" include the following:

| Sprout Client | Date Sprout Consulting Fee Collected | Leads Purchased From |
|---|---|---|
| L.B. | 3/16/15 | Alpha Lead Holdings |
| D.T. | 3/18/15 | Alpha Lead Holdings |
| G.H. | 3/20/15 | Alpha Lead Holdings |
| H.G. | 3/24/15 | Alpha Lead Holdings |
| J.C. | 4/28/15 | Alpha Lead Holdings |
| R.L. | 5/4/15 | Alpha Lead Holdings |
| L.M. | 5/18/15 | Alpha Lead Holdings |

## N.    ADDITIONAL ACTS IN FURTHERANCE OF THE SCHEME AND CONSPIRACY SPECIFIC TO QUICK ONLINE BIZ, LLC, BIZ MANAGEMENT PROS AND RLR ENTERPRISES, LLC

104.    As part of the conspiracy and scheme and artifice to defraud, and in order to

execute the scheme and artifice to defraud, and to attempt to execute the scheme and artifice to

defraud, the Telemarketing Enterprise and the defendants herein:

a.    on or about November 5, 2013, established bank accounts at Wells Fargo

in the name of H&R Investments, LLC which received deposits on behalf of merchant Biz

Management Pros;

b.      on or about December 16, 2013, established bank accounts at Wells Fargo in the name of Quick Online Biz, LLC;

c.      between on or about September 1, 2013 and October 17, 2013, established bank accounts at Bank of America and Wells Fargo in the name of RLR Enterprises, LLC;

d.      on or about June 2013, applied for and opened merchant accounts in the name of, and/or used by, Biz Management Pros; and

e.      on or about November 2013, applied for and opened merchant accounts in the name of Quick Online Biz, LLC.

105.    On or about December 23, 2013, a frontend call room of the Phoenix, Arizona based Telemarketing Enterprise contacted M.K., an individual residing in Pompano Beach, Florida, at home by one or more interstate telephone calls regarding the business opportunity as set forth above.  Based upon representations made to M.K. consistent with the frontend script of the Telemarketing Enterprise, M.K. agreed to purchase and invest in the business opportunity and pay, by credit card, the start-up fee of $695.00 and did, in fact, receive an invoice to execute from a merchant of the Telemarketing Enterprise, Biz Management Pros, as part of the Telemarketing Enterprise.

106.    On or about December 20, 2013, a frontend call room of the Phoenix, Arizona based Telemarketing Enterprise contacted L.B. and E.B., a husband and wife, residing in Chesterfield, Missouri, in the Eastern District of Missouri, at home by one or more interstate telephone calls regarding the business opportunity set forth above.  Based upon representations made to L.B. and E.B. consistent with the frontend scripts of the Telemarketing Enterprise, L.B. and E.B. agreed to purchase and invest in the business opportunity and pay, by credit card, the

start-up fee of $695.00 and E.B.'s credit card was, in fact, charged by a merchant of the Telemarketing Enterprise, Biz Management Pros, as part of the Telemarketing Enterprise.

107.    Beginning on or about January 2, 2014, a Reloader for the Telemarketing Enterprise contacted M.K. by interstate telephone call and, thereafter, convinced M.K. to purchase leads as part of the business opportunity offered by the Telemarketing Enterprise. Based upon the representations by the Reloader, consistent with those set forth above, M.K. did, in fact, purchase leads from RLR Enterprises, LLC, an entity of the Telemarketing Enterprise, and per the instructions provided by the Telemarketing Enterprise, paid $20,000 by personal check, check no. 303, made payable to RLR Enterprises, LLC and said personal check was, in fact, deposited on or about January 29, 2014 into a bank account at Bank of America held in the name of RLR Enterprises, LLC.

108.    On or about January 2, 2014, the same Reloader who contacted M.K. contacted and convinced L.B. and E.B. to purchase leads as part of the business opportunity offered by the Telemarketing Enterprise. Based upon representations by the Reloader, consistent with those set forth above, L.B. and E.B. did, in fact, purchase leads from Quick Online Biz, LLC and Biz Management Pros, both entities and merchants of the Telemarketing Enterprise. L.B. used a credit card and was charged $7,500.00 for the purchase of leads from Biz Management Pros; E.B. used two credit cards and was charged $9,000.00 for the purchase of leads from Biz Management Pros and $3,500.00 for the purchase of leads from Quick Online Biz, LLC.

## O.    THE WIRE

109.    On or about January 2, 2014, in the Eastern District of Missouri and elsewhere,

MICHAEL McNEILL a/k/a Mr. White a/k/a Todd Lockwood,
JOSHUA FLYNN a/k/a Mr. Pink a/k/a Jeff Thomas,
TIMOTHY MURPHY a/k/a Mr. Black a/k/a Colby Muhlberg a/k/a Arthur Whitton,
ASHLEY POWELL a/k/a Ashley Bazin a/k/a Ashley Payne a/k/a Brittany Wilson,

88

THOMAS SILHA a/k/a Keith Henderson a/k/a Dave Marsh,
SHAWN CASEY a/k/a Shawn Anderson a/k/a Daniel Arenson,
JENNIFER HANSEN a/k/a Hailee Randall,
ANDRE DEVOE,
JOHN BALLEWEG a/k/a Trent Lombardi,
DEAN MILLER a/k/a Jeffrey Wilkes
MICHAEL SILVER a/k/a Michael Wright,
BRUCE DOLL,
ANTHONY SWIANTEK, and
RUSSELL HIBBERT,

the defendants herein, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing this scheme to defraud and in attempting to do so, and in connection with telemarketing that victimized ten or more persons over the age of 55 and targeted persons over the age of 55, caused to be transmitted by means of wire communication in interstate commerce, certain signs, signals and sounds, that is, one and more interstate telephone calls between a backend room Reloader of the Telemarketing Enterprise in Phoenix, Arizona and L.B. and E.B. at their residence in Chesterfield, Missouri as part of a backend reload sales pitch which, in fact, resulted in L.B. and E.B. agreeing to purchase leads as represented from the Reloader and the Telemarketing Enterprise and engaging in credit card transactions processed through merchants accounts in the name of Quick Online Biz, LLC and Biz Management Pros totaling $20,000.

In violation of Title 18, United States Code, Sections 1343, 2326 and 2.

## COUNT 3
## Wire Fraud, Telemarketing, Aiding and Abetting
## 18 U.S.C. §§ 1343, 2326 and 2

The Grand Jury further charges:

1.      The allegations of Paragraphs 1 through 108 of Count 2 are incorporated by reference as if fully set forth herein.

2.      On or about June 9, 2014, in the Eastern District of Missouri and elsewhere,

MICHAEL McNEILL a/k/a Mr. White a/k/a Todd Lockwood,
JOSHUA FLYNN a/k/a Mr. Pink a/k/a Jeff Thomas,
TIMOTHY MURPHY a/k/a Mr. Black a/k/a Colby Muhlberg a/k/a Arthur Whitton,
ASHLEY POWELL a/k/a Ashley Bazin a/k/a Ashley Payne a/k/a Brittany Wilson,
THOMAS SILHA a/k/a Keith Henderson a/k/a Dave Marsh,
SHAWN CASEY a/k/a Shawn Anderson a/k/a Daniel Arenson,
SCOTT SHOCKLEE a/k/a Fredo,
JENNIFER HANSEN a/k/a Hailee Randall,
ANDRE DEVOE,
JOHN BALLEWEG a/k/a Trent Lombardi,
DEAN MILLER a/k/a Jeffrey Wilkes
MICHAEL SILVER a/k/a Michael Wright,
BRUCE DOLL,
ANTHONY SWIANTEK,
PHILIP HALE, and
CYBILL OSTERMAN,

the defendants herein, and other persons known and unknown to the Grand Jury, for the purpose

of executing this scheme and artifice to defraud, and to obtain money and property by means of

materially false and fraudulent pretenses, representations and promises, and in attempting to do

so, and in connection with telemarketing that victimized ten or more persons over the age of 55

and targeted persons over the age of 55, caused to be transmitted by means of wire

communication in interstate commerce, certain signs, signals and sounds, that is, an email

communication between Nevada and Missouri regarding applications for high risk merchant

accounts for Smart Business Pros, LLC.

In violation of Title 18, United States Code, Sections 1343, 2326 and 2.

### COUNT 4
### Mail Fraud, Telemarketing, Aiding and Abetting
### 18 U.S.C. §§ 1341, 2326 and 2

The Grand Jury further charges:

1.      The allegations of Paragraphs 1 through 108 of Count 2 are incorporated by

reference as if fully set forth herein.

90

2.     On or about November 12, 2014, in the Eastern District of Missouri and

elsewhere,

MICHAEL McNEILL a/k/a Mr. White a/k/a Todd Lockwood,
JOSHUA FLYNN a/k/a Mr. Pink a/k/a Jeff Thomas,
TIMOTHY MURPHY a/k/a Mr. Black a/k/a Colby Muhlberg a/k/a Arthur Whitton,
ASHLEY POWELL a/k/a Ashley Bazin a/k/a Ashley Payne a/k/a Brittany Wilson,
THOMAS SILHA a/k/a Keith Henderson a/k/a Dave Marsh,
SHAWN CASEY a/k/a Shawn Anderson a/k/a Daniel Arenson,
SCOTT SHOCKLEE a/k/a Fredo,
JENNIFER HANSEN a/k/a Hailee Randall,
ANDRE DEVOE,
JOHN BALLEWEG a/k/a Trent Lombardi,
DEAN MILLER a/k/a Jeffrey Wilkes
MICHAEL SILVER a/k/a Michael Wright,
BRUCE DOLL,
ANTHONY SWIANTEK,
PHILIP HALE,
CYBILL OSTERMAN and
BRIAN PHILLIPS,

the defendants herein, having devised and intending to devise a scheme and artifice to defraud,

and to obtain money and property by means of materially false and fraudulent pretenses,

representations, and promises, and for the purpose of executing this scheme to defraud and in

attempting to do so, and in connection with telemarketing that victimized ten or more persons

over the age of 55 and targeted persons over the age of 55, did knowingly cause to be sent and

delivered by mail: check no. 7822, drawn on an account in the name of J.G., account no.

xxx1114, with Teachers Credit Union, payable to Smart Business Pros, LLC, in the amount of

$20,000, from Indiana to Missouri, with such funds representing the purchase of leads from the

Telemarketing Enterprise as represented by a Reloader of the Telemarketing Enterprise.

In violation of Title 18, United States Code, Sections 1341, 2326 and 2.

## COUNT 5
### Wire Fraud, Telemarketing, Aiding and Abetting
### 18 U.S.C. §§ 1343, 2326 and 2

The Grand Jury further charges:

1.      The allegations of Paragraphs 1 through 108 of Count 2 are incorporated by reference as if fully set forth herein.

2.      On or about August 21, 2012, in the Eastern District of Missouri and elsewhere,

DONALD SCHNOCK,
MICHAEL McNEILL a/k/a Mr. White a/k/a Todd Lockwood,
JASON GALLAGHER,
ASHLEY POWELL a/k/a Ashley Bazin a/k/a Ashley Payne a/k/a Brittany Wilson, and
ANDRE DEVOE,

the defendants herein, and other persons known and unknown to the Grand Jury, for the purpose of executing this scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and in attempting to do so, and in connection with telemarketing that victimized ten or more persons, caused to be transmitted by means of wire communication in interstate commerce, certain signs, signals and sounds, that is, one and more interstate telephone calls between a backend room Reloader of the Telemarketing Enterprise in Phoenix, Arizona and S.L. in University City, Missouri as part of a backend reload sales pitch which, in fact, resulted in S.L. agreeing to purchase leads as represented from the Reloader and the Telemarketing Enterprise and engaging in credit card transactions processed through merchants accounts in the name of Network Market Solutions totaling $40,000.

In violation of Title 18, United States Code, Sections 1343, 2326 and 2.

## COUNT 6
### Wire Fraud, Telemarketing, Aiding and Abetting
### 18 U.S.C. §§ 1343, 2326 and 2

The Grand Jury further charges:

1.    The allegations of Paragraphs 1 through 108 of Count 2 are incorporated by reference as if fully set forth herein.

2.    Between or about September 14, 2012, in the Eastern District of Missouri and elsewhere,

DONALD SCHNOCK,
MICHAEL McNEILL a/k/a Mr. White a/k/a Todd Lockwood,
JASON GALLAGHER,
ASHLEY POWELL a/k/a Ashley Bazin a/k/a Ashley Payne a/k/a Brittany Wilson, and
ANDRE DEVOE,

the defendants herein, and other persons known and unknown to the Grand Jury, for the purpose of executing this scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and in attempting to do so, and in connection with telemarketing that victimized ten or more persons, caused to be transmitted by means of wire communication in interstate commerce, certain signs, signals and sounds, that is, one and more interstate telephone calls between a backend room Reloader, Michael McNeill, of the Telemarketing Enterprise in Phoenix, Arizona and S.G. in St. Louis, Missouri as part of a backend reload sales pitch which, in fact, resulted in S.G. agreeing to purchase leads as represented from the Reloader and the Telemarketing Enterprise and engaging in credit card transactions processed through merchants accounts in the name of Complete Market Share totaling $20,000.

In violation of Title 18, United States Code, Sections 1343, 2326 and 2.

## COUNT 7
## Wire Fraud, Telemarketing, Aiding and Abetting
## 18 U.S.C. §§ 1343, 2326 and 2

The Grand Jury further charges:

1.      The allegations of Paragraphs 1 through 108 of Count 2 are incorporated by

reference as if fully set forth herein.

2.      Between or about March 3, 2015 and April 17, 2015, in the Eastern District of

Missouri and elsewhere,

MICHAEL McNEILL a/k/a Mr. White a/k/a Todd Lockwood,
JOSHUA FLYNN a/k/a Mr. Pink a/k/a Jeff Thomas,
TIMOTHY MURPHY a/k/a Mr. Black a/k/a Colby Muhlberg a/k/a Arthur Whitton,
ASHLEY POWELL a/k/a Ashley Bazin a/k/a Ashley Payne a/k/a Brittany Wilson,
THOMAS SILHA a/k/a Keith Henderson a/k/a Dave Marsh,
SHAWN CASEY a/k/a Shawn Anderson a/k/a Daniel Arenson,
SCOTT SHOCKLEE a/k/a Fredo,
JENNIFER HANSEN a/k/a Hailee Randall,
ANDRE DEVOE,
JOHN BALLEWEG a/k/a Trent Lombardi,
DEAN MILLER a/k/a Jeffrey Wilkes
MICHAEL SILVER a/k/a Michael Wright,
BRUCE DOLL,
ANTHONY SWIANTEK,
PHILIP HALE,
CYBILL OSTERMAN,
BRIAN PHILLIPS, and
RUSSELL HIBBERT,

the defendants herein, and other persons known and unknown to the Grand Jury, for the purpose

of executing this scheme and artifice to defraud, and to obtain money and property by means of

materially false and fraudulent pretenses, representations and promises, and in attempting to do

so, and in connection with telemarketing that victimized ten or more persons, caused to be

transmitted by means of wire communication in interstate commerce, certain signs, signals and

sounds, that is, one and more interstate telephone calls between frontend Rollers, Closers and a

backend Reloader of the Telemarketing Enterprise in Phoenix, Arizona and L.S. in Hannibal,

Missouri as part of a frontend sale and backend reload sale that, in fact, resulted in L.S. agreeing to purchase leads as represented from the Reloader and the Telemarketing Enterprise and engaging in frontend and backend credit card transactions processed through merchants accounts in the name of Smart Business Pros, totaling $20,895.

In violation of Title 18, United States Code, Sections 1343, 2326 and 2.

## COUNT 8
## Bank Fraud, Aiding and Abetting
## 18 U.S.C. §§ 1344 and 2

The Grand Jury further charges:

1.     The allegations of Paragraphs 1 through 108 of Count 2 are incorporated by reference as if fully set forth herein.

2.     At all times material, BMO Harris Bank NA was a federally-insured financial institution and Electronic Merchant Systems was a registered ISO/MSP of BMO Harris Bank NA.

3.     On or about December 2014, in the Eastern District Missouri and elsewhere, the defendants,

MICHAEL McNEILL a/k/a Mr. White a/k/a Todd Lockwood,
JOSHUA FLYNN a/k/a Mr. Pink a/k/a Jeff Thomas,
TIMOTHY MURPHY a/k/a Mr. Black a/k/a Colby Muhlberg a/k/a Arthur Whitton,
BRUCE DOLL,
PHILIP HALE, and
RUSSELL HIBBERT,

aided and abetted by each other, and others known and unknown to the Grand Jury, did knowingly and intentionally devise and engage in and attempt to engage in a scheme and artifice to defraud and to obtain, moneys, funds, assets and credits owned by and under the custody and control of BMO Harris Bank NA, the deposits of which were insured by the Federal Deposit Insurance Corporation, by means of material false and fraudulent pretenses, representations and

promises, in that the defendants prepared, made, executed and submitted an application for a

merchant account with BMO Harris Bank, through the bank's registered ISO/MSP, and did, in

fact, obtain and maintain a BMO Harris Bank merchant account, MID number xxx6882, from

BMO Harris Bank, in the name of Smart Business Pros, LLC, for the purpose of processing and

settling credit card transactions, and in so doing, prepared and provided materially false and

fraudulent information and statements to BMO Harris Bank.

In violation of Title 18, United States Code, Sections 1344 and 2.

## COUNT 9
## Bank Fraud, Aiding and Abetting
## 18 U.S.C. §§ 1344 and 2

The Grand Jury further charges:

1.    The allegations of Paragraphs 1 through 108 of Count 2 are incorporated by

reference as if fully set forth herein.

2.    At all times material, Synovus Bank was a federally-insured financial institution

and Merchant E-Solutions was a registered ISO/MSP of Synovus Bank;

3.    On or about December 2014, in the Eastern District Missouri and elsewhere, the

defendants,

MICHAEL McNEILL a/k/a Mr. White a/k/a Todd Lockwood,
JOSHUA FLYNN a/k/a Mr. Pink a/k/a Jeff Thomas,
TIMOTHY MURPHY a/k/a Mr. Black a/k/a Colby Muhlberg a/k/a Arthur Whitton,
BRUCE DOLL,
PHILIP HALE, and
RUSSELL HIBBERT,

aided and abetted by each other, and others known and unknown to the grand jury, did

knowingly and intentionally devise and engage in and attempt to engage in a scheme and artifice

to defraud and to obtain, moneys, funds, assets and credits owned by and under the custody and

control of Synovus Bank, the deposits of which were insured by the Federal Deposit Insurance

Corporation, by means of material false and fraudulent pretenses, representations and promises, in that the defendants prepared, made, executed and submitted an application for a merchant account with Synovus Bank, through the bank's registered ISO/MSP, and did, in fact, obtain and maintain a Synovus Bank merchant account, MID number xxx8107, from Synovus Bank, in the name of Smart Business Pros, LLC, for the purpose of processing and settling credit card transactions, and in so doing, prepared and provided materially false and fraudulent information and statements to Synovus Bank.

In violation of Title 18, United States Code, Sections 1344 and 2.

### COUNT 10
### Bank Fraud, Aiding and Abetting
### 18 U.S.C. §§ 1344 and 2

The Grand Jury further charges:

1.     The allegations of Paragraphs 1 through 108 of Count 2 are incorporated by reference as if fully set forth herein.

2.     At all times material, National Bank of California was a federally-insured financial institution and Complete Merchant Solutions was a registered ISO/MSP of National Bank of California.

3.     On or about December 2014, in the Eastern District Missouri and elsewhere, the defendants,

MICHAEL McNEILL a/k/a Mr. White a/k/a Todd Lockwood,
JOSHUA FLYNN a/k/a Mr. Pink a/k/a Jeff Thomas,
TIMOTHY MURPHY a/k/a Mr. Black a/k/a Colby Muhlberg a/k/a Arthur Whitton,
BRUCE DOLL, and
PHILIP HALE,

aided and abetted by each other, and others known and unknown to the grand jury, did knowingly and intentionally devise and engage in and attempt to engage in a scheme and artifice

97

to defraud and to obtain, moneys, funds, assets and credits owned by and under the custody and control of National Bank of California, the deposits of which were insured by the Federal Deposit Insurance Corporation, by means of material false and fraudulent pretenses, representations and promises, in that the defendants prepared, made, executed and submitted an application for a merchant account with National Bank of California, through the bank's registered ISO/MSP, and did, in fact, obtain and maintain a National Bank of California merchant account, MID number xxx5455, from National Bank of California, in the name of Smart Business Pros, LLC, for the purpose of processing and settling credit card transactions, and in so doing, prepared and provided materially false and fraudulent information and statements to National Bank of California.

In violation of Title 18, United States Code, Sections 1344 and 2.

## COUNT 11
### Conspiracy to Launder Monetary Instruments
### 18 U.S.C. §1956(h)

The Grand Jury further charges:

1.      The allegations of Paragraphs 1 through 108 of Count 2 are incorporated by reference as if fully set forth herein.

## THE CONSPIRACY

2.      From on or about April 2012 through 2015, in the Eastern District of Missouri and elsewhere, the defendants,

MICHAEL McNEILL a/k/a Mr. White a/k/a Todd Lockwood,
DONALD SCHNOCK,
JOSHUA FLYNN a/k/a Mr. Pink a/k/a Jeff Thomas,
TIMOTHY MURPHY a/k/a Mr. Black a/k/a Colby Muhlberg a/k/a Arthur Whitton,
SCOTT SHOCKLEE a/k/a Fredo
BRUCE DOLL,
PHILIP HALE,
ANTHONY SWIANTEK,

98

ANDRE DEVOE,
JOHN BALLEWEG a/k/a Trent Lombardi,
JENNIFER HANSEN a/k/a Hailee Randall,
CYBILL OSTERMAN, and
BRIAN PHILLIPS,

did knowingly combine, conspire, and agree with each other and with other persons known and

unknown to the Grand Jury to commit offenses against the United States in violation of Title 18,

United States Code, Section 1956 and Title 18, United States Code, Section 1957, to wit:

(a) to knowingly conduct and attempt to conduct a financial transaction affecting

interstate and foreign commerce, which involved the proceeds of a specified unlawful activity,

that is wire fraud, mail fraud, and bank fraud, with the intent to promote the carrying on of

specified unlawful activity, that is wire fraud, mail fraud, and bank fraud, that while conducting

and attempting to conduct such financial transaction knew that the property involved in the

financial transaction represented the proceeds of some form of unlawful activity in violation of

Title 18, United States Code, Section 1956(a)(1)(A)(i); and

(b) to knowingly conduct and attempt to conduct financial transactions affecting

interstate commerce and foreign commerce, which transactions involved the proceeds of

specified unlawful activity, that is, wire fraud, mail fraud, and bank fraud, knowing that the

transactions were designed in whole or in part to conceal and disguise the nature, location,

source, ownership, and control of the proceeds of specified unlawful activity, and that while

conducting and attempting to conduct such financial transactions, knew that the property

involved in the financial transactions represented the proceeds of some form of unlawful activity,

in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

(c) to knowingly conduct and attempt to conduct financial transactions affecting interstate

commerce and foreign commerce, which transactions involved the proceeds of specified

99

unlawful activity, that is, wire fraud, mail fraud, and bank fraud, knowing that the transaction was designed in whole or in part to avoid a transaction reporting requirement under Federal or State law, and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction, represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(ii); and

(d) to knowingly engage and attempt to engage, in monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is the transfer, transportation, and delivery of money, as well as additional financial transactions in the form of the deposit of money into, and subsequent withdrawal from, accounts at financial institutions, electronic transfers between bank accounts, and domestic wires transfers initiated from bank accounts, such property having been derived from a specified unlawful activity, that is, wire fraud, mail fraud and bank fraud, in violation of Title 18, United States Code, Section 1957.

## I.    OBJECTS OF THE CONSPIRACY

3.    The objects of the conspiracy were to: use the proceeds of the specified unlawful activity to promote further operations and growth of the Telemarketing Enterprise; conceal and disguise the source, location, ownership, nature and control of the proceeds of the specified unlawful activity; to withdraw the proceeds in a manner as to avoid the transaction reporting requirements under state and federal law; and to engage in monetary transactions with more than $10,000 in proceeds.

## II.    MANNER AND MEANS

4.    The manner and means used to accomplish the objectives of the conspiracy included, among others, the following:

100

  a.  It was part of the conspiracy that, at the direction of defendant Murphy, McNeill, Flynn and other defendants and coconspirators, the defendants created, and caused to be created, limited liability companies;

  b.  It was further part of the conspiracy that, at the direction of defendants Murphy, McNeill, Flynn and other defendants and coconspirators, the defendants caused merchant accounts to be applied for and opened;

  c.  It was further part of the conspiracy that, at the direction of defendants Murphy, McNeill, Flynn and other defendants and coconspirators, the defendants opened and maintained bank accounts and caused additional bank accounts to be opened and maintained;

  d.  It was further part of the conspiracy that, at the direction of defendant Murphy and other defendants and coconspirators, an individual coconspirator typically opened three bank accounts specific to a corresponding merchant account: first, a "drop" account dedicated to receive deposits from the merchant account; second, an "operation" or "payroll" account dedicated to receive transfers, including transfers from the drop account; and, third, an additional account to be used by the individual coconspirator who opened the merchant account;

  e.  It was further part of the conspiracy that, at the direction of defendant Murphy, and other defendants and coconspirators, individual defendants and coconspirators opened additional bank accounts to receive transfers, including transfers from drop accounts, wires from individuals and checks from individuals;

  f.  It was further part of the conspiracy that defendant Murphy and other defendants and coconspirators would issue and cause to be issued checks to other coconspirators and defendants, including, but not limited to, defendants Devoe, Balleweg, Osterman, and Phillips and others;

     g.     It was further part of the conspiracy that defendants Devoe, Balleweg Osterman, Phillips and others would, at the direction of defendants Murphy, Shocklee and other defendants and coconspirators, take the checks to banks and cash the checks;

     h.     It was further part of the conspiracy that defendants Murphy, McNeill, Flynn and other defendants and coconspirators avoided any reporting to the Internal Revenue Service by the banks by utilizing multiple individuals to withdraw cash in amounts under $10,000 from multiple bank accounts utilized by the Telemarketing Enterprise;

     i.     It was further part of the conspiracy that defendants, including defendants McNeill and Flynn, would split much of the cash withdrawn from the bank accounts of the Telemarketing Enterprise;

     j.     It was further part of the conspiracy that, from November 2013 through July 2015, in-person customer withdrawals by an account signatory (as opposed to individually cashed checks) from Telemarketing Enterprise accounts totaled in excess of $2,000,000;

     k.     It was further part of the conspiracy that, in addition to those in-person customer withdrawals, additional withdrawals from Telemarketing Enterprise accounts came from checks in amounts under $10,000;

     l.     It was further part of the conspiracy that from November 2013 through July 2015, withdrawals in excess of $3,000,000 came from checks cashed in amounts under $10,000;

     m.     It was further part of the scheme that, of those withdrawals from Telemarketing Enterprise accounts from November 2013 through July 2015, in excess of $750,000 came from checks in amounts under $10,0000 cashed by defendants Balleweg, Devoe, Osterman and Phillips;

n.      It was further part of the conspiracy that the defendants paid individuals who cashed checks in amounts under $10,0000 a set amount, typically between $100 and $300, for cashing checks in their name for the defendants;

o.      It was further part of conspiracy that defendant Shocklee and others would often accompany individuals to the banks to ensure the transaction occurred as directed and the cash was, in fact, delivered to the defendants so it could be turned over and split among defendants Murphy, McNeill, Flynn, and others;

p.      It was further part of the conspiracy that the defendants used nominees and third parties for accounts and transactions;

q.      It was further part of the conspiracy that defendants McNeill, Murphy and Flynn directed and caused transactions to occur involving the purchase of gold and silver;

r.      It was further part of the conspiracy that, between February 24, 2014 and June 3, 2015, approximately thirteen or more transactions occurred involving the purchase of gold and silver from a Phoenix, Arizona based gold and silver dealer, as set forth below:

| Gold/Silver Purchase | Amount of Purchase | Account Used | Transaction Type |
|---|---|---|---|
| 02/24/14 | $169,037.00 | RLR Enterprises BOA#...9920 | Transfer |
| 03/27/14 | $16,000.00 | RLR Enterprises WF#...8624 | Ck#2711 |
| 03/27/14 | $44,000.00 | RLR Enterprises BOA#...9920 | Transfer |
| 04/16/14 | $162,600.00 | Financial Lead Brokers BOA#...0942 | Transfer |
| 04/28/14 | $246,610.00 | Financial Lead Brokers WF#....1520 | Ck#1733 |
| 05/19/14 | $120,600.00 | Secured Drop WF#...4958 | Ck#2516 |
| 01/13/15 | $131,840.00 | MCV Lead Holdings WF#...7011 | Ck#2012 |

| Gold/Silver Purchase | Amount of Purchase | Account Used | Transaction Type |
|---|---|---|---|
| 03/02/15 | $203,632.00 | Alpha Lead Holdings WF#...6673 | Ck#1169 |
| 03/26/15 | $97,656.00 | Alpha Lead Holdings WF#...6673 | Ck#1235 |
| 04/06/15 | $85,436.09 | Alpha Lead Holdings WF#...6673 | Ck#1265 |
| 04/14/15 | $98,240.00 | Alpha Lead Holdings WF#...6673 | Ck#1331 |
| 04/24/15 | $41,684.00 | Alpha Lead Holdings WF#...6673 | Ck#1386 |
| 04/28/15 | $75,720.00 | Alpha Lead Holdings WF#...6673 | Ck#1400 |
| 06/03/15 | $246,400.00 | Alpha Lead Holdings WF#...6673 | Ck#1500 |

s.    It was further part of the conspiracy that deposits into bank accounts of RLR Enterprises, Financial Lead Brokers, Secure Drop, MCV Lead Holdings, and Alpha Lead Holdings included wires and checks from individuals who purchased leads from the Telemarketing Enterprise;

t.    It was further part of the conspiracy that defendants used funds deposited into the banks accounts of RLR Enterprises, Financial Lead Brokers, Secure Drop, MCV Lead Holdings, and Alpha Lead Holdings for gold and silver;

u.    It was further part of the conspiracy that, between February 24, 2014 and June 3, 2015, the defendants purchased in excess of $1,700,000 in gold and silver;

v.    It was further part of the conspiracy that on one and more occasions defendant Shocklee supervised the pick-up and delivery of the gold and/or silver;

w.    It was further part of the conspiracy that on one and more occasions the defendants negotiated gold and/or silver transactions under the name "Todd Lockwood";

x.      It was further part of the conspiracy that defendant Murphy directed

defendant Osterman to establish CC Payroll Services, LLC and open bank accounts in its name;

y.      It was further part of the conspiracy that defendant Murphy directed

defendant Phillips to establish ACME Business Services and open bank accounts in its name;

z.      It was further part of the conspiracy that defendant Murphy directed

transactions in and out of CC Payroll Services, LLC and gave specific directions to defendant

Osterman regarding banking transactions involving CC Payroll Services, LLC;

aa.      It was further part of the conspiracy that defendant Murphy directed

transactions in and out of ACME Business Services, LLC and gave specific directions to

defendant Phillips regarding banking transactions involving ACME Business Services, LLC;

bb.      It was further part of the conspiracy that defendant Murphy gave

directions regarding financial transactions to defendant Osterman and defendant Phillips via his

personal phone.  Communications between defendants Murphy and Osterman and defendants

Murphy and Phillips include the following messages:

| Date | From/To | Message |
|---|---|---|
| 7/24/2014 | From: Murphy<br>To Cybill | The LLC papers haven't come in yet, but I can pay both of you today. Brian and I can take care of the accounts and stuff next week. |
| 7/24/2014 | From: Murphy<br>To Cybill | Come on down anytime |
| 7/25/2014 | From: Murphy<br>To Cybill | The bank may be calling you to confirm that a check for R[ ] J[ ] is okay to cash. Tell them it is legit please, if they need more info about it have them call Colby at 6024329641 |
| 7/27/2014 | From: Brian Phillips<br>To: Murphy | Hey Tim it's Brian. Still meeting at your office at 9 tomorrow? |
| 7/27/2014 | From: Brian Phillips<br>To: Murphy | Do I need to bring anything specific? |
| 7/27/2014 | From: Murphy<br>To: Brian Phillips | Just a couple forms of ID |

| Date | From/To | Message |
|------|---------|---------|
| 7/29/2014 | From: Brian Phillips To Murphy | Did the paperwork come in for tomorrow? |
| 7/29/2014 | From: Murphy | Yep |
| 7/29/2014 | From: Murphy To: Brian Phillips | Yes it did, can you still make it in the morning ? |
| 7/30/2014 | From: Brian Phillips To Murphy | Everything is good to go. |
| 7/30/2014 | From: Murphy To: Brian Phillips | Awesome, thank you sir |
| 7/30/2014 | From: Brian Phillips To Murphy | No worries. They had me set up the online banking. I used the username/password you wrote down. I'll send the paperwork with Cybill tomorrow and if you have any questions on changing anything let me know. |
| 7/30/2014 | From: Murphy To: Brian Phillips | Cool, that's great |
| 9/2/2014 | From: Cybill To: Murphy | Do you need me to do the thing today |
| 9/2/2014 | From: Cybill To: Murphy | The bank |
| 9/4/2014 | From: Murphy To: Cybill | Are you still up for doing that thing today? |
| 9/4/2014 | From: Cybill To: Murphy | Yes is there any way I can be there at like 1:30 |
| 9/4/2014 | From: Cybill To: Murphy | How often can I do what I did earlier? |
| 9/4/2014 | From: Cybill To: Murphy | Maybe every week, it depends on the week |
| 9/4/2014 | From: Cybill To: Murphy | That would be legit |
| 9/4/2014 | From: Murphy To: Cybill | Kinda... |
| 9/4/2014 | From: Murphy To: Cybill | It's what we like to call "legitimish" |
| 9/18/2014 | From: Murphy To: Cybill | Okay, I might need to leave your envelope with Ashley at the front. I'll tell her to expect you. |
| 9/23/2014 | From: Cybill To: Murphy | Do u have a check |
| 9/23/2014 | From: Murphy To: Cybill | I don't today, we're running behind this week. But what are you doing Thursday? |

| Date | From/To | Message |
|------|---------|---------|
| 9/23/2014 | From: Cybill To: Murphy | Can Brian do it? |
| 9/23/2014 | From: Murphy | If he wants to[ ] |
| 9/23/2014 | From: Cybill To: Murphy | Should I have him text you about it |
| 9/23/2014 | From: Brian Phillips | Hey Tim. Cybill told me to shoot you a text about Thursday. |
| 9/24/2014 | From: Brian Phillips | Any idea what time you wanted me to come by tomorrow? Or do you just want to shoot me a text in the morning |
| 9/24/2014 | From: Brian Phillips | Yeah that's perfect |
| 9/24/2014 | From: Murphy To: Brian Phillips | 10 will work, if that's good for you |
| 9/24/2014 | From: Murphy To: Brian Phillips | Cool, I'll see you in the morning |
| 9/25/2014 | From: Brian Phillips To: Murphy | Do they normally make you sit with a banker because the amount? The teller said she couldn't cash it because they need to verify the check |
| 9/25/2014 | From: Murphy To: Brian Phillips | You shouldn't have to do that at all, tell them you're in a hurry and go to another branch. |
| 9/25/2014 | From: Brian Phillips To: Murphy | They said because the amount they can't just cash it when I don't have an account and the only way is sitting with a banker. Want me to go to another Wells Fargo? |
| 9/25/2014 | From: Brian Phillips To: Murphy | What other Wells Fargo should I go to? |
| 9/25/2014 | From: Murphy To: Brian Phillips | 32nd street and camelback will have the cash |
| 9/25/2014 | From: Murphy To: Brian Phillips | And remember, you do have a business account at wells, Acme Business Services LLC. |
| 10/9/2014 | From: Murphy To: Cybil | When are you planning on coming down? |
| 10/9/2014 | From: Murphy To: Cybil | If Brian can come with you I can have him cash one too. |
| 10/9/2014 | From: Cybill To: Murphy | Okay perfect he's coming with me |
| 10/9/2014 | From: Cybill | What's the pin on my debit card |

| Date | From/To | Message |
|---|---|---|
| | To: Murphy | |
| 10/9/2014 | From: Cybill To: Murphy | And why are they even asking me that |
| 10/9/2014 | From: Cybill To: Murphy | They haven't asked me that before |
| 10/9/2014 | From: Murphy To: Cybill | 2014 |
| 10/9/2014 | From: Murphy To: Cybill | They usually ask if you don't have your card with you. |
| 10/9/2014 | From: Murphy To: Cybill | I have to send the account owner down to the bank to straighten that shxx out for Brian's check, it looks like they have another check in there 3 times. Just head back here, I'll pay him for doing it anyway. |
| 10/9/2014 | From: Cybill To: Murphy | Okay cool we are on our way |
| 10/30/2014 | From: Murphy To: Cybill | I'm leaving now, but I'll leave an envelope with Ashley at the front. |
| 10/30/2014 | From: Cybill To: Murphy | What time is Ashley leaving? |
| 10/30/2014 | From: Cybill To: Murphy | Ok I will just go pick it up when I get off work |
| 11/10/2014 | From: Cybill To: Murphy | So what exactly am I getting today. 2 weeks pay and money for PO boxes? Am I doing a check too? |
| 11/10/2014 | From: Murphy To: Cybill | I'm having him cash a check for your guy's money, that way it can be another $150. |
| 11/10/2014 | From: Cybill To: Murphy | Okay. Wait so it will be $650? |
| 11/13/2014 | From: Murphy To: Cybill | Okay, that's fine. The box number is 225, and renew it for 3 months. I think the total due is $60 or so. I probably gave you too much money. |
| 11/13/2014 | From: Murphy To: Cybill | When you're down there check to see if there are any packages, I'm waiting on a new pack of checks for your account. |
| 11/13/2014 | From: Cybill To: Murphy | I got a package and a letter |
| 11/13/2014 | From: Murphy To: Cybill | Great, is the package about the size of 250 checks? |
| 11/13/2014 | From: Cybill To: Murphy | Yes I guess? Lol it's slightly heavy |
| 11/13/2014 | From: Cybill | ....Brian will drop them off |

| Date | From/To | Message |
|------|---------|---------|
| | To: Murphy | |
| 11/13/2014 | From: Murphy | That's it. And when can I get them from you? What's your schedule like tomorrow? |
| 11/14/2014 | From: Murphy | That would be great, we need to write payroll on them |
| 11/14/2014 | From: Murphy To: Brian Phillips | Hey buddy, are you going to be able to bring those checks down here this morning? |
| 11/14/2014 | From: Murphy To: Cybill | He isn't responding to my text either. We really have to have those checks, I can go meet him if that's easier[ ] |
| 11/28/2014 | From: Cybill To: Murphy | What's my pin again just in case they need it 2014? |
| 11/28/2014 | From: Murphy To: Cybill | Yes it is. |
| 11/28/2014 | From: Cybill To: Murphy | The girl was an idiot and gave me 37 I just realized it |
| 11/28/2014 | From: Cybill To: Murphy | Oh no she didn't Im the idiot and can't count |
| 11/28/2014 | From: Cybill To: Murphy | No I went to 2 banks |
| 11/28/2014 | From: Murphy To: Cybill | Did you get it all at once? |
| 11/28/2014 | From: Cybill To: Murphy | I had to get some 50s but no 20s |
| 11/28/2014 | From: Murphy To: Cybill | Must have cleaned out that bank! |
| 11/28/2014 | From: Murphy To: Murphy | Okay, cool. You just made $500/hr |
| 11/28/2014 | From: Cybill To: Murphy | Right!?!? You're awesome thank you |
| 12/4/2014 | From: Cybill To: Murphy | They said they might have to put a hold on it. Why |
| 12/4/2014 | From: Murphy To: Cybill | Yeah. There's $70k in the account. You should have no problem cashing a check. |
| 12/4/2014 | From: Cybill To: Murphy | I asked she said it just means it's a blank alert |
| 12/5/2014 | From: Murphy To: Cybill | If Wells Fargo calls you would you answer and tell them whatever check they're trying to verify is fine. |
| 12/5/2014 | From: Cybill To: Murphy | Yes sir |
| 12/5/2014 | From: Murphy To: Cybill | If they have specific questions tell them to call your accountant Colby at [ ]9664 |

| Date | From/To | Message |
|---|---|---|
| 12/17/2014 | From: Murphy<br>To: Brian Phillips | I ordered checks for your account, but I need you to make a signature stamp so we can endorse them. Or you can sign a bunch of them if that's easier, but I'll pay you for the stamp. |
| 12/17/2014 | From: Brian Phillips<br>To: Murphy | It sounds like the stamp would be easier for the both of us. When/where do I do that? |
| 12/17/2014 | From: Murphy<br>To: Brian Phillips | You can get them made at OfficeMax/Copymax or any staples. I think they are cheap, like under $20, and it usually just takes a day. |
| 12/17/2014 | From: Murphy<br>To: Brian Phillips | But if you can get one over to me tomorrow or Friday, we can pay you the errand commission |
| 12/17/2014 | From: Brian Phillips<br>To: Murphy | I'll stop by one on my way home and see if it will be done in time to bring tomorrow. If not I'll bring it friday |
| 12/17/2014 | From: Murphy<br>To: Brian Phillips | Like the size of your signature on a check, the stamp itself is usually about 1"x 2 1/2". The Brother 1850 is a common one. |
| 12/17/2014 | From: Brian Phillips<br>To: Murphy | They said they will have it done before noon tomorrow so I'll pick it up and head your way. I'll let you know if anything changes. |
| 12/17/2014 | From: Murphy<br>To: Brian Phillips | That's perfect, thank you sir. |
| 1/7/2015 | From: Murphy<br>To: Cybill | Wells might be trying to call you to verify a check, tell them it's okay. |
| 1/7/2015 | From: Murphy<br>To: Cybill | It's check #1996, in the amount of $7135.00, payable to J[ ] H[ ] |
| 1/8/2015 | From: Murphy<br>To: Cybill | Tell them that you were expecting a transfer to arrive today that won't actually go through until tomorrow, so you are taking cash to deposit into a vendor's account so that the funds will be available today. And then say "no, I do not want to send a wire. And no, a cashiers check is not good enough." There should be an ACH deposit into the account for $15k arriving tomorrow. |
| 1/8/2015 | From: Murphy<br>To: Cybill | And there is more than $12k in the account. |

| Date | From/To | Message |
|------|---------|---------|
| 1/14/2015 | From: Murphy<br>To: Cybill | I have errands for you and Brian, but they have to get done first thing in the morning. Can you guys come to the office at 9 |
| 1/14/2015 | From: Murphy<br>To: Cybill | Can Brian come down? |
| 1/14/2015 | From: Murphy<br>To: Cybill | It's just checks, so I can still have him do one. |
| 1/14/2015 | From: Murphy<br>To: Cybill | And get both of your money |
| 1/14/2015 | From: Cybill<br>To: Murphy | F[ ]# I want to do a check |
| 1/14/2015 | From: Murphy<br>To: Cybill | It won't be the last time |
| 1/14/2015 | From: Murphy<br>To: Cybill | I'll give him an extra $150 for you and do one for free later then. |
| 1/14/2015 | From: Cybill<br>To: Murphy | Can he just do both checks? |
| 1/14/2015 | From: Murphy<br>To: Cybill | No, they're from the same account |
| 1/14/2015 | From: Murphy<br>To: Brian Phillips | Can you come down in the morning to do an errand and pick up your guys' pay? I have to get a check cashed early |
| 1/14/2015 | From: Brian Phillips<br>To: Murphy | Yeah I can come by whenever. What time should I be there? |
| 1/14/2015 | From: Murphy<br>To: Brian Phillips | Around 9-9:30 would be great. But the office has moved, so call me for the address when you get a chance. |
| 1/15/2015 | From: Cybill<br>To: Murphy | Are we going to get taxed for those checks we do? And how do we do our taxes with the businesses |
| 1/15/2015 | From: Murphy<br>To: Cybill | Hmmm... I seem to have misplaced your W9s, so I guess that's a no on the taxes. And we will be shutting down your businesses before a year has passed, so the IRS can pound sand. |
| 1/23/2015 | From: Murphy<br>To: Cybill | A withdrawal from your business checking account, $12k. I can pay you double the usual. |
| 1/29/2015 | From: Murphy<br>To: Brian Phillips | The bank may be calling to verify an Acme check, Andre Devoe for $8468.00 check number 1156 |

| Date | From/To | Message |
|------|---------|---------|
| 1/29/2015 | From: Murphy<br>To: Brian Phillips | If they ever call you and you need the info for the checks, just tell them to call your accountant and give them my number. |
| 1/29/2015 | From: Brian Phillips<br>To: Murphy | Is my "accountant" named Tim? |
| 1/29/2015 | From: Murphy<br>To: Brian Phillips | Sure, doesn't matter. |
| 1/30/2015 | From: Murphy<br>To: Brian Phillips | You might get 2 calls from Wells today to verify checks on the accounts, #1157 to John Balleweg for $6988, and #1158 to J[ ] H[ ]for $6110. Or have them call me |
| 2/2/2015 | From: Murphy<br>To: Cybill | Are you and Brian available tomorrow to do a couple checks? |
| 2/2/2015 | From: Cybill<br>To: Murphy | Actually I can as long as it's at like 10:30 |
| 2/2/2015 | From: Murphy<br>To: Cybill | That's fine, they're from the same company so I can't do more than one for each of you. But if you want to come down at 10:30 that's great. |
| 2/2/2015 | From: Cybill<br>To: Murphy | Thank you!!!! See you tomorrow |
| 2/3/2015 | From: Murphy<br>To: Cybill | Okay, I can get two for you and two for Brian. Should make it a pretty good day for you guys. |
| 2/3/2015 | From: Cybill<br>To: Murphy | So we have to go to 4 banks? |
| 2/3/2015 | From: Murphy<br>To: Cybill | No, 2 banks. I'll explain when you get here. |
| 2/5/2015 | From: Murphy<br>To: Brian Phillips | It's okay, I just need some money pulled out of your business account. |
| 2/5/2015 | From: Murphy<br>To: Brian Phillips | Sure, it's fine today. I need you to withdraw 12,300 from your business account |
| 2/13/2015 | From: Murphy<br>To: Brian Phillips | Let me know before you head down, I'd like to have you go to a bank in your area if possible |
| 2/13/2015 | From: Brian Phillips<br>To: Murphy | Ok I can do that. How much am I taking out? |
| 2/13/2015 | From: Murphy<br>To: Brian Phillips | 7,750 |
| 2/13/2015 | From: Brian Phillips<br>To: Murphy | Going to my 3rd bank. Apparently nobody has cash but I had them call this one to make sure they had enough. Sorry for the delay |

| Date | From/To | Message |
|------|---------|---------|
| 2/13/2015 | From: Murphy<br>To: Brian Phillips | No problem, sorry for the run around |
| 2/13/2015 | From: Brian Phillips<br>To: Murphy | I forgot to ask, but Is anything from my account going to come up when I do my taxes? |
| 2/13/2015 | From: Murphy<br>To: Brian Phillips | It shouldn't. And we are going to shut it down before the end of next year anyway. |
| 2/26/2015 | From: Murphy<br>To: Brian Phillips | Actually, yes today we do. If you could stop by a bank and withdraw $7650.00 from your account, then go by the mailbox and pick up whatever is there. Also, if you could use some of the money that you withdraw to pay the bill on the box too. |
| 2/26/2015 | From: Brian Phillips<br>To: Murphy | Will they let me pick up mail without having the key or do<br>I need to get the key from you first? |
| 2/26/2015 | From: Murphy<br>To: Brian Phillips | You won't need the key, your name is on the box. It's #330 |
| 2/26/2015 | From: Brian Phillips<br>To: Murphy | Ok perfect. Do you want me to take the weeks pay out of the money from the bank or do you already have that set aside? If so just let me know how much |
| 2/26/2015 | From: Murphy<br>To: Brian Phillips | If you could bring me 7k plus whatever is in the mailbox, the remainder of the money is yours. It should be your guys' pay and pay for pulling money and then some. |
| 3/20/2015 | From: Murphy<br>To: Brian Phillips | Yeah, I would like you to pull 8150 from your account at 2 different banks, so 16300 total. And then bring 16000 down to the office |
| 3/20/2015 | From: Murphy<br>To: Brian Phillips | But if you could use 2 branches out in Tempe, not Phoenix, that would be very helpful. |
| 3/20/2015 | From: Brian Phillips<br>To: Murphy | Is going to two banks necessary? Or should I ask the first bank if they have the total amount? |
| 3/20/2015 | From: Murphy<br>To: Brian Phillips | I think it would be better to go to two banks, that way neither one is over 10k. Tell them you're buying a car or something. |

cc.　　It was further part of the conspiracy that defendants Murphy, McNeill,

Flynn and other coconspirators would issue and cause to be issued checks, wires and other

methods of payments for:

i.　　the purchase of additional telemarketing leads for frontend rooms

of the Telemarketing Enterprise; transactions with one particular Phoenix-based

company selling leads include the following:

| Date of Purchase | Amount | Account |
|---|---|---|
| 6/28/2012 | $ 5,835.91 | ENF BOA#...6955 |
| 7/9/2012 | $ 6,366.60 | ENF BOA#...6955 |
| 7/11/2012 | $ 3,841.60 | ENF BOA#...6955 |
| 7/17/2012 | $ 6,332.15 | ENF BOA#...6955 |
| 7/20/2012 | $ 2,370.15 | ENF BOA#...6955 |
| 7/30/2012 | $ 3,535.00 | ENF BOA#...6955 |
| 8/6/2012 | $ 5,577.00 | ENF BOA#...6955 |
| 8/6/2012 | $ 1,170.00 | ENF BOA#...6955 |
| 8/14/2012 | $ 5,625.85 | ENF BOA#...6955 |
| 8/20/2012 | $ 6,062.25 | ENF BOA#...6955 |
| 8/22/2012 | $ 3,318.40 | ENF BOA#...6955 |
| 8/27/2012 | $ 4,582.10 | ENF BOA#...6955 |
| 9/4/2012 | $ 3,983.90 | ENF BOA#...6955 |
| 9/10/2012 | $ 4,925.75 | ENF BOA#...6955 |
| 4/25/2013 | $1,989.20 | WJ Security Consultants, LLC WF #...9598 |
| 10/15/2013 | $3,779.85 | RLR Enterprises, LLC BOA#...9920 |
| 10/29/2013 | $6,102.75 | RLR Enterprises, LLC BOA#...9920 |
| 11/1/2013 | $988.50 | RLR Enterprises, LLC BOA#...9920 |
| 11/22/2013 | $3,981.30 | RLR Enterprises, LLC BOA#...9920 |
| 11/26/2013 | $2,162.10 | RLR Enterprises, LLC BOA#...9920 |
| 12/6/2013 | $1,361.10 | RLR Enterprises, LLC BOA#...9920 |
| 12/9/2013 | $106.20 | RLR Enterprises, LLC BOA#...9920 |
| 12/9/2013 | $1,361.10 | RLR Enterprises, LLC BOA#...9920 |
| 12/13/2013 | $1,718.70 | RLR Enterprises, LLC BOA#...9920 |
| 12/13/2013 | $2,338.80 | RLR Enterprises, LLC BOA#...9920 |
| 12/26/2013 | $1,748.70 | RLR Enterprises, LLC BOA#...9920 |
| 12/26/2013 | $2,223.00 | RLR Enterprises, LLC BOA#...9920 |
| 12/30/2013 | $2,728.20 | RLR Enterprises, LLC WF#...8624 |
| 1/13/2014 | $4,800.00 | BizSystems Now WF#...8343 |

| Date of Purchase | Amount | Account |
|---|---|---|
| 1/22/2014 | $4,800.00 | BizSystems Now WF#...8343 |
| 1/31/2014 | $4,575.00 | BizSystems Now WF#...8343 |
| 2/14/2014 | $1,356.60 | BizSystems Now WF#...8343 |
| 2/24/2014 | $4,675.20 | RLR Enterprises, LLC BOA#...9920 |
| 2/28/2014 | $4,107.60 | RLR Enterprises, LLC WF#...8624 |
| 3/10/2014 | $4,022.40 | RLR Enterprises, LLC BOA#...9920 |
| 3/13/2014 | $2,834.10 | RLR Enterprises, LLC WF#...8624 |
| 3/21/2014 | $2,655.60 | RLR Enterprises, LLC WF#...8624 |
| 3/31/2014 | $4,380.30 | RLR Enterprises, LLC BOA#...9920 |
| 4/18/2014 | $ 3,343.20 | Financial Lead Brokers BOA#0942 |
| 4/21/2014 | $ 3,944.70 | Financial Lead Brokers BOA#0942 |
| 4/22/2014 | $ 1,250.00 | Financial Lead Brokers BOA#0942 |
| 4/28/2014 | $ 550.20 | Financial Lead Brokers BOA#0942 |
| 5/5/2014 | $3,065.00 | Financial Lead Brokers WF#...1520 |
| 5/9/2014 | $5,362.70 | Financial Lead Brokers WF#...1520 |
| 5/16/2014 | $ 3,327.30 | Financial Lead Brokers BOA#0942 |
| 5/27/2014 | $ 1,743.30 | Financial Lead Brokers BOA#0942 |
| 8/18/2014 | $ 3,341.10 | Smart Business Pros USB#...4859 |
| 8/29/2014 | $ 4,458.30 | Smart Business Pros USB#...4859 |
| 9/15/2014 | $ 8,755.74 | Smart Business Pros USB#...4859 |
| 10/14/2014 | $ 5,273.65 | Smart Business Pros USB#...4859 |
| 10/16/2014 | $ 9,033.10 | Smart Business Pros USB#...4859 |
| 10/27/2014 | $ 9,388.40 | Smart Business Pros USB#...4859 |
| 11/3/2014 | $ 4,427.53 | Smart Business Pros USB#...4859 |
| 11/3/2014 | $ 4,427.53 | Smart Business Pros USB#...4859 |
| 11/7/2014 | $ 5,516.58 | Smart Business Pros USB#...4859 |
| 11/10/2014 | $ 5,516.58 | Smart Business Pros USB#...4859 |
| 11/17/2014 | $ 5,215.53 | Smart Business Pros USB#...4859 |
| 11/17/2014 | $ 5,215.53 | Smart Business Pros USB#...4859 |
| 11/21/2014 | $ 9,079.15 | Smart Business Pros USB#...4859 |
| 11/28/2014 | $ 9,483.20 | Smart Business Pros USB#...4859 |
| 12/5/2014 | $ 3,613.50 | Smart Business Pros USB#...4859 |
| 12/12/2014 | $ 5,742.15 | Smart Business Pros USB#...4859 |
| 12/19/2014 | $ 4,042.25 | Smart Business Pros USB#...4859 |
| 1/12/2015 | $ 2,271.00 | MCV Lead Holdings WF#...7011 |
| 1/22/2015 | $ 5,597.90 | Smart Business Pros USB#...4859 |
| 1/30/2015 | $ 3,867.50 | Smart Business Pros USB#...4859 |
| 2/3/2015 | $ 4,299.90 | Alpha Lead Holdings, LLC WF#..6673 |
| 2/17/2015 | $ 5,424.01 | Smart Business Pros USB#...4859 |
| 2/23/2015 | $ 5,352.80 | Smart Business Pros USB#...4859 |

| Date of Purchase | Amount | Account |
|---|---|---|
| 2/26/2015 | $ 2,802.60 | Smart Business Pros USB#...4859 |
| 3/3/2015 | $ 3,262.45 | Smart Business Pros USB#...4859 |
| 3/13/2015 | $ 3,991.65 | Smart Business Pros USB#...4859 |
| 3/18/2015 | $ 4,372.95 | Smart Business Pros USB#...4859 |
| 3/26/2015 | $ 4,153.80 | Smart Business Pros USB#...4859 |
| 4/3/2015 | $ 1,726.13 | ACME Business Services, LLC WF#...6644 |
| 4/6/2015 | $ 1,726.13 | ACME Business Services, LLC WF#...6644 |
| 4/10/2015 | $ 2,028.30 | Alpha Lead Holdings, LLC WF#..6673 |
| 4/13/2015 | $ 2,028.30 | Alpha Lead Holdings, LLC WF#..6673 |
| 4/16/2015 | $ 2,054.33 | Alpha Lead Holdings, LLC WF#..6673 |
| 4/17/2015 | $ 2,054.33 | Alpha Lead Holdings, LLC WF#..6673 |
| 4/24/2015 | $ 2,084.05 | Alpha Lead Holdings, LLC WF#..6673 |
| 4/27/2015 | $ 2,084.05 | Alpha Lead Holdings, LLC WF#..6673 |
| 4/27/2015 | $ 2,084.05 | Alpha Lead Holdings, LLC WF#..6673 |
| 5/11/2015 | $ 2,671.30 | Alpha Lead Holdings, LLC WF#..6673 |
| 5/12/2015 | $ 2,671.30 | Alpha Lead Holdings, LLC WF#..6673 |

      ii.     payments to frontend rollers and closers for additional sales calls;

      iii.     telephone and dialer services utilized for additional frontend and backend room calls; and

      iv.     expenses associated with: the opening of new frontend rooms; moving existing frontend rooms to different locations; and establishing additional LLC and new web sites for those LLCs.

      dd.     It was further part of the conspiracy that the defendants caused and directed monetary transactions in amounts greater than $10,000 including wire transfers, electronic transfers, and bank teller transactions; and

      ee.     It was further part of the conspiracy that defendant McNeill purchased Cashier's Checks include the following:

| Date of Purchase | Bank | Amount | Payable To The Order of |
|---|---|---|---|
| 11/8/2012 | BMO Harris | $15,000 | Wynn Las Vegas |
| 11/21/2012 | Chase | $20,000 | Wynn Las Vegas |

116

| Date of Purchase | Bank | Amount | Payable To The Order of |
|---|---|---|---|
| | Phoenix, AZ | | |
| 11/30/2012 | Chase Phoenix, AZ | $30,000 | Wynn Las Vegas |
| 5/4/2013 | Chase Phoenix, AZ | $60,000 | Wynn Las Vegas |

All in violation of Title 18, United States Code, Section 1956(h).

### COUNT 12
### Money Laundering
### 18 U.S.C. § 1957

The Grand Jury further charges:

1.  On or about July 25, 2014, in the Eastern District of Missouri,

TIMOTHY MURPHY a/k/a Mr. Black a/k/a Colby Muhlberg a/k/a Arthur Whitton, and
PHILIP HALE,

the defendants herein, did knowingly engage and attempt to engage in a monetary transaction,

affecting interstate commerce, in criminally derived property of a value greater than $10,000,

that is, the wire transfer of funds from a bank account of Smart Business Pros, LLC, at US Bank,

St. Louis, Missouri, a financial institution, in the amount of $16,500, into a bank account of CC

Payroll Services, LLC, at Wells Fargo Bank, Tempe, Arizona, a financial institution, such

property having been derived from a specified unlawful activity, that is, mail fraud, in violation

of Title 18, United States Code, Section 1341; wire fraud, in violation of Title 18, United States

Code, Section 1343; and bank fraud, in violation of Title 18, United States Code, Section 1344.

In violation of Title 18, United States Code, Sections 1957 and 2.

### COUNT 13
### Money Laundering
### 18 U.S.C. § 1957

The Grand Jury further charges:

117

1.     On or about November 8, 2012, in the Eastern District of Missouri and elsewhere,

MICHAEL MCNEILL a/k/a Mr. White a/k/a Todd Lockwood,

the defendant herein, did knowingly engage and attempt to engage in a monetary transaction,

affecting interstate commerce, in criminally derived property of a value greater than $10,000,

that is, the negotiation of check number 1320 from a bank account of Canyon State Merchant

Services, LLC  at Bank of America, a financial institution, in the amount of $149,178.43, made

payable to 4 Group Holdings, LLC, at Bank of America, such property having been derived from

a specified unlawful activity, that is, mail fraud, in violation of Title 18, United States Code,

Section 1341; and wire fraud, in violation of Title 18, United States Code, Section 1343.

In violation of Title 18, United States Code, Sections 1957 and 2.

### COUNT 14
### Money Laundering
### 18 U.S.C. § 1957

The Grand Jury further charges:

1.     On or about November 8, 2012, in the Eastern District of Missouri and elsewhere,

DONALD SCHNOCK,

the defendant herein, did knowingly engage and attempt to engage in a monetary transaction,

affecting interstate commerce, in criminally derived property of a value greater than $10,000,

that is, the wire transfer of funds from a bank account of 4 Group Holdings, LLC at Bank of

America, a financial institution, in the amount of $149,178.43, into a bank account of Wynn Las

Vegas, LLC, at Bank of America, such property having been derived from a specified unlawful

activity, that is, mail fraud, in violation of Title 18, United States Code, Section 1341; and wire

fraud, in violation of Title 18, United States Code, Section 1343.

In violation of Title 18, United States Code, Sections 1957 and 2.

## FORFEITURE ALLEGATION

The Grand Jury further finds probable cause that:

1.　　Pursuant to Title 18, United States Code, Section 982(a)(8), upon conviction of an offense in violation of Title 18, United States Code, Section 1341, 1343 or 1344 or conspiracy to commit such an offense as set forth in Counts 1 through 10, the defendant(s) shall forfeit to the United States of America any real or personal property used or intended to be used to commit, to facilitate, or to promote the commission of said offense, and any real or personal property constituting, derived from, or traceable to gross proceeds that the defendant(s) obtained directly or indirectly as a result of said offense.

2.　　Also subject to forfeiture is a sum of money equal to the total value of any real or personal property constituting, derived from, or traceable to gross proceeds that the defendant(s) obtained directly or indirectly as a result of said offense(s).

3.　　Pursuant to Tile 18, United States Code, Section 982(a)(1), upon conviction of an offense in violation of Title 18, United States Code, Section 1956 or 1957 as set forth in Counts 11 through 14, the defendant(s) shall forfeit to the United States of America any property, real and personal, involved in such an offense, and any property traceable to such property.

4.　　Also subject to forfeiture is a sum of money equal to the total value of any real or personal property involved in any such offense(s), and any property traceable to such property.

5.　　Specific property subject to forfeiture includes, but is not limited to, the following:

　　a.　certain quantities of gold and silver, as follows:

　　(1)　approximately $229,037.00 in gold and silver purchased from CMI Gold and Silver from accounts of RLR Enterprises between about February 24, 2014 and March 27, 2014 and any property traceable thereto;

119

(2)   approximately $409,210.00 in gold and silver purchased from CMI Gold and Silver from accounts of Financial Lead Brokers between about April 16, 2014 and April 28, 2014 and any property traceable thereto;

(3)   approximately $120,600.00 in gold and silver purchased from CMI Gold and Silver from an account of Secured Drop on or about May 19, 2014 and any property traceable thereto;

(4)   approximately $131,840.00 in gold and silver purchased from CMI Gold and Silver from an account of MCV Lead Holdings on or about January 13, 2015 and any property traceable thereto; and

(5)   approximately $848,768.09 in gold and silver purchased from CMI Gold and Silver from an account of Alpha Lead Holdings between about March 26, 2015 and June 3, 2015 and any property traceable thereto;

b.   certain quantities of U.S. currency, as follows:

(6)   approximately $15,000.00 in U.S. currency seized during the execution of a search warrant at 3807 N. 87th St., Scottsdale, AZ 85251, on July 9, 2015;

(7)   approximately $1,475.00 in U.S. currency seized during the execution of a search warrant at 3807 N. 87th St., Scottsdale, AZ 85251, on July 9, 2015;

(8)   approximately $7,000.00 in U.S. currency seized during the execution of a search warrant at 835 W. Picadilly Dr., Phoenix, AZ 85013, on July 9, 2015;

(9)   approximately $190,298.00 in U.S. currency seized during the execution of a search warrant at 3310 N. 50th Pl., Phoenix, AZ 85018, on July 9, 2015;

(10)   approximately $33.00 in U.S. currency seized during the execution of a search warrant at 3310 N. 50th Pl., Phoenix, AZ 85018, on July 9, 2015;

(11)   approximately $100.00 in U.S. currency seized during the execution of a search warrant at 3310 N. 50th Pl., Phoenix, AZ 85018, on July 9, 2015;

(12)   approximately $1,486.00 in U.S. currency seized during the execution of a search warrant at 3310 N. 50th Pl., Phoenix, AZ 85018, on July 9, 2015;

(13)   approximately $1,091.00 in U.S. currency seized during the execution of a search warrant at 3824 E. Daley Ln., Phoenix, AZ 85050, on July 9, 2015;

(14)   approximately $700.00 in U.S. currency seized during the execution of a search warrant at 3824 E. Daley Ln., Phoenix, AZ 85050, on July 9, 2015; and

(15)   approximately $52,000.00 in U.S. currency seized during the execution of a search warrant at 3824 E. Daley Ln., Phoenix, AZ 85050, on July 9, 2015;

    c.  certain other valuables, as follows:

(16)  1 oz. Canadian gold coin seized during the execution of a search warrant at 3807 N. 87th St. Scottsdale, AZ 85251, on July 9, 2015;

(17)  1 oz. Canadian gold coin seized during the execution of a search warrant at 3807 N. 87th St. Scottsdale, AZ 85251, on July 9, 2015;

(18)  1 oz. Canadian gold coin seized during the execution of a search warrant at 3807 N. 87th St. Scottsdale, AZ 85251, on July 9, 2015;

(19)  1 oz. Canadian gold coin seized during the execution of a search warrant at 3807 N. 87th St. Scottsdale, AZ 85251, on July 9, 2015;

(20)  1 oz. Canadian gold coin seized during the execution of a search warrant at 3807 N. 87th St. Scottsdale, AZ 85251, on July 9, 2015;

(21)  1 oz. Republik Osterreich gold coin seized during the execution of a search warrant at 3807 N. 87th St. Scottsdale, AZ 85251, on July 9, 2015;

(22)  one silver coin seized during the execution of a search warrant at 3807 N. 87th St. Scottsdale, AZ 85251, on July 9, 2015;

(23)  one $25 American gold coin seized during the execution of a search warrant at 3807 N. 87th St., Scottsdale, AZ 85251, on July 9, 2015;

(24)  Rolex (Men's) seized during the execution of a search warrant at 3807 N. 8th St., Scottsdale, AZ 85251, on July 9, 2015;

(25)  Rolex (Ladies') seized during the execution of a search warrant at 3807 N. 8th St., Scottsdale, AZ 85251, on July 9, 2015;

(26)  Breitling watch (Men's) seized during the execution of a search warrant at 3824 E. Daley Ln., Phoenix, AZ 85050, on July 9, 2015;

(27)  Blue/Black Breitling watch (Men's) seized during the execution of a search warrant at 3824 E. Daley Ln., Phoenix, AZ 85050, on July 9, 2015; and

(28)  Rolex Yachtmaster II seized during the execution of a search warrant at 3824 E. Daley Ln., Phoenix, AZ 85050, on July 9, 2015;

    d.  certain firearms and ammunition, along with any related accessories, ammunition, or magazines, as follows:

(29)  Glock .45 30S SIN: XDN247;

(30)  Springfield .45 SIN: S3127243;

(31)   308 Rifle SIN: F72521;

(32)   Mossberg 12g Shotgun SIN: U709819;

(33)   FNH .45 Auto SIN: FX3U042935;

(34)   Smith & Wesson .9mm Auto SIN: DSV3763;

(35)   Ruger .357 Revolver SIN: 3819991;

(36)   Browning .22 Auto SIN: 515ZX17866;

(37)   Wooden Stock Rifle SIN: A107748;

(38)   FNH Rifle SIN: 3185NC37126;

(39)   Shotgun SIN: XCC94;

(40)   Smith & Wesson .9mm SIN: HEJ8382;

(41)   9mm Ammo seized during the execution of a search warrant at 3310 N. 50th Pl., Phoenix, AZ 85018, on July 9, 2015;

(42)   Bushmaster AR-15, SIN L462655;

(43)   Ammo & Magazine for AR-15 seized during the execution of a search warrant at 3310 N. 50th Pl., Phoenix, AZ 85018, on July 9, 2015;

(44)   Bond Arms 410 Double Barrel Derringer, SIN 8016;

(45)   Performance Center Rifle 500 SW Magnum, SIN CWF3421;

(46)   Five .50 caliber bullets seized during the execution of a search warrant at 3310 N. 50th Pl., Phoenix, AZ 85018, on July 9, 2015;

(47)   X-P-Springfield Armour .45 caliber, SIN S3131794;

(48)   Magazine and ammunition seized during the execution of a search warrant at 3310 N. 50th Pl., Phoenix, AZ 85018, on July 9, 2015;

(49)   Century Arms: C-39 Pistol 7.62, SIN 3WM002800;

(50)   Shotgun 12g, SIN H11427580;

(51)   Additional magazine and ammunition seized during the execution of a search warrant at 3310 N. 50th Pl., Phoenix, AZ 85018, on July 9, 2015;

(52)   Cal-M91/38 Russian Bayonet, SIN CE2326;

(53)   Ruger LCP .280MM, SIN 431-166863;

(54)   Mossberg Blackhead Edition Shotgun 12g, SIN U936057;

(55)   Fabrique National Herstal Belgium rifle, SIN FN051331;

(56)   .380 Glock 42, SIN AATM275;

(57)   Kel-Tec Shotgun Pump, SIN XBZ16;

(58)   Glock 26 9mm, SIN XCY379;

(59)   North American Arms .22 Magnum, SIN E256644;

(60)   Smith & Wesson .45 Cal SW1911, SIN UFT11054;

(61)   Springfield Armory XDS .45 Cal, SIN S315582; and

(62)   Kel-Tec PF-9 9mm, SIN SG823;

e.   a vehicle, as follows:

(63)   one 2014 Jaguar F-Type Coupe, VIN# SAJWA6DAOFMK15376; and

f.   certain real property, as follows:

(64)   real property located at 3310 North 50th Place, Phoenix, Arizona 85018 (Maricopa County), Parcel No: 128-18-017, bearing a legal description as follows: Lot 17, OSBORN ESTATES, according to Book 63 of Maps, Page 23, records of Maricopa County, Arizona.

6.   If any of the property described above, as a result of any act or omission

of the defendant(s):

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third party;

c.   has been placed beyond the jurisdiction of the court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be divided

without difficulty,

the United States of America will be entitled to the forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

A TRUE BILL.

_____

FOREPERSON

CARRIE COSTANTIN
Acting United States Attorney

_____
CHARLES S. BIRMINGHAM, #47134MO
Assistant United States Attorney

124